```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF TEXAS
 2                       SAN ANTONIO DIVISION

 3   UNITED STATES OF AMERICA,    )
                                  )
 4        v.                      )  Docket No. 5:19-CR-106(1)-DAE
                                  )
 5   BENJAMIN BOGARD,             )  San Antonio, Texas
                                  )  February 21, 2019
 6        Defendant.              )  2:13 p.m. to 5:09 p.m.
     _____)

 7                    TRANSCRIPT OF DETENTION HEARING
 8            BEFORE THE HONORABLE HENRY J. BEMPORAD
                   UNITED STATES MAGISTRATE JUDGE
 9
     A P P E A R A N C E S:
10
     FOR THE GOVERNMENT:
11        UNITED STATES ATTORNEY'S OFFICE
          By:  Tracy Thompson, Esquire
12        601 N.W. Loop 410, Suite 600
          San Antonio, TX  78216
13
     FOR THE DEFENDANT:
14        MORRIS & BERMUDEZ, PLLC
          By:  Michael J. Morris, Esquire
15        299 W. San Antonio Street
          New Braunfels, TX  78130
16
     COURT RECORDER:  FTR Gold
17
     TRANSCRIBER:
18        CHRIS POAGE, CRR, RMR
          United States Court Reporter
19        655 East Cesar E. Chavez Blvd., Suite G-65
          San Antonio, TX  78206
20        Telephone:  (210) 244-5036
          chris_poage@txwd.uscourts.gov
21
     Proceedings reported by electronic sound recording.  Transcript
22   produced by computer-aided transcription.

23

24

25
```

INDEX

PAGE

KRISTINA SPINDEL

Direct Examination by Ms. Thompson ......................17

Cross-Examination by Mr. Morris .........................37

Redirect Examination by Ms. Thompson ...................46

RUSSELL DORAN

Direct Examination by Ms. Thompson ......................48

Voir Dire Examination by Mr. Morris ....................49

Direct Examination (Continued) by Ms. Thompson .........50

Cross-Examination by Mr. Morris .........................63

Redirect Examination by Ms. Thompson ...................69

REX MILLER

Direct Examination by Ms. Thompson ......................72

Cross-Examination by Mr. Morris .........................76

Redirect Examination by Ms. Thompson ...................81

Recross-Examination by Mr. Morris .......................82

RUSSELL DORAN

Direct Examination by Ms. Thompson ......................84

Cross-Examination by Mr. Morris .........................88

ROBBIE BOGARD

Direct Examination by Mr. Morris .......................94

Cross-Examination by Ms. Thompson ......................104

Redirect Examination by Mr. Morris ....................108

Recross-Examination by Ms. Thompson ...................111

1     (Open court at 2:13 p.m.)

2          THE COURT:  Good afternoon.  Please be seated.

3  Kriston.

4     (At the bench off the record)

5          THE COURT:  Calling the case of SA:19-M-131.  That's

6  United States of America versus Benjamin Bogard.  If I could

7  have announcement of counsel, please.

8          MS. THOMPSON:  Good afternoon, Your Honor.  Tracy

9  Thompson appearing on behalf of the United States.

10          THE COURT:  Good afternoon.

11          MR. MORRIS:  Good afternoon, Your Honor.  Mike Morris

12  on behalf of Mr. Bogard.

13          THE COURT:  All right.  Good afternoon to you as well.

14     We had previously held the beginnings of a detention

15  hearing in this case, at which time the parties reached an

16  agreement to have -- as I remember, Mr. Bogard transferred to

17  Laurel Ridge Treatment Center where he could receive an

18  evaluation as to his psychological condition to see, in light

19  of that condition, if conditions of release could be set in the

20  case and what those conditions might be.

21     As I recall, I released Mr. Bogard to the custody of FBI

22  Agent Miller who was going to transfer him to Laurel Ridge

23  where he'd get the evaluation, and then transfer him back to

24  GEO until we could have the hearing.

25     It appears that all that has occurred, and I actually have

submitted to me by Mr. Morris a discharge summary and some
additional documents from Laurel Ridge.  Let me hear from
Mr. Morris first, and then I'll hear from the government.

    Am I capturing what -- where we are correctly, Mr. Morris?

        MR. MORRIS:  That's correct, Your Honor.  It was --
the primary concern that I heard from the Court was having a
diagnosis or at least some information regarding a diagnosis.
I think we have that now.

        THE COURT:  All right.

        MR. MORRIS:  I think that is the information the Court
was needing to be able to proceed.

        THE COURT:  All right.  As I mentioned, I received
this -- from you a discharge summary.  It's a three- --
four-page document.  Have you provided this document to the
government or any portions of it?

        MR. MORRIS:  I have.  That whole four pages you have
to the government.

        THE COURT:  Okay.  Because that was one of the issues
that we had before about how confidential the information would
be.  It could come to me or to the pretrial services office,
but only some things would be able to come to the government.

    So this is a document I'm going from, but the whole
document's with the government?

        MR. MORRIS:  That's correct.

        THE COURT:  Excellent.  Okay.

1    MS. THOMPSON:  I received it right before the hearing,

2 Your Honor.

3    THE COURT:  Me too.  Okay.  So —- Okay.  So we're all

4 on the same page.

5   Now, I had, as I mentioned, a pretrial services report

6 already in the case.  I don't remember where exactly we had

7 gotten vis-a-vis the detention hearing, whether we needed to

8 hear testimony from the agent as to the circumstances of the

9 case, proffers or testimony regarding any of the material in

10 the pretrial services report and so forth.  With regard to

11 that, let me reach out to start with the government to see

12 where they are with regard to detention in the case.

13    MS. THOMPSON:  We had not actually started the

14 detention hearing.

15    THE COURT:  All right.  I don't remember any

16 testimony, so that's kind of what I assumed.  Go ahead.

17    MS. THOMPSON:  We wanted to address his mental health

18 issues first.

19    THE COURT:  Got you.

20    MS. THOMPSON:  And it was at least assumed by me that

21 depending on whatever mental health issues he may have that

22 were then undiagnosed, that Laurel Ridge may be a treatment

23 center that could provide long-term or intensive treatment.

24    THE COURT:  Yes.  Treatment.  Uh-huh.

25    MS. THOMPSON:  And now I have learned from speaking

1  with the individuals at Laurel Ridge that they don't do that.

2  It is strictly an acute care facility for immediate --

3  individuals in immediate need of mental health treatment.

4          THE COURT:  Got you.  Okay.

5          MS. THOMPSON:  So the option of having him reside at

6  Laurel Ridge and receive mental health treatment is not an

7  option.

8          THE COURT:  All right.  Well, and that -- as I

9  understand this discharge summary, they in fact -- their

10 referral would be to outpatient treatment, is what they

11 recommended.  At least that's what I saw on the third page of

12 the document but --

13         MS. THOMPSON:  I didn't see that.  What I saw --

14         THE COURT:  Okay.  Go ahead.

15         MS. THOMPSON:  -- is that they are -- and they

16 informed the FBI -- when the FBI went to go talk to them and

17 review some of the material, they told them they are not able

18 to provide a forensic psychiatric evaluation and/or long-term

19 psychiatric treatment.  They are not able to assess the

20 defendants' future dangerousness.  That's not what they do, and

21 they wouldn't be able to do that for us.  And so they

22 discharged him back to the custody of the FBI, knowing he was

23 going to be back in a jail facility.

24         THE COURT:  All right.  Got you.  Okay.

25         MS. THOMPSON:  So I want to be careful.  I don't

think -- based on my discussions with Laurel Ridge, I don't
think their recommendation was, all he needs is outpatient
treatment and that would be fine.  I think what they -- the
conclusion they came to, as expressed to me, is, We can't do a
dangerousness assessment for you, the type that you want.  And
so he doesn't need -- he's not suicidal now.  He claims not to
be suicidal or homicidal, and, therefore, we're discharging
him.  There's nothing we can do to help him because we're an
acute care facility.

                THE COURT:  All right.  I see the argument.

        So, I mean, it sounds to me like I need to go forward then
with the hearing because there's not some agreement on what
conditions of release the government would agree to that would
address this issue of dangerousness, is what it's sounding like
to me.

                MS. THOMPSON:  Correct.  Because at this point we
still don't have a true dangerousness exam.  The government's
position is he needs to be -- he needs to remain in custody
through the pendency of this case.

                THE COURT:  Okay.

                MS. THOMPSON:  If the Court is inclined to release him
at any point, I would ask that he be given a dangerousness
assessment through the Bureau of Prisons prior to that
happening.  But at this point I don't know -- based on
everything I know, I don't think -- I would not be agreeable or

1 amenable to any conditions of release.

2       THE COURT: I see. All right. Very well. Well, then

3 that -- I think that means then we're going forward with the

4 hearing. So let me hear from the government as to what

5 evidence you'd like to present.

6    Mr. Morris, yes, you had something you wanted to add.

7       MR. MORRIS: I'm sorry. If I could just briefly

8 interject, Your Honor.

9       THE COURT: Yeah. Sure.

10       MR. MORRIS: You were asking about the prospects of

11 the guidelines around this detention hearing, and I wonder if I

12 could just bring up a couple of quick points.

13       THE COURT: All right.

14       MR. MORRIS: We can narrow down the issues

15 significantly.

16       THE COURT: Sure.

17       MR. MORRIS: If we'll look at the criminal complaint

18 filed in this case, Your Honor, the charge in this case is a

19 single charge under 18 2252(a)(5)(B). That is specifically not

20 an Adam Walsh charge. This is not an Adam Walsh case. This is

21 not a case that was triggered under Adam Walsh, even though the

22 pretrial services report reports otherwise.

23       THE COURT: All right.

24       MR. MORRIS: Because it's not an Adam Walsh case and

25 hasn't been charged as such, there's two limitations on this

1   detention hearing.  And if I may briefly bring a case to the
2   Court's attention.  This is a case with Roger -- *United States*
3   *v. Roger Ploof*, 851 F.2d 7, First Circuit 1988.  I'll provide a
4   copy to opposing counsel.

5       In this case, Your Honor, it makes it abundantly clear the
6   issue of dangerousness can only be to the charges currently
7   before the Court, not some uncharged conduct.

8       There is no charged conduct of terroristic threat.  There's
9   no charged conduct of violence against anyone.  All there is,
10  is the charged conduct of receipt of child pornography.  That
11  is the relevance and the boundaries of relevance.  And if I
12  could provide this case to Your Honor.

13      A brief review of it makes very clear, Your Honor, that
14  this is -- the limits of this case and the testimony regarding
15  this case need to be within those narrow confines, not an
16  examination of everything anybody's ever done because the
17  government wants to detain you.

18      The second issue --

19          THE COURT:  Let me just stop you there.

20          MR. MORRIS:  Yes, Your Honor.

21          THE COURT:  Hasn't the statute been amended since this
22  1888 case?

23          MR. MORRIS:  It has.

24          THE COURT:  I mean, as I understand it, I have to hold
25  a detention hearing in any case involving any felony, whether

or not it's a crime of violence, it involves a minor victim.
Once I have to hold a detention hearing, then I have to make
two determinations.  One is whether there are conditions will
set that will assure the safety of the community.  One is
whether conditions will set that will assure the appearance of
the defendant.  That's what I think I'm doing.  And I thought I
have to look at all the factors in G.  Are you saying that
those factors don't apply?

        MR. MORRIS:  I'm saying --

        THE COURT:  Because one of them is the circumstance of
the offense.

        MR. MORRIS:  And the circumstances, of course, are
there.

        THE COURT:  Okay.  All right.

        MR. MORRIS:  But it's circumstances of the offense
charged.

        THE COURT:  Okay.

        MR. MORRIS:  And that's what we're here to talk about,
is the offense charged, not some other offense that's
uncharged, unrelated, alleged -- just currently want to be
thrown out for the purposes of prejudicial information.  I
think the Court needs to be able to limit it to the specific
offense charged, that that's the relevant --

        THE COURT:  Aren't I also -- assume I agree with you
about that part, aren't I also required to consider the

1    person's character, physical, mental condition and so forth?

2              MR. MORRIS:  Oh, absolutely.

3              THE COURT:  And wouldn't this go -- I mean, I thought

4    that's one of the things we're talking about.

5              MR. MORRIS:  The mental condition, absolutely --

6              THE COURT:  All right.

7              MR. MORRIS:  And -- the medical records from Laurel

8    Ridge, all that.  But what I think you're going to hear is an

9    FBI agent getting up and wanting to tell you about all these

10   terrible videos on someone's phone and threats against other

11   people and threats against persons and people.

12             THE COURT:  Well, I'll make a relevancy determination

13   at the time --

14             MR. MORRIS:  The second --

15             THE COURT:  -- if necessary.

16             MR. MORRIS:  -- quick question for you, Your Honor.

17             THE COURT:  Yes.  Uh-huh.

18             MR. MORRIS:  There's a second case I wanted to point

19   out to the Court, *United States v. Martin-Trigona*.  This case

20   makes it abundantly clear that under the Bail Reform Act the

21   conditional requirement of psychiatric evaluation to determine

22   dangerousness is not within the scope of the federal

23   [inaudible].

24       The dangerousness scope that Ms. Thompson has mentioned is

25   part of a competency hearing, which there's been no allegation

1    of lack of competency.  There is no question, quite frankly,

2    about competency.  It is a question only -- they would like to

3    have a BOP evaluation for dangerousness.  And this case makes

4    it abundantly clear that's inappropriate.  That can't be

5    ordered by the magistrate court or the district court.

6          THE COURT:  Okay.  I think I've addressed the first

7    issue, Ms. Thompson, with regard to what evidence I can

8    consider.  I'll just -- I'll just entertain relevancy

9    objections at the appropriate time.

10    On this question of dangerousness, is there particular

11    language that you wanted to point me to in the statute?

12          MS. THOMPSON:  Well, first, I want to correct the

13    record.

14          THE COURT:  Go ahead.

15          MS. THOMPSON:  This case does fall under the Adam

16    Walsh Act.  He was charged by complaint with receiving child

17    pornography.  And that is, under 3142(f), not only a crime of

18    violence but also a crime involving a minor child.  It also

19    invokes a presumption of detention that will exist in this

20    case.  The detention factors that the Court has to consider

21    involve the nature of the offense --

22          THE COURT:  Okay.  I got to stop you, too.  I'm sorry.

23    It's 2252(a)(5), right?  That's the crime?

24          MS. THOMPSON:  No.  (a)(2).  Oh, actually, it's both.

25    It's (a) --

1          THE COURT:  It says (a)(5) on the complaint.  And so

2     I'm just going with what's on the complaint.  And (a)(5) isn't

3     listed for the presumption.  So that's why I'm asking.  I

4     don't -- I don't know that it really matters.  I'm going to

5     make the determination based on the facts that are in front of

6     me.  I just -- y'all are making me concerned that there's some

7     different rules apply that I'm getting wrong.  But that's my

8     concern.

9          MS. THOMPSON:  There aren't, Your Honor.

10          THE COURT:  That's my concern.

11          MS. THOMPSON:  There aren't any different rules.

12          THE COURT:  Okay.

13          MS. THOMPSON:  The very last paragraph of the

14     complaint affidavit includes the statute for receipt.  I

15     think --

16          THE COURT:  Oh, I see.

17          MS. THOMPSON:  -- a legal secretary in my office only

18     included one statute --

19          THE COURT:  On the front.

20          MS. THOMPSON:  -- at the beginning.

21          THE COURT:  All right.

22          MS. THOMPSON:  So that is the possession statute.

23          THE COURT:  I see.

24          MS. THOMPSON:  But the offense description is listed

25     as receipt of child pornography.  And those are the appropriate

1    penalties for receipt of child pornography.

2         The complaint affidavit clearly sets out that he knowingly

3    received and possessed child pornography.  They do fall under

4    the Adam Walsh Act.  There is a presumption of detention.  And

5    some of the factors that the Court is to consider is the nature

6    of the offense charged, which do not relate to any terrorism

7    offenses but child exploitation offenses, the weight of the

8    evidence.

9         But you also have to consider the history and

10   characteristics of the defendant in which his online persona

11   would come into place.  And also, you have to consider, most

12   importantly, the nature and seriousness of the danger to any

13   person or the community that would be posed if he were to be

14   released.  And that's really where the government is focusing,

15   because that is -- I don't know what other word to say other

16   than there is great danger that could be posed based on what we

17   know about this defendant if he were to be released.

18              THE COURT:  All right.

19              MS. THOMPSON:  And that was the case at the time of

20   his arrest.  I would submit to the Court that now knowing he's

21   charged with a child exploitation offense and is looking at a

22   maximum of 20 years imprisonment, that also provides a lot of

23   incentive to carry out the plans that he's posted online and

24   puts him back in that, I want to not be on this planet anymore.

25              THE COURT:  I was thinking more of the Adam Walsh

having to do with what conditions would be required more than
this factor as to the factors to be considered.  What is your
view on this question of -- you were saying you wanted to have
a BOP forensic analysis of this gentleman for dangerousness.
And Mr. Morris, as I understand it, said, Look, that's a
competency issue.  Usually that's determined under statutes 41
something -- 41.  Yeah.  But not so much a dangerousness issue,
unless there's some specific language in the -- in the Bail
Reform Act that I haven't -- that I certainly might have
missed.

          MS. THOMPSON:  I don't know.  And I'm not familiar
with his case, and it's out of the Second Circuit, so it
doesn't really mean anything to this Court anyway.  I think
that he misspoke when he said it's not within the scope of this
Court.  My understanding is that you don't have to order a
dangerousness assessment.  You can determine the level of
dangerousness --

          THE COURT:  All right.

          MS. THOMPSON:  -- with regard to the testimony at the
bail hearing, or at the detention hearing.  But there is that
option within the Bureau of Prisons.  They do two different
assessments.  One is competency.  The other is dangerousness.
They don't always go hand in hand.  I'm not asking for -- that
we do a dangerousness assessment now.  I'm asking that the
defendant be detained.

1          THE COURT:  All right.

2          MS. THOMPSON:  But if the Court gets to the point

3   where it believes that release is appropriate, I wanted to let

4   the Court know that that dangerousness assessment by the

5   doctors at the Bureau of Prisons, which are not paid by the

6   defendant or his family, would be available to the Court.  And

7   they actually do a forensic psychiatric evaluation that

8   addresses future dangerousness, as best they can, unlike Laurel

9   Ridge.

10          THE COURT:  All right.

11          MS. THOMPSON:  I thought Laurel Ridge was capable of

12   doing that based on the little I knew at the time of the last

13   detention hearing, but it turns out, they're not.

14          THE COURT:  All right.  Very well.

15      Well, I'll keep those things in matter -- in mind.

16   Mr. Morris, if you have objections as to the relevancy of any

17   particular testimony, same with you, Ms. Thompson, just make an

18   objection.  I'll figure it out then.

19      So let me hear from the government as to the question of

20   detention or release.

21          MS. THOMPSON:  Your Honor, I have three witnesses.

22   The first will be Special Agent Kristina Spindel.

23          THE COURT:  All right.  Agent, come forward.  My

24   courtroom deputy will swear you in.

25      (The oath was administered)

1              KRISTINA SPINDEL, GOVERNMENT'S WITNESS, SWORN

2                          DIRECT EXAMINATION

3    BY MS. THOMPSON:

4    Q.   Please state your name for the record.

5    A.   Kristina Michelle Spindel.

6    Q.   Where are you employed?

7    A.   FBI San Antonio.

8    Q.   How long have you had that employment?

9    A.   Since 2014, November.

10   Q.   What is your assignment within the FBI?

11   A.   I'm currently assigned to the Domestic Terrorism Squad on

12   the Joint Terrorism Task Force in San Antonio headquarters.

13   Q.   Are you familiar with the defendant, Benjamin Bogard?

14   A.   I am.

15   Q.   How did he come to your attention?

16   A.   So we received a lead from FBI Albany out of upstate

17   New York regarding an open investigation concerning potential

18   terroristic threats.

19   Q.   Was an anonymous tip provided to the Albany FBI Crime

20   Stoppers?

21            MR. MORRIS:  Objection, leading.

22            THE COURT:  Overruled.

23            THE WITNESS:  So FBI Albany originally got the case as

24   it was forwarded from Albany Crime Stoppers.  They received an

25   anonymous tip in early November of 2018 regarding an Instagram

1   account and possible terroristic posts from that account.

2           MS. THOMPSON:  May I approach, Your Honor?

3           THE COURT:  Yeah, you may.

4   BY MS. THOMPSON:

5   Q.  Special Agent Spindel, I'm showing you what I'll mark as

6   Government Exhibit 1, and ask that you take a look at that.  Do

7   you recognize that?

8   A.  I do.

9   Q.  Is that the information regarding the tip and the

10  investigation that the Albany Division conducted that you were

11  provided in this case?

12  A.  It is.

13  Q.  What was the original information that was provided to

14  Crime Stoppers?

15  A.  So through the database an anonymous caller reported on

16  November 5th, 2018, provided some concerning posts.  Would you

17  like me to read the narrative?

18  Q.  Yes, please.

19  A.  Okay.  So the anonymous caller posted the following:  I

20  found an account on Instagram.  He seems to be a member or

21  sympathizer of the terrorist group Atomwaffen Division.  We

22  know --

23          THE COURT:  Of what?  I'm sorry.  What was --

24          THE WITNESS:  Atomwaffen Division, A-T-O-M-W-A-F-F-E-N

25  Division.

1          THE COURT:  Okay.

2          THE WITNESS:  -- a white supremacy group.

3          THE COURT:  Stop right there because someone is

4    standing up.

5       Yes, sir.

6          MR. MORRIS:  Sorry.  This is a point where I would

7    object.  I think this has nothing to do with what's been

8    charged against Mr. Bogard.  I believe this has absolutely no

9    relevance to the charges that are currently pending in front of

10   him.  And without any kind of ability to look at what's being

11   read from, I am -- it appears that this is the agent's

12   testimony or this is something that she is testifying to.

13         THE COURT:  I will.  If she's reading from the

14   document, I was going to say, you have a right under Rule 26.2

15   to review that document.  I get the feeling that Ms. Thompson

16   may have handed you a copy of the document at this time to

17   allow you to cross-examine upon it.

18      With regard to your relevance objection, it's -- I'm going

19   to carry that objection until I hear how this is tied in.

20         MR. MORRIS:  Very good, Your Honor.

21         THE COURT:  All right.  You may proceed, Ms. Thompson.

22      I'm sorry.  Agent, you were reading from it.

23      But, Ms. Thompson, it may be better if you asked particular

24   questions, if there are some questions, from that document so

25   we can get to the key parts in case -- unless maybe all of it's

1   important.  I'll --

2         MS. THOMPSON:  I believe all of it's important, Your

3   Honor.

4         THE COURT:  I'm happy to hear it.

5         MS. THOMPSON:  It's short.

6         THE COURT:  That's fine.  Go ahead.

7         MS. THOMPSON:  But it provides --

8         THE COURT:  All right.  Very well.

9         MS. THOMPSON:  -- all information that goes to the

10  issue of dangerousness.

11        THE COURT:  All right.  Very well.

12     So you were saying an anonymous caller had said Atomwaffen

13  Division, is that was the information.

14        THE WITNESS:  That's correct.

15        THE COURT:  And that's as far as you had gotten.  Go

16  ahead.

17        THE WITNESS:  That is correct.

18  BY MS. THOMPSON:

19  Q.  What is the Atomwaffen Division roughly?

20  A.  So it's a white supremacy group.

21  Q.  What did the caller state next about the reason why they

22  called?

23  A.  So the anonymous caller was concerned that this individual

24  may be planning a bombing or other terrorist attack.

25  Q.  What did they notice a few days ago that caused them alarm?

A.   So back in November they reported that an Instagram account

had -- an individual on Instagram account HelterSkelter333.exe

posted a video.  The individual was shooting a shotgun in the

woods and screaming an anti-Semitic phrase, race war now and

praise Allah.

     Shortly thereafter, the individual stated that he or she

felt bad about dropping out of college to live in a van.  The

anonymous reporter went on to say that this

HelterSkelter333.exe never communicates with anyone that he or

she used to know, and has nothing to live for.  That same

anonymous reporter was concerned that it would only be a matter

of time before he or she snaps, and knows that it's going to

happen.

Q.   Now, in the -- I'm going to take you back to the tip that

was provided.  It said that, in the video that was posted, that

the anonymous caller saw, to the Instagram story, he was

shooting a shotgun in the woods while screaming different

things that you testified about.  Correct?

A.   That is correct.

Q.   And that the individual, the defendant on the Instagram

account, is the one that said, It's only a matter of time

before I snap, and that the defendant knows it's going to

happen.  Is that correct?

A.   That is correct.

Q.   Why don't you read the rest of the tip, starting right

1  there.

2  A.  Okay.

3          MR. MORRIS:  And if I may briefly, Your Honor, just we

4  can lodge our objection.  I understand hearsay is not

5  necessarily an objection during a detention hearing.  I would

6  just point out that this is the fourth level of hearsay just

7  added onto this anonymous tip.

8          THE COURT:  All right.  Very well.  I'll consider

9  that -- I'll consider that as -- I still haven't heard as to

10  how it's tied in.  So I understand.

11          MR. MORRIS:  Thank you, Your Honor.

12          THE COURT:  You were going to read the next part.

13          THE WITNESS:  Thank you, Your Honor.

14      HelterSkelter333.exe said that, We'll all see him one day

15  and see what he did.  The anonymous reporter then went on to

16  say that, today, that being November 5th of 2018, he posted a

17  story inquiring about where he could purchase ten kilograms of

18  potassium perchlorate.  This, combined with his previous posts,

19  leads me to believe that he is planning a terrorist attack.  I

20  have included all relevant information.  I have him in the

21  files, so essentially screenshots of those posts on Instagram.

22      The anonymous reporter said -- believed that

23  HelterSkelter333.exe lived in New York state, went on to say

24  that he or she was not 100 percent sure but thought that this

25  individual lived in New York state.

1      Went on to say, even if he did -- he lives in a van and may

2   be nomadic.  And that was the end of the narrative.

3   BY MS. THOMPSON:

4   Q.  What did the Albany Division of the FBI do with that

5   information?

6   A.  So the Albany Crime Stoppers reported that and this

7   particular narrative and report to Albany JTTF with the FBI.

8   Q.  Was an investigation done into the Instagram account of

9   HelterSkelter333?

10  A.  So based on the posts and the screenshots provided, an

11  investigation ensued from this --

12          THE COURT:  Oh, can I -- I'm sorry.  Can I interrupt

13  for one second?  I didn't -- I may have missed the screenshot

14  part.  So the report -- the anonymous report was like an email

15  report that included like pictures from the Instagram?

16          THE WITNESS:  That is correct.

17          THE COURT:  And so that's where some of that -- when

18  you said the 333 said these things --

19          THE WITNESS:  Yes.

20          THE COURT:  -- it's from those -- those screenshots?

21          THE WITNESS:  That is correct, Your Honor.

22          THE COURT:  All right.  I didn't get exactly that.  I

23  understand now.

24     Go ahead, Ms. Thompson.  I'm sorry.

25          MS. THOMPSON:  That's okay.

BY MS. THOMPSON:

Q.  Are a copy of the screenshots that were provided to the FBI
included in the packet that you have, that will be Government
Exhibit 1?

A.  They appear to be.

Q.  What else was discovered with regard to the tip that caught
the attention of the FBI?

A.  Well, certainly, the threat of possible mass violence, the
threat of potential terroristic acts and the concern over the
acquisition of explosive precursors.

Q.  Was there -- did the FBI find information in the
defendants' accounts about the defendant posting about shooting
up a school?

        MR. MORRIS:  I'm sorry, Your Honor.  I have to object.
I've heard nothing so far that ties any of what she said --

        THE COURT:  It's all subject to that relevancy
objection.  I'm waiting to hear the same thing, too.

        THE WITNESS:  So I don't -- I don't have that post in
front of me.

        MS. THOMPSON:  May I approach?

        THE COURT:  You may.

BY MS. THOMPSON:

Q.  What information did you learn that the defendant had
posted about committing acts of mass violence?

A.  So outside of the HelterSkelter333.exe profile name on

1  Instagram, there were additional profiles throughout online

2  social media, that being Instagram, that being Twitter, as well

3  as Steam, which is a online gaming website, the account on

4  Steam subscribed to by HelterSkelter333.exe also had a post

5  that was very concerning.

6      HelterSkelter333.exe on Steam posted, "Proud to say I have

7  the most hours in this game in the world.  This is one of my

8  favorite games.  It's going to be a cult classic like Bad Rats.

9  There are many subtle details in this game that you'll only

10 start to understand once you reach 100 plus hours of pure bliss

11 enjoyment.

12     "My life was quite depressing before I discovered this

13 game.  Now I no longer want to shoot up a school and kill

14 myself.  CNN was wrong about games training you to become

15 killers.  Instead, I became a lover of art.  I see countless

16 hundreds of hours of enjoyment coming ahead for everyone."

17 Q.  Did you find posts of the defendant where he talks about

18 his relationship with his parents?

19         THE COURT:  Okay.  Now, I got stop -- I got confused

20 here.  I thought we were still on this -- have we tied things

21 to the defendant?

22         MS. THOMPSON:  Oh.

23         THE COURT:  You see what I'm saying?  I thought we

24 had -- these were associated with 333.  I don't remember the

25 whole name.  I'm terrible with those sorts of names.  I don't

1    do that stuff.  But have we tied it in to -- I'm just trying to

2    connect the dots, so I could rule on Mr. Morris' objection.

3             MS. THOMPSON:  Some of these -- yes, I'll get to that.

4             THE COURT:  Okay.

5             MS. THOMPSON:  All of these were part of the original

6    tip.

7             THE COURT:  All right.  But I'm going to -- I will

8    carry -- then I'm going to carry the objection until I hear --

9    get the whole thing.  You see why I raised the concern?

10            MS. THOMPSON:  I do.

11            THE COURT:  Okay.  Go ahead.

12   BY MS. THOMPSON:

13   Q.  What did the FBI determine as far as the identity of the

14   person using HelterSkelter333.exe?

15   A.  So part of the investigative process would involve

16   determining a potential IP address from that particular user

17   account, profile name.  Generally people use profile names that

18   aren't indicative of their true identity.

19        So FBI Albany proceeded with a subpoena to Instagram for

20   the account HelterSkelter333.exe.  The subscriber email to that

21   was an email registered to a DoD Education Activity or

22   DoDEA.edu email, as well as an IP address that resolved back to

23   New Braunfels, Texas.

24   Q.  And the DoDEA.edu email address came back to who?

25   A.  So I'm going to look for the exact email address.  My --

1    Q.  The exact email address was

2    BBOG966JRJDJ2@student.DoDEA.edu.  And who was that email

3    address assigned to?

4    A.  That is correct.  Through multiple other database queries

5    and consultation with our DoD counterparts, that email address

6    resolved back to Benjamin Bogard when he attended high school

7    at Ramstein High School at Ramstein Air Force Base in Germany.

8    Q.  Was that email address also used to create the Instagram

9    account HelterSkelter333.exe?

10   A.  It was.

11   Q.  In the -- through the investigation of the Instagram

12   account were you able to find -- or was the FBI able to find

13   images depicting the defendant using that Instagram account?

14   A.  The FBI office out of Albany was.

15   Q.  Did they also investigate the Instagram account called

16   BasedSea -- S-E-A -- Remover?

17   A.  That is correct.

18   Q.  And did they find images depicting the defendant as the

19   user of that Instagram account?

20   A.  That is correct.  But for the record, BasedSeaRemover was a

21   Twitter account.

22   Q.  Thank you.

23       Was that account also used to profess white supremacy?

24   A.  It appears that there was material consistent with white

25   supremacy ideology.

1  Q.  Did the FBI find information related to and contained

2  within the HelterSkelter.exe account regarding the defendant's

3  relationship with his parents?

4  A.  I will reference that post.

5      So in regards to comments about a relationship with what we

6  believe to be Benjamin Bogard's parents, that was placed on the

7  Steam account.  There was a post that was made -- it's not

8  dated, but it was by HelterSkelter.exe.  And it stated, My

9  parents -- there was several hearts in there, with an I-N-G,

10 hate me.  Another post on HelterSkelter.exe, which was the

11 Instagram account, stated that, My parents beat me daily and

12 tell me I'm a failure.  I want to die.  And that was in quotes.

13 Q.  You testified the FBI also investigated the Twitter account

14 that's named BasedSeaRemover.  Was there -- did you find

15 evidence in that account that was troubling to the FBI as far

16 as dangerousness of the defendant?

17 A.  On July 7th of 2018 someone by the Twitter handle ACR,

18 Alpha Charlie Romeo, posted a picture of a trigger guard and

19 stated, "What are your favorite parts of guns?  I like trigger

20 groups and bolt carriers," to which BasedSeaRemover that same

21 day replied, "The part that kills 30 babies per trigger pull."

22 Q.  After the FBI received the tip information from Albany and

23 did an investigation of their own, did you speak with the

24 defendant at any time?

25 A.  We did.  Certainly, we vetted the information that was

1    forwarded from FBI Albany and kind of worked through the

2    investigative process to locate the Instagram owner of

3    HelterSkelter333.exe as well as the Twitter accounts.

4         It was determined that, through open source checks, that

5    perhaps Benjamin Bogard was residing either in San Marcos as a

6    student at Texas State University or in New Braunfels with his

7    parents.

8    Q.   Where did you find him residing when you met with him?

9    A.   We initially -- we initially arranged to interview his

10   father, Robbie Bogard, on January 23rd.  His father, Robbie

11   Bogard, is employed by the U.S. Air Force at Randolph Air Force

12   Base.  So our initial step was to go meet with Mr. Bogard, that

13   being Robbie Bogard, to ask a few basic questions and hopefully

14   determine the location of his son, Benjamin.

15   Q.   And did you do that?

16   A.   We did.

17   Q.   What information did Mr. Bogard tell you about his son?

18   A.   Mr. Bogard was very welcoming.  We spoke with Mr. Bogard

19   with just some very basic details regarding our open

20   investigation.  Mr. Bogard confirmed that Benjamin was, in

21   fact, living with them at their -- at their residence in

22   New Braunfels; that Benjamin had dropped out of school at Texas

23   State.  He was a double major in computer engineering and I

24   think mechanical engineering; that Benjamin had been living

25   with them unemployed for the past couple of months.

1    Q.  Had been living with them and unemployed?

2    A.  -- and unemployed for the past couple of months.

3    Q.  Did he indicate to you or did your investigation discover

4    when he had dropped out of Texas State?

5    A.  According to Robbie Bogard, Benjamin's father, Benjamin

6    dropped out of school in the fall of 2018 semester.

7    Q.  In fact, Agent Spindel, are you aware of a missing persons

8    report being filed with regard to Benjamin Bogard?

9    A.  Certainly, doing our due diligence to vet all the

10   information possible, we often reach out to our state and local

11   partners to identify whether any police reports are filed.

12   Sometimes, you know -- significant as it relates to possible

13   family violence or criminal arrests.

14        In doing so, we queried our liaison partners at Comal

15   County sheriff's office, to which we identified two reports

16   being made from back in October of 2018.  The first was a

17   missing persons report filed by Benjamin's father, Robbie

18   Bogard.  Their son did not return home from work, and they were

19   concerned about his safety.

20   Q.  Were you able to learn how long he was gone from his home

21   in New Braunfels before he was found?

22   A.  I don't have the report in front of me, but I believe it

23   was just a few days.

24   Q.  Do you recall from your investigation what he did during

25   those three days that he was gone?

1   A.  Robbie had indicated to us that his son had left the house

2   with their vehicle, a shared vehicle that they allowed Benjamin

3   to use, which was a Volvo station wagon; that his son

4   additionally took several passports with him and also took a

5   blank firearm, an inert firearm, that resembled a .357 handgun.

6   Q.  Are you aware now of where Benjamin Bogard went during

7   those three days that he was missing?

8   A.  We were able to determine that Benjamin, through the

9   interview with Robbie Bogard and later Benjamin, that Benjamin

10  traveled to Dallas, Texas.  Benjamin had found a large van

11  online, had been looking for vehicles consistent with that

12  particular model, and traveled to Dallas to purchase that van

13  for a thousand dollars.  Additionally, Benjamin traveled to

14  Dallas and purchased a shotgun online that he found on Armslist

15  for a hundred dollars.

16  Q.  Are you aware of anything else that he bought while on this

17  trip to Dallas?

18          MR. MORRIS:  Your Honor, I just feel the need to lodge

19  my objection regarding relevance.  We're here to talk about the

20  charge that is specifically before the Court.  This has

21  absolutely nothing to do therewith, nor does a blank opening of

22  what he bought and where and --

23          THE COURT:  All right.  Thank you.  The objection's

24  overruled in light of the evidence tying these websites and

25  Instagram accounts to Mr. Bogard, which I think has been

1  sufficiently done at this point for this -- purposes of this

2  hearing and in light of the factor that I have to consider of

3  the nature and seriousness of the danger to any person in the

4  community that would be posed by the person's release, which is

5  a factor under 3142(g)(4). I have to consider it. So I'm

6  going to consider this evidence. But I note your objection,

7  Mr. Morris.

8      You may continue.

9          MS. THOMPSON: Thank you.

10 BY MS. THOMPSON:

11 Q. Did Mr. Bogard also buy a skull mask as far as you could

12 tell during your investigation?

13 A. I can't speak to when he purchased the skull mask.

14 Q. How did those three items become of significant importance

15 to the FBI during this investigation?

16 A. Well, certainly, the images that were posted on multiple

17 Instagram accounts, so we already talked about the Steam

18 account, in addition to the Twitter accounts. Those images are

19 very relevant. They portray an image of violence, and in

20 addition to the ideology that was espoused with a weapon, you

21 know, that is always very concerning to us about public safety

22 and also the safety of the individual involved.

23 Q. When you met with Benjamin Bogard, where did that interview

24 take place?

25 A. So the follow-on interview with Benjamin Bogard happened

1    two days after we spoke with his father, Robbie Bogard, at

2    Randolph Air Force Base.  Robbie had confirmed that his son,

3    Benjamin, was residing in New Braunfels with he and his wife,

4    Caroline.  We admonished Robbie several times that it would be

5    in the best interest of the ongoing investigation that Benjamin

6    would not be made aware of our inquiries and our interest in

7    speaking with him, just due to the gravity of the situation and

8    the potential for mass violence.

9        However, we did -- my partner and I did discuss with Robbie

10   that we would be back to him, we would get back with him in the

11   next 48 hours, two days, to give any sort of follow-on guidance

12   on how we would set up an approach and interview with Benjamin.

13       When Robbie was recontacted on Friday, February 25th,

14   Robbie acknowledged to my partner, another investigator

15   involved in this, that Robbie had confronted Benjamin with our

16   concerns and with the FBI interest in mind, which really sped

17   up the process to sit down and speak with Benjamin assuming

18   that there was digital evidence possibly that could have been

19   destroyed with the notification to his son that the FBI was

20   interested in some of the online postings.

21   Q.  So did you talk to Benjamin Bogard on January 25th?

22   A.  We did.

23   Q.  What did he tell you?

24   A.  Benjamin agreed to sit down with myself and another

25   investigator working domestic terrorism matters.  After we

1    spoke with both Robbie -- his father, Benjamin's father,

2    Robbie, and his mother, it was agreed to -- by all parties that

3    Benjamin would speak to us alone.  And so when we presented the

4    online posts, the Twitter handles, the Instagram accounts,

5    Benjamin was very open with us and acknowledged that those

6    accounts were, in fact, his accounts.

7    Q.  Did he tell you he dropped out of school in early fall,

8    like September of 2018?

9    A.  I can't recall the specific date that he mentioned that he

10   had dropped out of school, but he did state that school was

11   boring to him and he was not challenged, and that he thought it

12   best to drop out and pursue a career with the United States

13   Air Force.

14   Q.  What information did he provide about the postings that

15   caught the FBI's attention about committing acts of mass

16   violence?

17   A.  Benjamin explained these particular posts.  And Benjamin

18   was provided photos of all of those posts.  And Benjamin

19   explained to us that this was all an online persona, and that

20   he had no intent to plot, plan or effect any mass violence;

21   that people were gravitated to his posts.  He received a lot of

22   likes because of these posts.  And he continued with multiple

23   accounts and multiple graphic images because it drew attention.

24   Q.  Did you talk about -- or can you describe for the Court the

25   video that Mr. Bogard admitted making and posting that involved

1    the van, the shotgun and a mask?

2    A.  So Benjamin acknowledged that he, in fact, made that

3    particular video.  And Benjamin stated that he dressed in his

4    militant attire and the half -- skeleton half mask and

5    proceeded to go deep into the woods behind his house to shoot

6    that video so that no one saw him and that no one would be

7    alarmed by, obviously, a weapon and a militant costume, if you

8    will.

9    Q.  Is it illegal to discharge a firearm within the city limits

10   of New Braunfels?

11   A.  I can't speak to that.

12   Q.  The Court hasn't seen the video.  Can you describe what the

13   video portrays?

14   A.  Essentially, violent rhetoric, the racking of a shotgun.

15   The imagery related to the mask, the skeleton mask as we know

16   best, that multiple violent white supremacists, extremists use

17   in their posts and their online forums as well.

18   Q.  Did he provide consent for the FBI to view his phone at

19   that time?

20   A.  So at the conclusion of the interview, you know, Benjamin

21   explained the posts, acknowledged that the accounts were his,

22   stated, again, that this was just an all -- an online persona;

23   that he had no intent to plot or plan any act of mass violence.

24       So when we talked to Benjamin, we talked to him about that

25   concern.  Our concern is terrorism.  And so Benjamin did

1  consent for us to search his phone for any sort of plots and

2  plans of mass violence.

3  Q.  And what did you find on the phone?

4  A.  We had -- Benjamin initially wanted the phone to be

5  searched and extracted in his presence.  We had a digital

6  forensic examiner come out to the house, and attempted to

7  extract Benjamin's phone with his consent in front of Benjamin.

8       However, multiple glitches in the programming and the

9  particular model of Benjamin's phone warranted us to ask

10  Benjamin if he would be amenable to us physically taking the

11  phone and bringing it back to FBI headquarters for further

12  analysis.  And Benjamin was amenable to that.

13  Q.  Did you find other evidence of his -- related to mass

14  violence on his phone?

15  A.  That's correct, yes.

16  Q.  The search -- is it fair to say the search of his phone did

17  not mitigate the FBI's fear that he would commit acts of mass

18  violence?

19  A.  That is correct.

20       MS. THOMPSON:  I have nothing further for this

21  witness, Your Honor.

22       THE COURT:  All right.  I had one question before

23  Mr. Morris.  But you can go ahead and come up.

24    Did the FBI find the gun, the shotgun?

25       THE WITNESS:  Your Honor, when we interviewed Benjamin

1    at his house on January 25th, both his father, Robbie, and

2    Benjamin were able to retrieve the shotgun that had been stowed

3    in their attic --

4              THE COURT:  Oh, all right.

5              THE WITNESS:  -- secured in their attic, so that we

6    could look at it, possibly get a serial number off of it.  And

7    so they were able to bring it out for our review.

8              THE COURT:  And did y'all get a serial number?

9              THE WITNESS:  It's an older model, sir, before serial

10   numbers were --

11             THE COURT:  Ah, I see.  All right.  That was my

12   question.  Thank you.

13        You may inquire, Mr. Morris.

14             MR. MORRIS:  Thank you very much, Your Honor.

15                         CROSS-EXAMINATION

16   BY MR. MORRIS:

17   Q.  Agent Spindel, the Exhibit 1 you have sitting there in

18   front of you is a number of sheets that were turned over to you

19   from Albany; is that right?  Is that what this is supposed to

20   be?

21   A.  So essentially, sir, it's the documentation that was

22   embedded in that particular reporting from FBI Albany.

23   Q.  Can you find a page that's -- in my stack it is the last

24   page.

25             THE COURT:  Do you want to approach, Mr. Morris?  You

1  can make sure that you're looking at the same page.

2          MR. MORRIS:  It looks like this.

3          THE COURT:  Sure.

4      (Discussion off the record)

5  BY MR. MORRIS:

6  Q.  Can you tell me where on this page it references

7  HelterSkelter333?

8  A.  So I -- there is no reference to HelterSkelter on here,

9  sir.  Respect was an account that was registered to the phone

10  number that Benjamin used.  Benjamin told us that this was not

11  his account.

12  Q.  But still, you're using this as something that is supposed

13  to be an indicator of what?

14  A.  Well, certainly, it's the broader scope, sir.  With all of

15  the other accounts, this was registered with the phone number

16  that Benjamin used.

17  Q.  Okay.  Any -- other than a phone number, anything else that

18  would tie that to Mr. Bogard?

19  A.  No.

20  Q.  The finding by this Albany packet occurred back in

21  November, correct?  November 5th?

22  A.  That is correct.

23  Q.  Okay.  Between November 5th and January 23rd, did this rise

24  to the level of what you considered an immediate need to find

25  out who this was and to find out if it was a threat?

1   A.  I can't speak to the immediacy of this per Albany.  But I

2   will say, again, with the multiple online profiles, online

3   accounts, again, that information as far as subpoenas go to vet

4   the IP addresses and any sort of other data that is used to

5   register those accounts, that takes time.  So Albany

6   immediately served those subpoenas.  And it wasn't until the

7   subpoena return came back that, again, the owner, if you will,

8   of the particular HelterSkelter333.exe was determined to be in

9   Texas or San Antonio's AOR.

10  Q.  Okay.

11  A.  And that case was then routed.

12  Q.  What date was that?  When did you get the case in

13  San Antonio AOR?

14  A.  I can't speak to a specific day, sir, but it was early

15  January.

16  Q.  Okay.  And then you spoke to the father, Rob Bogard,

17  January 23rd, right?

18  A.  That is correct.

19  Q.  And you had all this information about what you believed

20  were credible threats when you spoke to him, right?

21  A.  We did.

22  Q.  And then you waited two more days and spoke to Benjamin,

23  correct?

24  A.  That is correct.

25  Q.  And then when was Benjamin eventually arrested?

1  A.  Again, I can't speak to that.  I was not in the area at the

2  time.

3  Q.  Would you doubt me if I said it was eight days later?

4  A.  It was approximately a week later.

5  Q.  Okay.  So if you were concerned for the immediate threat

6  and danger of this, but you left him as a free man from

7  November 5th, at least for Albany, all the way until February

8  2nd, 3rd, right --

9  A.  Again, sir, those subpoenas took time to determine that

10  Benjamin was actually here.  We received the case in early

11  January.  Based on --

12  Q.  Fair enough.  But you went and saw him February 25th -- I

13  mean, January 25th, right?

14  A.  That is correct.  But we --

15  Q.  And based on what you knew here, didn't arrest him?

16  A.  No.  Based on -- the arrest was predicated by our Violent

17  Crimes Against Children Squad after the consent for the phone

18  was received and, of course, the forensic imaging of that phone

19  thereafter.

20  Q.  Has your department recommended that criminal charges be

21  pressed against Mr. Bogard for what you've seen from the Albany

22  information?

23  A.  I can't speak to that right now.

24  Q.  Well, who can?

25  A.  The charges that Benjamin is facing is as a result of the

1   imaging of the phone.

2   Q.  And have nothing to do with domestic terrorism charges.

3   You'll agree with me, right?

4   A.  That is correct.

5   Q.  Okay.  This online persona that he says -- have you heard

6   the term before -- have you heard in the dictionary "edgelord"?

7   A.  I have not.

8           THE COURT:  I'm sorry.  You have to say that again,

9   Mr. --

10          MR. MORRIS:  Edgelord; E-D-G-E-L-O-R-D.

11          THE COURT:  Okay.  Thank you.

12          MR. MORRIS:  May I approach very briefly?

13          THE COURT:  You may approach.

14          MS. THOMPSON:  I'm going to object, Your Honor, as to

15   relevance.

16          THE COURT:  All right.

17          MS. THOMPSON:  She hasn't even heard the term.

18          THE COURT:  Let me -- let me get the question and the

19   answer, and then I'll consider the objection, Ms. Thompson.

20       So you have -- your question was whether she'd ever heard

21   of the term?

22          MR. MORRIS:  Correct.

23   BY MR. MORRIS:

24   Q.  And now, after having read the definition there -- could

25   you read that definition for us, please?

 1          MS. THOMPSON:  Objection, irrelevant.

 2          THE COURT:  I'm going to wait to see if she can -- he

 3   can tie it together.

 4          MR. MORRIS:  Thank you.

 5          THE COURT:  But I'll consider that objection at the --

 6   once we're done with the line of questioning.

 7          THE WITNESS:  So this is "edgelord" from the

 8   urbandictionary.com.

 9          MR. MORRIS:  Yes, ma'am.

10          THE WITNESS:  And you would like me to read the

11   definition of it?

12          MR. MORRIS:  Yeah.  Just give the Court an idea of

13   what that definition is.  You don't have to read it verbatim.

14          THE WITNESS:  Okay.  Top definition:  "Edgelord, a

15   poster on an internet forum (particularly 4chan)" -- and that's

16   a 4, the number 4, C-H-A-N -- "who expresses opinions which are

17   either strongly nihilistic, (life has no meaning, or

18   referencing Tyler Durden's special snowflake speech from the

19   film *Fight Club* being probably the two main examples)

20   containing references to Hitler, Nazism, fascism or other taboo

21   topics which are deliberately intended to shock or offend

22   readers."

23   BY MR. MORRIS:

24   Q.  Okay.  And did Mr. Bogard -- may I have that back, Your

25   Honor?

1    THE COURT:  You can.

2    BY MR. MORRIS:

3    Q.  Did Mr. Bogard indicate to you that he was posting things

4    intending to shock readers to obtain approval, I think is what

5    your testimony was?

6    A.  That is correct.

7    Q.  Okay.  So this kind of --

8          THE COURT:  All right.  So I'll just say for the

9    limited purpose it was suggested -- it was offered,

10   Ms. Thompson, I'll overrule the objection.  I don't know if

11   "edgelord," the particular term, has anything to do with it,

12   but the idea of trying to shock people.  I got it.

13        Go ahead.  You may proceed, Mr. Morris.

14   BY MR. MORRIS:

15   Q.  Do you play online video games, Ms. Spindel?

16   A.  I do not.

17   Q.  Okay.  So of the quotes that you see that were attributed

18   to Mr. Bogard, do you know how many of those are quotes from

19   video games?

20   A.  I do not.

21   Q.  And he indicated that on Steam he had hundreds of hours on

22   a game online, and you thought that was a mass -- an interest

23   or a concern, correct?

24   A.  Not the hundreds of hours on the video game.  It was the

25   post thereof.

1  Q.  Okay.  Which, again, you don't know how many of those are

2  quotes, right, or memes?

3  A.  Can't speak to that.  No, sir.

4  Q.  Okay.  Ms. Spindel, when you spoke to Mr. Bogard, Rob

5  Bogard, and his wife Caroline, did you tell them -- did you ask

6  them whether or not they beat their son daily?

7  A.  We did.  We asked Benjamin as well.

8  Q.  And what was the report all the way around?

9  A.  His parents both said no, and Benjamin said no.

10 Q.  Did you see any evidence anywhere that that actually

11 occurred?

12 A.  No.

13 Q.  Okay.  Is it illegal to own a shotgun?

14 A.  As we best know, Benjamin is not a prohibited possessor of

15 a firearm.

16 Q.  Is it illegal to have a white van?

17 A.  It is not.

18 Q.  Is it illegal to go to Ohio and not tell your parents where

19 you're going for a couple of days?

20 A.  I believe his parents, in our interview with father,

21 referenced that Benjamin went to spend time with his

22 grandmother in Ohio.  It was his trip to Dallas that they were

23 unaware of.

24 Q.  Okay.  Is it illegal to go someplace and not tell your mom

25 and dad where you go?

1    A.  No.

2    Q.  Okay.  Even if you're living with them?

3    A.  No.

4    Q.  When you met with Mr. Bogard, Rob Bogard, on 25 January --

5    23 January, did you advise him he needed -- that he should get

6    an attorney or that he could get an attorney?

7    A.  We did not advise him to get an attorney.

8    Q.  Did you tell him that he could get an attorney for his son?

9    A.  We spoke nothing about attorneys.  We talked to him about

10   our interest in identifying the location of Benjamin.  And

11   Mr. Bogard, that being Robbie Bogard, advised us that he has

12   taught his son over the years to lawyer up.  If law enforcement

13   comes to speak with you, that chances are -- because of the

14   training that Benjamin received from his father, Robbie, that

15   chances were that Benjamin was going to lawyer up.  That was

16   the extent of lawyer talk in regards to his father's interview.

17   Q.  But because you had mom and dad's cooperation on 25

18   January, he didn't lawyer up, right?  And actually surrendered

19   the phone to you to examine?

20   A.  He did.  He gave consent to search his phone.

21   Q.  In the video is there anyone getting hurt with the video

22   you're talking about, where he's got a gun and a skull mask and

23   a van?

24   A.  There is not.

25   Q.  Do you know if that video was ever sent out to anyone?

1    A.  I can't speak to that.  I do not know.

2    Q.  On the phone, where the videos are, do you know which of

3    those videos were actually ever sent out or were just made for

4    his own entertainment?

5    A.  We do know that the video that was taken in the woods was

6    obviously posted and the anonymous reporter from, you know,

7    Albany Crime Stoppers had purview over that.  So that

8    particular video was posted.

9    Q.  And that's the one where he's got the shotgun, racks the

10   shotgun in the woods --

11   A.  Correct.

12   Q.  -- and was wearing the skull mask on the bottom, right?

13   A.  Correct.

14        MR. MORRIS:  I'll pass the witness, Your Honor.

15        THE COURT:  All right.  Ms. Thompson, anything further

16   for Agent Spindel?

17        MS. THOMPSON:  Yes, Your Honor.

18        THE COURT:  Okay.

19                   REDIRECT EXAMINATION

20   BY MS. THOMPSON:

21   Q.  Just two points of clarification.  Agent Spindel, you

22   testified that the Helter -- the Instagram account

23   HelterSkelter333.exe was able to be tied to Benjamin Bogard

24   specifically, correct?

25   A.  Through the DoDEA.edu email as well as the IP address

1  resolving back to New Braunfels, Texas.

2  Q.  And the email address was specifically assigned only to

3  Benjamin Bogard?

4  A.  That is correct.

5  Q.  Are you familiar with the screen name

6  ProphetOfExtinction333?

7  A.  I am not.

8  Q.  The video that you testified about most recently, that was

9  part of the tip to Crime Stoppers in Albany, was when --

10  involved Benjamin Bogard out behind his house firing a shotgun,

11  correct?

12  A.  That is correct.

13  Q.  Is there wording associated with that video that he posted

14  online?

15  A.  I can't recall the specific wording.

16  Q.  Does "Gas the kikes," "race war now," "praise Allah" sound

17  familiar?

18  A.  It does.

19          MS. THOMPSON:  Thank you.  Nothing further.

20          THE COURT:  Anything, Mr. Morris?

21          MR. MORRIS:  Nothing further.

22          THE COURT:  Thank you, ma'am, for your testimony.  You

23  may be excused from the witness stand.

24      Ms. Thompson, you indicated you had additional [inaudible].

25          MS. THOMPSON:  Yes.  Government calls Special Agent

1   Russell Alex Doran.

2           THE COURT:  All right.  Special Agent, come forward.

3   My courtroom deputy will swear you in.

4       (The oath was administered)

5           RUSSELL DORAN, GOVERNMENT'S WITNESS, SWORN

6                   DIRECT EXAMINATION

7   BY MS. THOMPSON:

8   Q.  Please state your name for the record.

9   A.  It's Russell Alexander Doran.

10  Q.  Where are you employed?

11  A.  San Antonio FBI.

12  Q.  How long have you been employed there?

13  A.  In San Antonio, for just over three years, three and a half

14  years.  And within the FBI, nine and a half years.

15  Q.  Where were you assigned prior to San Antonio?

16  A.  Anchorage, Alaska.

17  Q.  What's your assignment within the FBI San Antonio Division?

18  A.  San Antonio, same as my entire FBI career, working

19  counterterrorism matters, both international and domestic

20  terrorism.

21  Q.  Were you involved in the investigation of Benjamin Bogard?

22  A.  I was.

23  Q.  What was your role in the investigation?

24  A.  I was aware of it initially when it came in, just as a

25  peripheral.  But I became more specifically involved after the

1   phone was obtained through consent and it was imaged and we

2   began to review the contents of that phone specifically for

3   items that concerned us from a terrorism threat standpoint.

4   Q.  Were you aware --

5            THE COURT:  One second.

6        Did you say -- want to say something --

7            MR. MORRIS:  Yeah.  Can I have just -- for ten

8   seconds, can I take him quickly on voir dire and find out the

9   relevance of what he's going to testify so I can just make an

10  objection to his entire testimony?

11           THE COURT:  Sure.

12           MR. MORRIS:  Thank you.  Just two quick questions.

13           THE COURT:  Sure.  No problem.  Go ahead.

14                    VOIR DIRE EXAMINATION

15  BY MR. MORRIS:

16  Q.  Agent Doran, do you know anything about the -- were you the

17  investigator for the child pornography portion of this case?

18  A.  No.

19  Q.  Do you have any information about the child pornography

20  portion of this case?

21  A.  Yes.  I was one of the ones that initially saw the child

22  pornography as we were reviewing the phone for other items, in

23  which case we referred it to the squad that specifically

24  handles child pornography.

25  Q.  And that's -- that's Agent Miller's squad, correct?

1    A.  Correct.

2    Q.  Okay.  And so the ambit -- the ambit of your knowledge is

3    the terrorism and counterterrorism portion, correct?

4    A.  Correct.

5              MR. MORRIS:  Your Honor, we would object --

6         Thank you very much.

7         We would object, Your Honor, that this is duplicative,

8    number one, but, number two, has absolutely nothing to do with

9    this-- what you've already heard under the -- considered --

10             THE COURT:  For the reasons previously stated, the

11   objection's overruled.  However, Mr. Morris, if there's

12   something that goes particularly far afield and you have a

13   specific relevancy objection, I'll be happy to consider it at

14   the appropriate time.

15             MR. MORRIS:  Thank you.

16             THE COURT:  You may proceed, Ms. Thompson.

17             MS. THOMPSON:  Thank you.

18                  DIRECT EXAMINATION (CONTINUED)

19   BY MS. THOMPSON:

20   Q.  Agent, are you aware that there were some issues in

21   processing the defendant's cellular phone?

22   A.  I knew it was -- from what I was told, it was a different

23   phone than what they normally deal with.  And so not all of it

24   could be easily extracted onto our -- through the software that

25   we -- I say "we" -- the FBI typically uses to download.

1   Q.  Would you agree that the forensic analysis of the phone

2   took a lot longer than it normally would with a --

3   A.  Yes.

4   Q.  -- more common phone?

5   A.  Yes.  A lot of it had to be done by hand.

6   Q.  You mentioned you were involved or aware that child

7   pornography had been found on the defendant's phone.  How did

8   that come about?

9   A.  Myself and another intelligence analyst on the [inaudible]

10  was reviewing the phone and the material from the phone and

11  came across a video that -- the intel analyst initially saw it.

12  She showed myself and then referred it to the VCAC squad.  But

13  we reviewed the phone and, like I said, saw the video that

14  appeared to show a minor child.  Again, we're not experts.  So

15  we passed that video, as well as kind of the general

16  information of the case, down to them so they could also start

17  reviewing for any additional items of child pornography.

18  Q.  Did the video that you viewed depict the anal penetration

19  of a very young, prepubescent child?

20  A.  Yes.

21  Q.  Are you aware, through the investigation -- you've

22  continued to be involved in this investigation; is that

23  correct?

24  A.  Yes.

25  Q.  Are you aware that other images depicting child pornography

1  have been located on that phone?

2  A.  I'm aware of that, yes.

3  Q.  In fact, are you familiar with most of the material that

4  was located on the defendant's phone?

5  A.  Yes.

6  Q.  There is a video -- and I know we have copies of it here in

7  case the Court wants to view any of the information that's on

8  the phone.  But there is a video in which -- are you familiar

9  with the video in which the defendant talks about buying a van

10 and a shotgun and a mask?

11 A.  Yes.

12 Q.  Can you describe that for the Court, the context and what

13 happens in the video, if you can?

14 A.  There's a video we found.  It was posted -- we found it

15 through the Snapchat app.  It wasn't -- so it was -- we believe

16 in the cloud -- the Snapchat cloud, but it was in the app.  And

17 it references -- again, it's the -- Mr. Benjamin Bogard wearing

18 a skull mask, standing in front of his van, holding a shotgun.

19     And he says, I'm paraphrasing, how to be homeless.  First

20 thing you have to do, buy a van.  Second thing you have to do,

21 buy a shotgun.  Third thing you have to do, get a skull mask.

22 Hell yeah.

23     Next step, drive around looking for -- and then he rattles

24 off a list of minorities, derogatory terms, you know.  And then

25 says, You drive around town looking for them, point the shotgun

1    at them, pull the trigger.  The only right they deserve is the

2    right to lead, which is obviously a very concerning video from

3    our standpoint when we found it.

4    Q.  And it depicts the defendant?  You could identify the

5    defendant in the video?

6    A.  It's clearly him.  It's consistent with all the other

7    videos that we found on the phone that also were described

8    earlier by Agent Spindel.

9    Q.  And he actually bought the van that's depicted in the

10   video?

11   A.  He bought it in -- yes, in Dallas.  He admitted to that.

12   Q.  And the shotgun that he uses and discharges in the video?

13   A.  In that video -- in that specific video he doesn't

14   discharge it.  I believe he racks it or maybe points it, but he

15   doesn't discharge it.  It looks like he's inside of a garage

16   somewhere, based on where the video was filmed.

17   Q.  And was that shotgun located at the house where he was

18   living with his parents?

19   A.  Yes.  It was the same shotgun that was there when they --

20   when they interviewed him.

21   Q.  Do you know if other weapons were located at that

22   residence?

23   A.  The only other weapon that we know of that they, I believe,

24   saw when they were there was the -- what looked like a .357

25   magnum.  We never saw or examined it.  It was explained to us

1   that it was a German starter pistol.  It was inert.  It

2   couldn't fire rounds.  But we never examined it, and we are not

3   aware -- we didn't search the house.  We're unaware of any

4   other weapons.

5   Q.  You went there and spoke with the individuals at the house,

6   but a search was not conducted?

7   A.  When I was there, I was there to effect the arrest of

8   Mr. Benjamin Bogard.

9   Q.  Are you aware of whether the FBI's ever searched that house

10  for weapons?

11  A.  We have not.

12  Q.  In the review of the defendant's phone did you find a

13  search history or any search terms that caught your attention?

14  A.  We had a list of Google browser searches and the specific

15  search terms that he used, yes.

16  Q.  Do you recall what any of them included?

17  A.  Again, from our standpoint, looking for things that were

18  concerning or indicated potential act of violence, there were

19  searches that referenced buildings to bomb.  There were

20  searches -- multiple searches for Dylann Roof, which --

21  Q.  Who is Dylann Roof?

22  A.  Dylann Roof was the individual with white supremacy

23  extremist ideology who shot up the church in Charleston,

24  South Carolina, killing eight, I believe.

25  Q.  Were there also images that you believe depict Dylann Roof

1  on the defendant's phone?

2  A.  We believe they were, yes.

3  Q.  What other searches did you find that caught your

4  attention?

5  A.  There were search -- multiple searches on how to build a

6  gun, like how to make -- or how to get a 3D printer to build a

7  gun, I would say upwards of 20 to 25 searches on buying guns.

8  I know there were some other search terms.  I can't remember

9  off the top of my head.  I have my notes for the Google browser

10 history.

11 Q.  Are you familiar with the screen name

12 ProphetOfExtinction333?

13 A.  Yes.

14 Q.  What is that?

15 A.  That was one of the screen names he used.  I believe it was

16 specifically used for at least one of his Telegram accounts.

17 Q.  Are you familiar with the chat, "I'm thinking about getting

18 a loan, buying a new rifle, ammo, gear and going HAM on the

19 state capitol building"?

20 A.  Yes.

21 Q.  When was that posted, if you recall?

22 A.  December 29th of 2018.

23 Q.  And that was posted by the defendant, using

24 ProphetOfExtinction?

25 A.  It was inside of a chat with himself and another individual

1   which we haven't identified.

2   Q.  In your investigation did you learn when Mr. Bogard dropped

3   out of Texas State University?

4   A.  The night of the -- the only information I have on that is

5   the night of the arrest, when Mr. Miller and I interviewed

6   Benjamin, he indicated it was, I want to say, late September,

7   early October, early fall.

8   Q.  And then are you familiar with the missing person report

9   that was filed October 8th?

10  A.  Yes.  I'm familiar with that.  I've read it.

11  Q.  In your review of the videos, a lot of the videos that were

12  found on his phone, did you find videos of the defendant

13  discharging the shotgun, that he purchased in Dallas, behind

14  his house the first week of November of 2018?

15  A.  Yes.  So in addition to the video we believe that was

16  referenced in the report, we found numerous videos that were

17  actually on his phone that he had made himself.  The specific

18  one referenced "gas the kikes," "race war now."

19      There's another one where he's -- the very next video, he's

20  firing a shotgun in the woods.  And I believe it's "glory to

21  Allah," again, firing the shotgun aggressively three or four

22  rounds at a time.  Probably half a dozen of those videos that

23  he had made himself.

24  Q.  What else did you find on the defendant's phone that caused

25  you concern during this investigation?

1    A.   I would say it was the sheer volume of mass killings and

2    violence, in addition to the videos made by Benjamin himself,

3    other videos or images that he had obviously obtained or

4    downloaded, videos of beheadings, videos of hangings, videos of

5    people driving around what looked like the Middle East

6    somewhere, just killing people with an AK-47, videos that were

7    white supremacist ideology in nature, videos that were Islamic

8    extremist ideology in nature.  From a violence standpoint, that

9    was concerning to us.

10   Q.   Did you find a video in which he -- the defendant is

11   pictured burning the Constitution of the United States?

12   A.   Yes.

13   Q.   Could you tell where that video was taken?

14   A.   We couldn't tell.  Based on the background, it appeared to

15   be a house that was in the process of being constructed.  When

16   we met with and -- or when we arrested and interviewed

17   Benjamin, it was -- he was in a neighborhood that is being

18   developed.  So we surmised that it very well could have been

19   made in one of the houses in that neighborhood.  But we'd be

20   guessing.

21   Q.   Did you review a video in which he talks about driving

22   around or searching his neighborhood looking for specific

23   minorities?

24   A.   There was a specific video that he racks a shotgun and

25   says -- quote it but -- I mean, do you want to quote it?

1  Q.  Please.  I'm sorry.

2  A.  "Is that a nigger in my neighborhood?"

3  Q.  Does he say what he would do?

4  A.  He just racks his shotgun as he -- as he -- it's a video of

5  himself racking the shotgun and presumably pointing it at

6  somebody as he said that quote.

7  Q.  In addition to the child pornography that was found, did

8  you find anime pornography?

9  A.  There were all sorts of pornographic images, from

10 extreme -- yeah, just a lot of extreme pornographic images and

11 videos.

12 Q.  Did you also find images on the defendant's phone of him

13 dressed as a female?

14 A.  Yes.

15 Q.  In some of them is he wearing a wig?

16 A.  Yes.

17 Q.  In some of them is he -- I don't know what it's called --

18 saluting to --

19 A.  He has -- in some of those images he's wearing a gas mask.

20 He's pointing the gun.  There are -- I don't know.  I'd have to

21 guess -- 30, 40 images related to him dressed up in a woman's

22 outfit, different variations thereof, some like with

23 violent-type content to go along with it.

24 Q.  Are there some where he is giving what is commonly known as

25 a white supremacy salute?

1   A.   It's, yeah, the heil Hitler salute.

2   Q.   Why were those disturbing during -- to you and other

3   investigators during the investigation?

4   A.   I would say those were -- it goes -- it speak to -- it

5   was -- we were trying to get an idea of what his mental health

6   or mental capacity was.  And the -- it showed that -- from our

7   standpoint, that -- with the violence and, you know, unstable

8   mindset that -- you know, that's typically the people we see

9   that mobilize to violence.

10      And so from our -- you know, the history of what we've

11  dealt with, we kind of took it all into account.  And that's

12  when -- once we knew we had child pornography on the phone that

13  had a potential charge, we felt like we needed to arrest him as

14  soon as possible.

15  Q.   Are you aware of the ages or approximate ages of the

16  individuals that have been involved or committed acts of mass

17  violence like at the Charleston church in South Carolina, in

18  Florida, Sandy Hook Elementary, those acts of mass violence?

19          MR. MORRIS:  Objection, Your Honor.  It has nothing to

20  do with this.

21          THE COURT:  Yeah.  I'll sustain.  I have general

22  knowledge of that.  That's a little far afield.

23  BY MS. THOMPSON:

24  Q.   You mentioned that there were videos found on the

25  defendant's phone.  I think they were referred to as depicting

1   graphic violence or having shock value.  Do you know what I'm

2   talking about?

3   A.  The videos he made or the videos that were just on his

4   phone?

5   Q.  Other videos that were just on his phone.

6   A.  Yeah.  There were -- I don't remember what the exact number

7   was -- over 500 and some videos, some -- I would say a good

8   portion of those were related to violence and violent images.

9   Q.  Are you aware of the studies that show that the more you

10  look at violent images, the more that normalizes that type of

11  behavior?

12          MR. MORRIS:  Objection, Your Honor, again, not

13  relevant to the --

14          THE COURT:  That's overruled.  I'll allow him to

15  answer if he knows.  And I will consider, for the limited

16  purposes of this hearing, FBI agents the experts in this field,

17  subject, of course, to any cross-examination, Mr. Morris, you

18  want to make.

19      But you can answer the question, sir.

20          THE WITNESS:  Well, along those lines, I am not a

21  behavioral analysis expert, but my experience working terrorism

22  and matters of mass violence, yes, those -- we have -- we have

23  seen a history of that on the -- after they have committed

24  those acts of mass violence, that they did partake of that type

25  of stuff.

1          MS. THOMPSON:  May I approach, Your Honor?

2          THE COURT:  You may.

3    BY MS. THOMPSON:

4    Q.  Special Agent Doran, I'm showing you what I'll mark for

5    identification as Government Exhibit 2 and ask that you look at

6    those.  Do you recognize those?

7    A.  Yes.  These were images that were found on Benjamin's

8    phone.

9    Q.  I'm sorry.  They're pictures of --

10   A.  No.  I'm sorry.  They're pictures that were found on

11   Benjamin's phone.  One is of the shotgun that we've seen him

12   shooting in the other videos and that he admitted to having.

13   The other images are of another what we call a long gun.

14         MS. THOMPSON:  May I approach again, Your Honor?

15         THE COURT:  You may.

16   BY MS. THOMPSON:

17   Q.  I'm going to show you three more images and ask if you

18   recognize those.

19   A.  Yes.  These are -- these are images of the van that

20   Benjamin bought and retrofitted.

21   Q.  Does the comforter located in the van that he bought and

22   retrofitted match the comforter that is portrayed under the

23   various firearms in Exhibit 2?

24   A.  Yes.  This gun is laying on top of a comforter that matches

25   Benjamin's, as well as the shotgun that looks like the gun that

1   we have.  That's actually not the shotgun.

2   Q.  That's yet a fourth firearm?

3   A.  Yes.  Yes.  I'm sorry.  Obviously that's not the shotgun.

4   Q.  And the images --

5   A.  But these are all -- these two images are on the same --

6   what appear to be the same comforter as what's inside

7   Benjamin's van.

8   Q.  And what did -- when you say he retrofitted the van, what

9   does that mean?  What did he do with it?

10  A.  Well, based on the images and based on the interview with

11  Benjamin, he indicated that he was turning his van into a

12  camper so that he could live out of it.  And so it's got a

13  stove.  And he basically turned the back into his own little

14  living space, kind of like a small apartment or camper.

15          MS. THOMPSON:  Thank you, Agent.

16      I have nothing further at this time.

17          THE COURT:  All right.  I have one question, Agent.

18  Then Mr. Morris can -- I always do.  I'm sorry.  I always have

19  one question.

20      When you say Mr. Bogard made these videos -- I think I've

21  maybe taken one selfie in my whole life -- does this mean he

22  did the video himself, or was there -- is it possible -- was

23  there someone else involved making these things?

24          THE WITNESS:  It looks like the phone or --

25          THE COURT:  Maybe it's on a stand or something?

1          THE WITNESS:  -- whatever was set up.  And so this is

2    leaned up against a tree or something else, maybe a chair that

3    he had taken out there.  We can't -- it does not appear that

4    there's somebody else.

5          THE COURT:  That's what I was wondering.

6          THE WITNESS:  Obviously, our --

7          THE COURT:  You didn't see anything that showed

8    somebody else was involved --

9          THE WITNESS:  No.

10         THE COURT:  All right.

11         THE WITNESS:  Obviously, our concern, we have not seen

12   any indication of somebody else.

13         THE COURT:  All right.  Very well.  Thank you.  That

14   was my only question.

15      Go ahead, Mr. Morris.

16         MR. MORRIS:  Thank you, Your Honor.

17                        CROSS-EXAMINATION

18   BY MR. MORRIS:

19   Q.  Mr. Doran, of all the videos you were seeing on the phone,

20   let's just talk about the category of the ones that were --

21   looked like they were produced by Mr. Bogard.

22   A.  Yes, sir.

23   Q.  In any of those videos is there any actual violence that

24   occurs in those videos?

25   A.  Actual -- does he actually kill anybody or shoot anybody?

1  No, sir.

2  Q.  Does he shoot a rabbit?  Did he shoot at anything that's

3  moving?  Does he shoot --

4  A.  No.

5  Q.  Does he tear something apart?

6  A.  Not that we can see.

7  Q.  Okay.  Other than this one video that may have been sent to

8  somebody in Albany showing him with the shotgun, the van and

9  the mask, do you have any indication from that phone that those

10  videos were ever shared with anybody?

11  A.  Well, the one video was within Snapchat.  So my

12  understanding is if it's -- and excuse me.  I'm not a Snapchat

13  expert.  But once it's there, he was -- he would have been

14  sending out or showing that to whoever had access to his

15  Snapchat account.

16  Q.  Okay.  But do you know the difference between the Snapchat

17  app and the Snapchat cloud?

18  A.  Yes.

19  Q.  Okay.  It wasn't in the cloud, right?  It was in the app?

20  A.  Well, for it to be -- for it to be on the phone, for us to

21  have it, my understanding that means it would be in the cloud.

22  But, again, I'm not -- I'm not going to speak to that.  I'm not

23  a computer person.

24  Q.  Okay.  But you're sitting here telling the Court that you

25  think it had to be in the cloud in order to be on the app,

1    right?  But you have no idea?

2    A.  It was -- we saw it.  It was -- it was within the app on

3    the phone.  I am not going to tell you whether or not it was in

4    the cloud or on the app.  I don't know.  I'm not a cyber --

5    Q.  Or whether it was distributed to anybody?

6    A.  I'm sorry?

7    Q.  Or whether it was distributed to anybody?

8    A.  I just know it was in Snapchat, yes.

9    Q.  Okay.  Do you know that Snapchat's also a place where you

10   can store your photos and store your videos and store things?

11   A.  Again, I don't have any idea about what you can do inside

12   Snapchat.

13   Q.  Okay.  One of the weapons that we're talking about in this

14   is a starter pistol, right?  Did you say a .357 you thought it

15   looked like?

16   A.  It reveal -- or resembled a .357.

17   Q.  Okay.  It's a cap gun, right?  It makes a loud noise,

18   right?

19   A.  We have not -- we have not reviewed the gun.  If that's

20   what they say it is, then we'll have to take them at their

21   word.

22   Q.  In one of these videos Mr. Bogard says "praise to Allah."

23   Do you know if Mr. Bogard is Muslim?

24   A.  He indicated he was not religious.

25   Q.  Okay.  So in another video you say there's things where

1  he's spouting white supremacy or using their symbols.  Do you

2  know if he has any ties to any white supremacy groups?

3  A.  Specifically -- the anonymous tipster referenced Atomwaffen

4  Division.  That would be the only group that we have any

5  specific ties to.

6  Q.  Okay.  And do you have any ties between Mr. Bogard and the

7  Atomwaffen Division besides some anonymous person in New York

8  who thinks --

9  A.  Not specifically that I have seen from my part of the

10 investigation.  No, sir.

11 Q.  So these videos that he makes are a small number, right?

12 But then there's, I think you said, lots and lots of videos of

13 violence or gore or pornography, right?

14 A.  Yes.

15 Q.  Okay.  But this number of videos that Benjamin makes is a

16 dozen?  Two dozen?

17 A.  That sounds about right.

18 Q.  Okay.  Do you know where these gore videos are traded on

19 the internet?

20 A.  Through these various chat rooms.  He indicated to us he

21 was doing a lot of it through Instagram.

22 Q.  And why?  Why are they traded?  Do you know?

23 A.  I don't want to guess what somebody is trading videos for.

24 Q.  Okay.  So you have no idea what the motivation is among

25 people who trade videos of gore or any of these videos that you

1  consider violent videos?

2  A.  I know from my experience working terrorism matters that

3  terrorist groups will use those as recruitment tools.  He had

4  an ISIS recruitment video on his phone as well.

5  Q.  Okay.  Do you know if he ever indicated to you he was

6  interested in joining ISIS?

7  A.  He did not.

8  Q.  Okay.  Do you have any evidence that he joined any white

9  supremacy groups, any hate groups, any domestic terrorist

10 groups?

11 A.  Not specific groups other than the individuals that he was

12 associated with on his chats.  I would say that was a group.

13 He indicated he was involved with group chats, upwards of 25 to

14 30 people in some groups that were sharing these various images

15 and videos.

16 Q.  And you know who those other 25 to 30 people are, and you

17 know that they are white supremacists or --

18 A.  No.

19 Q.  When you drove to Benjamin's neighborhood, describe for the

20 Court what that neighborhood looks like.  I think you said it

21 was under construction.  Are the houses close together?  Are

22 they far apart?

23 A.  They're far apart.  They're, if I had to guess, acrish

24 lots.

25 Q.  Okay.

1    A.  Fairly nice subdivision, gated subdivision in

2    New Braunfels.

3    Q.  No schools in the neighborhood where he lives?  No day

4    cares that you observed?  Did you see any schools or daycares?

5    A.  It was -- it was 8:00 at night.  It was dark, no lighting.

6    I mean, I don't know what's in that neighborhood.

7    Q.  Okay.  You didn't see any, right?

8    A.  I did not see any schools.

9    Q.  Okay.  Did you find any -- you also -- on the day when he

10   was at home on 25 January, you took his desktop computer and

11   his laptop computer and his phone, right?

12   A.  I'm sorry.  On the 25th?

13   Q.  Yes.

14   A.  No.  We took -- on the 25th his phone was provided through

15   consent.  On the 1st, when we arrested him, is when we obtained

16   the other computers.

17   Q.  Got you.

18       Have you analyzed and looked through the computer and the

19   laptop?

20   A.  We started that process.

21   Q.  Found any violent videos there?

22   A.  No additional -- nothing that is additionally concerning.

23   Q.  Same videos that were in the phone are on the laptop,

24   you're telling the Court?

25   A.  Well, I haven't seen those -- we have -- I have not had a

1  chance to fully review the computer —— either the computer or

2  the other system we took.

3  Q.  So as you sit here testifying today, you don't know if

4  there's any violent videos on the laptop or on the desktop?

5  A.  Not that —— not that I have personally seen.

6          MR. MORRIS:  Pass the witness, Your Honor.

7          THE COURT:  All right.  Anything further,

8  Ms. Thompson?

9                    REDIRECT EXAMINATION

10  BY MS. THOMPSON:

11  Q.  Special Agent, the firearms that you testified about, the

12  German pistol that looks like a .357 revolver and the shotgun,

13  where are those weapons now as far as you know?

14  A.  All the weapons are still at his residence, with his

15  parents, as far as we know.

16  Q.  You were asked about what the other individuals

17  associated —— or chatting with the defendant in these group

18  chats.  And you were asked if you know whether they are

19  associated with white supremacy.  I think your answer was no.

20  Is that no, you don't know, or no, they're not connected to

21  white supremacy?

22  A.  We don't —— we don't know.  We actually have a search

23  warrant [inaudible] that we have not received results on yet.

24  Q.  Is it fair to say you don't know who all those individuals

25  are?

1    A.  We have not identified hardly any of the other individuals.

2    Q.  You testified that you don't know what the defendant is

3    shooting at in the videos where he's shooting.  You don't --

4    A.  Correct.  We only see him firing.  We have no idea what's

5    on the other end.

6    Q.  What -- do you see a theme as to what he -- what does he

7    talk about shooting in those videos?

8    A.  Minorities, women, all sorts of minority groups,

9    religious -- I mean, Jews.

10   Q.  When the defendant left his home on October 8th of 2018,

11   and his parents filed a missing person report, did they also

12   hire a private investigator?

13   A.  Yes.

14   Q.  Is that who was able to determine that the defendant

15   purchased the white van on October 8th?

16   A.  I believe it was.  I'd have to go back and read -- the

17   police reports is how I got most of that information.

18   Q.  Are you aware of whether or not the defendant's father even

19   knew at that time that his son was no longer attending Texas

20   State University?

21   A.  We're not aware when his -- no.  I'm not specifically aware

22   when his father learned.

23        MS. THOMPSON:  Thank you.  Nothing further.  Oh, I do

24   want to offer Exhibits 1 and 2.

25        THE COURT:  Okay.

1          MR. MORRIS:  I haven't seen them, Your Honor.

2          MS. THOMPSON:  I gave you a copy of Exhibit 1.

3          MR. MORRIS:  Yeah.  But where's 2?

4          THE COURT:  Okay.  Why don't you show them to defense

5   counsel, see if there's any objection.

6          MR. MORRIS:  For purposes of this hearing, Your Honor,

7   no objection.

8          THE COURT:  All right.  Very well.  They'll be

9   admitted.

10      (Government's Exhibit Nos. 1 and 2 admitted)

11          THE COURT:  Anything further from this witness?

12          MS. THOMPSON:  No, Your Honor.

13          THE COURT:  Anything further from this witness,

14  Mr. Morris?

15          MR. MORRIS:  Nothing further, Your Honor.

16          THE COURT:  Thank you, sir, for your testimony.  You

17  may be excused from the witness stand.  If you'll hand those

18  exhibits up to the courtroom deputy.  Otherwise, they may get

19  lost.  Thank you.

20      And you have another witness, Ms. Thompson?

21          MS. THOMPSON:  Yes, Your Honor.  Government calls

22  Special Agent Rex Miller.

23          THE COURT:  All right.  Very well.  Agent Miller, come

24  forward.  The courtroom deputy will swear you in.

25      (The oath was administered)

1           REX MILLER, GOVERNMENT'S WITNESS, SWORN

2               DIRECT EXAMINATION

3  BY MS. THOMPSON:

4  Q.  Please state your name for the record.

5  A.  Yes.  My name is Special Agent Rex Miller.

6  Q.  Where are you employed?

7  A.  I'm employed with the Federal Bureau of Investigation here

8  in San Antonio.

9  Q.  How long have you had that employment?

10  A.  For 15 years, little over.

11  Q.  What's your assignment within the FBI?

12  A.  For that time I've been assigned to the Violent Crimes

13  Against Children.

14  Q.  What are your duties and responsibilities in that unit?

15  A.  My primary responsibility is to investigate crimes related

16  to children via the internet.

17  Q.  When were you contacted regarding the investigation of

18  Benjamin Bogard?

19  A.  On, I believe, the 29th of January I was informed that they

20  had taken a phone from Mr. Bogard.  And during that process,

21  they had found what they believed a video associated with child

22  pornography, and they asked if our squad could take a look at

23  that video to confirm that.  And I did that.

24  Q.  Did you also obtain a search warrant to search the contents

25  of that phone specifically for child pornography?

1   A.   Yes, ma'am.  At that point I contacted -- after looking at
2   the video, I did confirm it was a minor prepubescent child, an
3   18-second video, that was being anally raped.  I contacted you
4   to obtain a search warrant for the phone at that point.
5   Q.   During the forensic examination of the search of the phone,
6   did you also find additional images depicting child
7   pornography?
8   A.   Yes, ma'am, I did.
9   Q.   Were you able during the investigation to talk to the
10  defendant about child pornography?
11  A.   Yes, ma'am.  When he was arrested on the 1st of February,
12  we asked if he'd be willing to speak with the FBI, and that he
13  waived his Miranda rights and then agreed to speak with us.
14  Q.   What did he tell you about the child pornography on his
15  phone?
16  A.   During the -- I described one of the videos, the video that
17  we had found on the phone.  Mr. Bogard did not recall that
18  video; that he had -- or that he had saved that video to his
19  phone, but did mention that he was part of a Instagram group
20  that would trade videos of that nature.
21  Q.   The video you just said was saved on his phone?
22  A.   Correct.
23  Q.   Describe why that's significant in your investigation.
24  A.   Well, to save a video, it's typically an active step.  One
25  of the videos was found under the Instagram account on the

1   internal memory of the phone.  Some of the other -- another

2   video -- or one of the videos was also found internally on the

3   phone, and then another image was found on the SD card that was

4   connected to the phone.

5   Q.  Did you speak with Mr. Bogard about how long he has been

6   using Instagram to receive images of child pornography?

7   A.  Yes, ma'am.  Mr. Bogard estimated that he's been involved

8   in the -- with the Instagram account I think between three to

9   four months from the time we did the interview.

10  Q.  Based on your training and experience, if he's sharing

11  files on Instagram, how did they get from Instagram to be saved

12  onto his phone?  If you've used it on Instagram, is it

13  automatically saved on his phone?

14  A.  No, not necessarily.  Typically you would have to click on

15  that image.  And then that will get saved into your account,

16  just like his other accounts -- other files and images that he

17  had that were saved under his Instagram folder on the phone.

18  Q.  Did you speak with him at all about his sexual interest in

19  children and whether he had one?

20  A.  Yes.  At that point he did not -- we talked to him -- to

21  get into that, we talked to him about that we found images of

22  him dressed as a female, and wanted to get a little bit behind

23  that, not being at all judgmental.  Just, what is -- what is

24  your sexual orientation?  And then do you have a sexual

25  interest in children?

1     And with regard to the dressing up as a female, he said he

2     liked to do that, but he did not have a -- at that point a

3     sexual interest in children.

4     Q.  Did you also find a large amount of anime pornography on

5     his phone?

6     A.  Yes.  It's a very unique anime.  A lot of the anime that we

7     found specific to Bogard's phone depicted female-type anime

8     with male genitalia, to say it best.

9     Q.  And are some of them what looks like a female that looks

10    like a male engaging in sexual acts, but both of them have male

11    genitalia?

12    A.  Correct.  Yes, ma'am.

13    Q.  Did Mr. Bogard discuss with you why he was a part of these

14    groups that shared this material?

15    A.  He described it, it brought him excitement; that it was

16    edgy; and that some of the members of the group would laugh and

17    get joy out of trading some of the files back and forth.

18    Q.  Did he indicate that he knew what it was, that he knew it

19    was child pornography?

20    A.  I don't specifically remember if he called -- well, yes, he

21    did in a way because at the end he said he could help law

22    enforcement specifically locate the Instagram group that he

23    believed was where he obtained child pornography from.  He did

24    not remember the names or any type of chatting, but that he

25    could specifically help us find that group that may be trading

1  those images.

2  Q.  He was a member of a variety of different Instagram groups?

3  A.  Yes, ma'am.

4  Q.  But he told you he could tell you which one was trading

5  child pornography?

6  A.  Correct.  He believed he could help us locate that group.

7          MS. THOMPSON:  Thank you.  I have nothing further.

8          THE COURT:  All right.  Mr. Morris?

9          MR. MORRIS:  Thank you.

10                      CROSS-EXAMINATION

11  BY MR. MORRIS:

12  Q.  Mr. Miller, have you spoken to any member of the media

13  about Mr. Bogard's case?

14  A.  No, I have not.

15  Q.  You haven't spoken to Mr. Hendrick?

16  A.  No.  The only media contact I've had is they asked on

17  Tuesday what was the delay, and, I said the detention hearing

18  has been moved to today at 2:00.

19  Q.  Then you have spoken to a member of the media?

20  A.  Not specifically with -- mentioning Bogard's name or any

21  specific detail of the investigation.

22  Q.  Some other case that was moved to 2:00?

23          MS. THOMPSON:  Your Honor, I'm going to object to this

24  whole line of questioning.  It's irrelevant.

25          THE COURT:  Yeah.  Explain the relevance of the

1    question.

2          MR. MORRIS:  That's all right.  We'll move on, Your

3    Honor.

4          THE COURT:  All right.

5    BY MR. MORRIS:

6    Q.  Do you know for a fact that Instagram requires you to click

7    on a video in order for that video to be saved to the phone?

8    A.  Well, there's a couple of ways, Instagram, you can do it.

9    Many times you can download a screen saver -- I'm sorry -- a

10   screen recorder, which Mr. Bogard's phone did have the screen

11   recorder.  So he could turn that screen recorder on.  And then

12   if you watch the video on Instagram, you could then download --

13   then it would record that video that you just watched.

14   Q.  Not really the question I asked you.

15        My question to you was, are you aware that Instagram has a

16   way where you can -- the videos that you can trade through

17   Instagram, you don't have to click on them or anything, and it

18   stays on your phone?

19   A.  I'm not aware of that.  No, sir.

20   Q.  That it goes to a special folder that Instagram has on the

21   phone -- that it stores a download folder?

22   A.  There is a folder on Instagram that we found on his phone,

23   but those appear to be files that he had specifically

24   downloaded from.

25   Q.  Sure.  Meaning that at some point he downloaded a file.

1  And do the names of these files indicate that they're child

2  pornography?

3  A.  No, they do not.

4  Q.  Okay.  So whether somebody knows they're receiving child

5  pornography or not is not by the name of the file, correct?

6  A.  Well, you have to be careful.  With this -- in this

7  particular case we have a file that was downloaded through

8  Instagram, another file that appears to be downloaded through

9  the Google browser.  And so the Google browser, those names are

10  not associated with child pornography names.  Those are -- as

11  that file is either being looked at or clicked on, a file --

12  that file was then saved to the computer.

13  Q.  Okay.  And that's automatic, right?

14  A.  That's -- the Snapchat -- I'm sorry.  The Instagram is more

15  of an active step.  And, again, we will know further about that

16  information.  A search warrant is pending to numerous Instagram

17  accounts.

18  Q.  Okay.  You say these videos are edgy, right?  I'm sorry.

19  You indicated that Mr. Bogard told you that he thought they

20  were edgy?

21  A.  Well, besides the child porn, he described the other shock

22  and gore type files that he would download as either he,

23  himself, or the other people call as edgy, correct.

24  Q.  I think we've heard testimony hundreds of videos on his

25  phone?

1    A.   Correct.

2    Q.   Of which three were child pornography?

3    A.   We have one video file, and then we have one image which is

4    a collage that depicted four images.  Two of those appear to be

5    child pornography or are consistent with child pornography.

6    And then we have another file that is associated with child

7    pornography.

8    Q.   "Another file."  Is it a video, or is it a picture?

9    A.   Another image.  I'm sorry.

10   Q.   Another image?

11   A.   Correct.

12   Q.   So I have two pictures and one video?

13   A.   Correct.

14   Q.   Out of hundreds of videos?

15   A.   Correct.  Yes, sir.

16   Q.   Okay.  If Mr. Bogard attempted to delete all of that and to

17   get rid of all of that off of his phone, did you have him talk

18   to you about the fact that he tried to get his phone totally

19   reset and have all his old files gone?

20   A.   I believe he made mention to prior investigators with

21   regard that he had reset his phone, but I do not have

22   information to that.  He did not speak to me directly about

23   that.

24   Q.   You went to go visit with the treatment providers at Laurel

25   Ridge, correct?

1  A.  Correct.  Yes, sir.

2  Q.  And you showed them the videos.  You showed them the

3  violent videos.  You showed them child pornography videos,

4  showed them him dressed up videos, all those?

5  A.  Correct.

6  Q.  Including the ones that he made for himself, no idea

7  whether those have been distributed or not, but the ones he

8  made of him taking his own videos?

9  A.  Correct.  And anything that may have exposed any type of

10 nudity with regard to Mr. Bogard, those were covered up to --

11 just to show a little bit of modesty to the evaluators looking

12 at them.

13 Q.  And they saw those videos before issuing a discharge order

14 to send him with you?

15 A.  Well, we spoke -- I believe it was a Friday.  I'd have to

16 go back -- which day -- whatever date we went to speak with

17 Laurel Ridge.

18     During that, investigators, myself and Mr. Doran, Agent

19 Doran, we spoke with them.  I believe there was five of the

20 Laurel Ridge personnel.  They indicated that they seemed to

21 have a continued evaluation they wanted to do.  Once we showed

22 them all of our information, we had left the facility, didn't

23 even get back to our office before they called us to say,

24 Please come back and pick up Mr. Bogard.

25 Q.  So they indicated when you got there that they had

1  continued work they wanted to do with him?

2  A.  Correct.  It appeared to be that.

3  Q.  And then after seeing the videos and everything you showed

4  them, they said no.  But do you know if that discharge summary

5  was prepared before or after?

6  A.  I do not know when it was prepared.  No, sir.

7          MR. MORRIS:  Thank you.  Pass the witness, Your Honor.

8          THE COURT:  Anything, Ms. Thompson?

9          MS. THOMPSON:  Yes, Your Honor, briefly.

10                     REDIRECT EXAMINATION

11 BY MS. THOMPSON:

12 Q.  When you spoke to the individuals at Laurel Ridge, did they

13 indicate to you anything that was concerning about the

14 defendant's behavior as he walked around the facility?

15 A.  When I -- I had to get back to get the search warrant when

16 Mr. -- Agent Doran went back to pick them up -- to pick up

17 Mr. Bogard to bring him back into the U.S. Marshal's custody,

18 he advised that the personnel at Laurel Ridge did have a

19 concern with Mr. Bogard; that to them it appeared like he was

20 looking at the doors; that he was -- could be a potential risk

21 of danger to other personnel at Laurel Ridge.  And they did --

22 I believe they did not want that risk.

23          MS. THOMPSON:  Thank you.  Nothing further.

24

25

RECROSS-EXAMINATION

BY MR. MORRIS:

Q.  He was looking outside, and that was considered risk?

A.  They said he was looking at the doors as they were going

through locked doors at Laurel Ridge.  There was many locked

doors just when we -- and I don't know what his treatment was

at that point.  But in their expression they had concern to the

point that we didn't even get back to the office, to where they

called us back to come get him.

Q.  Okay.  Every one of those doors has a window in it, that

you walked through?

A.  I would have to go back and check.  I don't -- but we only

got to the part of the admissions and then to a back room.  I

don't know what is beyond that.

Q.  And they didn't tell you that?

A.  No.

Q.  You're saying they told Agent Doran, who was just on the

stand a minute ago?

A.  Correct.  Yes.

Q.  Huh.

        MR. MORRIS:  Pass the witness.

        MS. THOMPSON:  Nothing further.  I am happy to call

Agent Doran back to the stand to ask him those questions.

        THE COURT:  Well, let's finish with Mr. -- Agent

Miller.

1    Agent Miller, thank you for your testimony.  You may be

2 excused from the witnesses stand.

3    I'm not -- it does sound like there's some relevance here.

4 Let me -- you may want to proffer exactly where we're going

5 with this question because I have the discharge summary.  I

6 don't see anything in the summary about concerns about violence

7 while Mr. Bogard was there.  And I got a little confused

8 because it sounded like Agent Miller said that they wanted to

9 get rid of him as soon as he got there, but it sounds like he

10 was admitted on the 8th -- or looked like he was admitted on

11 the 8th and held to the 13th, which is five days.  So that's

12 why I'm --

13         MS. THOMPSON:  Right.

14         THE COURT:  So maybe you would proffer exactly what

15 this is about, and then we'll see --

16         MS. THOMPSON:  Actually, I think it's easier if I call

17 him to the stand --

18         THE COURT:  Sure.

19         MS. THOMPSON:  -- given the objections by defense

20 counsel that he get it firsthand instead of me proffering it

21 instead of Agent Miller proffering it.

22         THE COURT:  Okay.

23         MS. THOMPSON:  But I -- and I'll argue the

24 discharge -- the value of the discharge summary with regard to

25 the time he spent there, during my argument.  But I think they

1  only had him for a five-day evaluation.

2          THE COURT:  Right.

3          MS. THOMPSON:  That's all they were asked to do.

4          THE COURT:  Right.  That's my understanding as well.

5  All right.  So do you want to call him and ask him some

6  questions?  Go ahead.

7          MS. THOMPSON:  Yes.  Special Agent Doran.

8          THE COURT:  Agent, I'll remind you, you're still under

9  oath.

10          RUSSELL DORAN, GOVERNMENT'S WITNESS, SWORN

11                  DIRECT EXAMINATION

12  BY MS. THOMPSON:

13  Q.  Special Agent, did you accompany Special Agent Miller last

14  Wednesday, I believe, to Laurel Ridge treatment facility to

15  meet with the treatment providers about Benjamin Bogard?

16  A.  I did.

17  Q.  How long did that meeting take?

18  A.  I think we were there an hour, hour and a half.

19  Q.  When the appointment was set up, were you given information

20  from Laurel Ridge that Mr. Bogard would remain at the facility

21  for a few days after you met with them?

22  A.  When we arrived at the facility and began the meeting, they

23  indicated that they didn't know how much longer he would be

24  there.  They thought another day or two.

25  Q.  And as you were traveling from Laurel Ridge back to the

1  FBI, did you and Special Agent Miller get a phonecall from
2  Laurel Ridge saying Mr. Bogard was ready to be released back to
3  the FBI?
4  A.  When I got back -- actually, dropped Mr. -- Special Agent
5  Miller off at a lunch near the office.  When I got back to the
6  office, I realized my phone had been off.  I turned it off
7  during the meeting.  Turned it back on.  I had three missed
8  calls.  And as I was checking my missed calls, I received
9  another call from the same number, and it was Laurel Ridge
10  asking us if we could -- that they were through with their
11  evaluation.  There's nothing further they could do.  If we
12  could come back and pick up Mr. Bogard.
13  Q.  When you and Agent Miller met with the Laurel Ridge
14  providers, was there discussion about what type of evaluation
15  they could provide?
16  A.  Yes.  And it was essentially what you summed up earlier for
17  the Court in terms of, it wasn't -- they did not provide a
18  dangerous assessment, which is what they perceived that us,
19  being -- we were just kind of relating what our understanding
20  of what the Court was looking for.  But that they would
21  recommend -- for that type of an evaluation, you would have to
22  meet with a forensic psychiatrist.  They do not provide that --
23  so they did not provide that service there.  They had people
24  they could recommend.
25       But, again, we didn't go into specifics of what Benjamin's

1  treatment was, assessment was.  We didn't go into any of his --

2  we were just there to provide them the information that was on

3  the phone so that they could make a full evaluation and see the

4  concerns that we had.

5  Q.  Were you also with Special Agent Miller when Mr. Bogard was

6  first dropped off at Laurel Ridge?

7  A.  I was.

8  Q.  Was there some confusion as to why he was there within the

9  facility?

10  A.  There appeared to be nobody that really knew why we were

11  there to drop him off.  We eventually found somebody that

12  seemed to have some knowledge, had spoken with the father,

13  Robbie Bogard, who was there as well.  And we kind of cleared

14  up, and they seemed to have a general understanding when we

15  left that he was not to leave without being in FBI custody.

16  Q.  When you went back to pick up Mr. Bogard after you were

17  told the evaluation was over, what happened?

18  A.  I went back.  Special Agent Miller had something else going

19  on.  I believe he was preparing the search warrant or swearing

20  out a search warrant.  So I grabbed another agent from the

21  squad.  We went down to pick up Mr. Bogard, and we were met in

22  the front by one of the individuals.  I can't remember her

23  name.  She was one of the directors of one of the treatment

24  plans of the facility, and kind of explained to us the process

25  of how they wanted it to go.  And we took her into our vehicle

1  and drove around to the back, waiting for them to do the

2  out-processing for Benjamin.

3  Q.  What information were you provided about their concern

4  about Mr. Benjamin -- Mr. Bogard while he was there?

5  A.  Again, I didn't want to get into what they specifically

6  assessed.  I just asked what changed from the time that Rex and

7  I were there half an hour ago, to us needing to come back and

8  pick him up.  And she said, based on our discussions and the

9  fact that they did not provide that type of care, that it

10 wasn't worth the risk.  And that was the term she used, was it

11 wasn't worth the risk.

12 Q.  Was there comments made about Mr. Bogard looking at doors,

13 trying to escape, anything like that?

14 A.  So, again, as we sat there, we were talking.  And from a

15 security standpoint, just for our knowledge, she wanted us to

16 know that she thought that -- and as it was relayed to her from

17 other either treating physicians or people he was working with,

18 that he appeared to be kind of assessing the doors as they were

19 open.  And, again, just as it was relayed to me, appeared to be

20 inching closer when they were opened.  Some of the orderlies,

21 or whatever they refer to themselves as, thought that he might

22 have been assessing whether or not he could get out.

23 Q.  And she described that to you as a concern that the staff

24 had?

25 A.  Yes.

1   Q.  Thank you.  Nothing further.

2   A.  Yes.

3   Q.  Oops.  Go ahead.

4   A.  Oh, no.  And as it relates to us, because we were about to

5   pick him up, she wanted us to be aware that she thought -- they

6   thought he might be trying to escape.

7           MS. THOMPSON:  Thank you.  Nothing further.

8           THE COURT:  All right.  Mr. Morris?

9           MR. MORRIS:  Quick question.

10                       CROSS-EXAMINATION

11  BY MR. MORRIS:

12  Q.  Agent Doran, do you know what the word "elopement" means,

13  E-L-O-P-E-M-E-N-T?

14  A.  No.

15  Q.  Okay.  You've heard of people going to get married and they

16  elope?

17  A.  Yes.

18  Q.  Okay.  In the medical field, in a lockdown facility, do you

19  know what elopement means?

20  A.  No.

21          MR. MORRIS:  Okay.  May I approach, Your Honor?

22          THE COURT:  You may.

23  BY MR. MORRIS:

24  Q.  Let me show you the report from -- you picked him up

25  February 13th, right?

1   A.   Yes.  Last Wednesday.

2   Q.   What time of day would that have been?

3   A.   Let's see.  I grabbed an agent.  They said they needed to

4   process paperwork.  I think we were there at 2:00, 2:30.

5   Q.   Okay.  So can you see on this report right here that this

6   is the report for 7:00 a.m. to 3:00 p.m. on February 13th?

7   A.   Yes.

8   Q.   And do you see the word "elopement" right there?

9   A.   Yes.

10  Q.   And what's the checkmark --

11       MS. THOMPSON:  Your Honor, I'm going to object.  I

12  don't have this report.  I don't know what he's referring to.

13       MR. MORRIS:  Let me show it to you.

14       MS. THOMPSON:  I wasn't --

15       THE COURT:  I don't -- I don't know either.  Let him

16  show it to you.  You can look at something that hasn't been

17  admitted to me, but I certainly will allow you to review it,

18  Ms. Thompson.

19       MR. MORRIS:  And I'll represent to the Court that all

20  of the medical records from Laurel Ridge were filed under seal

21  for an in camera inspection.  This is one of those.

22       THE COURT:  Oh, all right.

23       MR. MORRIS:  And I can point the Court to the specific

24  page if we need to.

25       MS. THOMPSON:  I'll object.  I'll object.  The Court

1  has the record; and the witness has already testified, he's not

2  familiar with that term or how it's used and he didn't author

3  the report.

4           THE COURT:  All right.  Well, given -- I'll let you

5  finish your inquiry.  But yeah, if he doesn't know, he doesn't

6  know, Mr. Morris.

7           MR. MORRIS:  Sure.

8  BY MR. MORRIS:

9  Q.  And what's the checkmark in the box say?

10 A.  It's next to the word "none."

11 Q.  Okay.  And you're not familiar that they would do this

12 three times a day every day, check these boxes?

13 A.  I have no idea what they do.  No, sir.

14 Q.  Okay.  And that there was never a threat of escape, never

15 anyone noticing a marking in the record.  You haven't seen any

16 of those records.  You don't know that, right?

17 A.  No, sir.

18          MR. MORRIS:  Pass the witness, Your Honor.

19          THE COURT:  All right.

20          MS. THOMPSON:  Nothing further.  I'll just state for

21 the record we don't have the record so we don't know what they

22 say.

23          THE COURT:  Right.  I don't know either.  I have to

24 look at what they're talking about.

25      Thank you, sir.  You may be excused from the witness stand.

1    I have some of these documents as -- that have been

2  submitted in camera, and I'm going to accept your proffer as

3  opposed to digging through them, that there was not an

4  elopement determination made on any of those reports.  I am

5  familiar with that phrase myself.

6         MR. MORRIS:  Yes.  And it's -- that was a specific

7  page for that date.

8         THE COURT:  Oh, I see.

9         MR. MORRIS:  7:00 a.m. to 3:00 p.m.  That's why we --

10        THE COURT:  Let me just ask you -- and I'm going to

11 ask you to proffer more.  Is there any other place in those

12 reports where they seem to indicate that there's a risk of

13 elopement or that they have made a --

14        MR. MORRIS:  Absolutely not.

15        THE COURT:  All right.  Very well.

16        MR. MORRIS:  And I can forward you every one of

17 those --

18        THE COURT:  No.  And I'll accept your proffer on that.

19 That's fine.

20    Any additional witnesses you'd like to present,

21 Ms. Thompson?

22        MS. THOMPSON:  No, Your Honor.  The government rests.

23        THE COURT:  Well, let me just ask, with regard to the

24 pretrial services report that was originally created, obviously

25 we've had additional information since then, plus the

1   information subject to that additional information.  Any

2   objections or corrections to the pretrial services report?

3               MS. THOMPSON:  Yes.

4               THE COURT:  All right.

5               MS. THOMPSON:  The last paragraph on Page 2 --

6               THE COURT:  Yes.

7               MS. THOMPSON:  -- says he -- Mr. Bogard noted he left

8   Texas State University after completing the fall 2018 semester.

9   That's incorrect.  He left in September of -- he quit school in

10  September of 2018.

11              THE COURT:  All right.

12              MS. THOMPSON:  And also, he advised to be unemployed

13  since December of 2018.  We show a last paycheck for him dated

14  September 8th of 2018.

15              THE COURT:  All right.

16              MS. THOMPSON:  At least the employment he had with the

17  university ended when he quit going to school.  I'm not aware

18  of any other employment since then.  So both of those pieces of

19  information provided by the defendant seem to be incorrect.

20              THE COURT:  Well, he said he was working as a

21  lifeguard.  Is that at Texas State?  I thought that was in

22  New Braunfels.

23              MS. THOMPSON:  No.  That was in the summer.  And I

24  believe he ended that in July.

25              THE COURT:  Oh, I see.  Oh, okay.  Got you.  All

1   right.  Very well.  Thank you.

2       Let me turn to you, Mr. Morris, start with the pretrial

3   services report.  Any objections or corrections that you'd like

4   to make?

5               MR. MORRIS:  Couple quick corrections, Your Honor.

6               THE COURT:  Uh-huh.

7               MR. MORRIS:  The bottom paragraph at the bottom of the

8   first page indicates that he's always resided with his parents.

9   Actually, he lived on his own at Texas State for a year.

10              THE COURT:  Right.  Right.

11              MR. MORRIS:  And was independent during that

12  timeframe.

13              THE COURT:  Okay.

14              MR. MORRIS:  Last -- as far as his assets go, he has

15  nothing.  And I think the report reflects that accurately.

16  There should be no indicators in the report that he has any

17  assets.

18              THE COURT:  Just the vehicle.  They indicate a

19  vehicle.  I'm assuming -- I don't know if that's the van or

20  something else.

21              MR. MORRIS:  I think it's the van, and I think it's a

22  $1,500 van.

23              THE COURT:  All right.

24              MR. MORRIS:  That was what he paid for it.

25              THE COURT:  All right.

1        MR. MORRIS:  Anything in the report, of course, that's

2   attempting to indicate a mental diagnosis or a mental concern

3   is, of course, objectionable to us because they're not mental

4   health professionals, to be able to make those decisions.  So

5   other than that --

6        THE COURT:  All right.  Well, we've heard -- I now

7   have a full -- or not a full.  I have additional information

8   from Laurel Ridge on that.  And I'm going to consider that

9   information.

10       MR. MORRIS:  Correct.  Other than that, nothing

11  significant, Your Honor.

12       THE COURT:  All right.  Very well.

13       MR. MORRIS:  Other than we don't think [inaudible].

14       THE COURT:  Other evidence that you would like to

15  present by way of proffer or testimony?

16       MR. MORRIS:  I would present some evidence, but I

17  think it'd probably go quickly if I can do it with just

18  Mr. Bogard.

19       THE COURT:  All right.  Sir, if you'll come forward,

20  my courtroom deputy will swear you in.

21     (The oath was administered)

22           ROBBIE BOGARD, DEFENDANT'S WITNESS, SWORN

23                    DIRECT EXAMINATION

24  BY MR. MORRIS:

25  Q.  Mr. Bogard, can you introduce yourself to the Court,

1    please.  What's your name?

2    A.  Robbie Bogard.  I'm Benjamin's father.

3    Q.  Thank you.

4        Can you tell us briefly what changes, what modifications,

5    what things you changed about your house and living situation

6    in light of the fact of trying to get ready for Benjamin to be

7    released on bond?

8    A.  We have taken all the -- our iPads, iPhones, secured those

9    in our bedroom, taken all the charging cords, removed

10   anything -- other computer related from the house and stored

11   that securely.

12   Q.  Okay.  What else have you done?  Are there any firearms in

13   your house?

14   A.  There are no firearms in my house at all.

15   Q.  Okay.  Any fake firearms in your house at all?

16   A.  There are no fake firearms.

17   Q.  Anyplace there might be a firearm secreted or hidden that

18   you wouldn't know about?

19   A.  No.

20   Q.  All right.  You are familiar with your son's bedroom and

21   his space where he primarily resides.  How is that in regards

22   to the rest of the house?  Is it upstairs?  Downstairs?  Can

23   you explain to the Court what that situation is?

24   A.  We have a one-story house.

25   Q.  Is --

1  A.  As soon as you come in the house, you'd have to pull ‑‑

2  come in, basically pull a U-turn.  He's by the front door.

3  Q.  Okay.  So is there a way for Rob ‑‑ for Benjamin to go in

4  or out of his bedroom without you knowing it?

5  A.  No.

6  Q.  Does he have a separate entrance?

7  A.  No.

8  Q.  Any way that he can go in and out of his bedroom door, if

9  you're in the living room, without you being able to see?

10 A.  No.

11 Q.  Okay.  Tell me about Benjamin's ties to the community.  Let

12 me just limit you a little bit real quick.  We have a gentleman

13 here, Mr. Hoffmann, Tobin Hoffmann.  Can you tell the Court why

14 Mr. Hoffmann's here?

15 A.  Mr. Hoffmann was actually Benjamin's Boy Scout troop master

16 where Benjamin was actually an Eagle Scout.

17 Q.  Okay.  And when did he complete that?

18 A.  I'm going to think June 2014.  I may be a year off on that,

19 but I'm pretty sure it was June 2014.

20 Q.  And is Mr. Hoffmann familiar with his ‑‑ with Benjamin's

21 character, with his physical condition, mental condition,

22 family ties, all those things?

23 A.  Very much so, when he was in Scouts with him for several

24 years.

25 Q.  Okay.  One of the things the Court has to consider is

1   Benjamin's past conduct.  Are you aware of any run-ins with law

2   enforcement previously with Benjamin?

3   A.   Other than one single speeding ticket, there's been none.

4   Q.   Okay.  You and your wife were concerned when Benjamin took

5   off to Ohio for a while?

6   A.   We were concerned when he took off to Dallas.  He actually

7   went to Ohio to see my mother, his maternal grandmother.

8   Q.   Oh, so he stayed with grandma for the trip to Ohio?

9   A.   Yes.

10  Q.   Went to Dallas.  And while up there, traded in the car he

11  had, bought a van and purchased a shotgun?

12  A.   Yes.  He didn't trade in the car.  He just bought the van

13  and the shotgun.

14  Q.   Okay.  And were you able to talk to him when he came back

15  and discuss with him why that happened and have a conversation

16  with him about what his motivations were?

17  A.   Yes, we were.

18  Q.   And what was that conversation like?  What was the impetus

19  for that?

20  A.   My wife and I have always told Benjamin when he graduated

21  from high school, he was willing to stay at -- or he was able

22  to stay at the house if he had a job or he was going to

23  college.

24       And then when he lost his job at Texas State, because that

25  was a student-hire job, and the day before classes started for

1   fall 2018 he decided not to go back to school.  I think he

2   thought we were going to be very upset with him that he didn't

3   have a job, he wasn't going to school.  So that seemed to be

4   the decision to move away.

5   Q.  Okay.  Embarrassment?

6   A.  Pardon me?

7   Q.  Embarrassment on his part, of being in that situation?

8   A.  I think very much so.

9   Q.  Okay.  Can you tell us what your situation for employment

10  and your wife's situation for employment?  Just give the Court

11  an idea of how often you're at home and who's at home when?

12  A.  My wife, she stays at home.  I work 6:00 to 3:00.  So after

13  3:00, I'm home.  But my wife is there all the time.

14  Q.  Do you work weekends?

15  A.  No.  I do not work weekends.

16  Q.  Okay.  6:00 to 3:00, just five days a week, right?

17  A.  Monday through Friday.

18  Q.  All right.  Any previous knowledge of any history of drug

19  abuse or alcohol abuse on Benjamin's behalf?

20  A.  No.  He doesn't even like Coca-Cola, beer, wine, any of

21  that so --

22  Q.  And y'all have lived in Europe and have been around that

23  where -- culture where that's allowed among people his age?

24  A.  Yes.

25  Q.  And he did not partake even at that point?

1   A.  No, sir.

2   Q.  Does he usually show up where he's supposed to when he's

3   supposed to?  If he's got an appointment or if he's got a

4   meeting, if he's got something where he's supposed to be, is he

5   good at showing up on time?

6   A.  Yes, he is.

7   Q.  Okay.  Give me an example of that.

8   A.  Boy Scouts with Tobin Hoffmann behind you there, would

9   always be on time for his schoolwork, whether that was high

10  school, whether that was the University of Maryland that he did

11  over in Germany for his first year of school, or at Texas

12  State.  We never had any knowledge of him not showing up on

13  time, and was always there.

14  Q.  What is your understanding of other than you and -- I

15  believe you said there's a grandmother in Dallas?

16  A.  No.  Grandmother's in Ohio.

17  Q.  In Ohio.  I'm sorry.  He was visiting a friend in Dallas.

18      Any other family here in the U.S. that he'd go visit --

19  A.  Yes, my father and stepmother, they live in South Carolina.

20  Q.  Okay.  And has he been to visit them by himself previously?

21  A.  Not by himself.  I had a brother die earlier this year, and

22  Benjamin and I took a road trip to go to the funeral in

23  September.

24  Q.  One of the things the Court is concerned about is whether

25  or not there's a propensity for violence.  Have you observed

1   anything that indicates to you one way or another whether

2   Benjamin has any --

3   A.   I'll just share a couple of quick examples that come to

4   mind.  When the agents were out at the house the first time to

5   talk to Benjamin, they made it seem like this whole thing was

6   not a big deal.  And Officer Reyes actually told Benjamin to

7   take the mask and burn it.

8        So we went out to do this.  And when the fire was starting,

9   Benjamin noticed a scorpion crawling towards the fire, and

10  Benjamin went and got a stick and actually moved the scorpion

11  out away from the fire so the scorpion wouldn't get toasted by

12  the fire.

13       And Benjamin, when he decided to drop out of Texas State,

14  he wanted to join the Air Force.

15  Q.   What was the problem with that, with him joining the

16  Air Force?

17  A.   He was waiting for some medical clearance.  He has a minor

18  case of scoliosis, so it has to get cleared through the

19  Air Force medics.

20  Q.   Okay.

21  A.   But I've been associated with the U.S. Air Force either

22  active duty or as a civil servant for the last 35 years.  So

23  I'm pretty familiar with all the jobs that Benjamin could get.

24  So I sat down with him, with the Air Force enlisted

25  classification directory, and went over almost every job in the

1   Air Force.

2        And one job I asked him if he would be interested --

3   actually, two jobs were remotely piloted aircraft pilot or

4   remotely piloted aircraft sensor.  And I asked Benjamin, Hey,

5   would you be -- would you be interested in either of these

6   jobs?

7        And his very quick response to me was, I don't want a job

8   where I have to kill people.

9   Q.  Okay.  Have you ever seen Benjamin have violent

10  propensities or indicators?

11  A.  No.

12  Q.  You were unaware of the videos that Benjamin was shooting

13  on his phone, correct?

14  A.  Correct.

15  Q.  But at the end of the day, you've now learned a good bit

16  about those.  Are you aware of Benjamin's online persona, his

17  online character?

18  A.  No.

19  Q.  Okay.  In real life tell me about Benjamin's character, as

20  best you've observed?

21  A.  He's a good kid, a good son, has always done what we wanted

22  him to, has done well in school.  So that's the Benjamin I

23  know.

24  Q.  Okay.

25  A.  The Benjamin that I saw -- again, when you use that term

1    "edge master," that's what I'm seeing from what I've heard

2    today.

3    Q.  Okay.  You didn't know about the videos or the pornography

4    or any of that stuff.  What assurances can you give the Court

5    that you and your wife are going to be able to maintain his

6    safety and his presence and assure that he's going to be here

7    when he needs to be here for the Court hearings that come up?

8    A.  Either my wife or I will be with him at all times.  There

9    won't be any computer internet access to do any of that.  And,

10   you know, I can just guarantee that we can try to get him some

11   help because there seems to be some concerns with the mental

12   health awareness, and that we will be with him at all time and

13   limits -- or audit what he does.

14   Q.  And we contacted a couple -- or you've contacted a couple

15   of forensic psychologists, correct?

16   A.  Yes.

17   Q.  And there's a group that y'all have contacted for people

18   who have been involved or have been --

19   A.  Yeah.  There's a group in Chicago actually made up of

20   former white supremacists called Life After Hate.  And what

21   this group's ethos is now is to take people who may have the

22   hatred, and work with them where they no longer have this type

23   of hate.

24   Q.  Okay.  And is there a way that he can engage with them

25   either online or --

1   A.   There's online, and I have phonecalls into them, but they

2   have not got back with me yet.

3   Q.   You understand pretrial could require that you have

4   monitoring software on every computer in your house, that every

5   website you go to goes to pretrial services, that they would

6   see all that?

7   A.   We're agreeable to that.

8   Q.   Okay.  You understand that he may -- that Benjamin may have

9   to have an electronic monitor on at all times when he's living

10  with you?

11  A.   And we're agreeable to that, and I think it gives the Court

12  a greater guarantee that nothing will happen.

13  Q.   Okay.  And you're willing to pay for that if you have to

14  because he doesn't have resources, right?

15  A.   I am.

16  Q.   Okay.  What about the ability to know where he is and

17  when -- if Benjamin's not where he's supposed to be or not

18  where he told you he's going to be, are you able to call

19  pretrial services and report on your own son?

20  A.   Yes, I could.

21  Q.   Okay.  And you're agreeing to the Court that that's what

22  we're going to do if he's not where he's supposed to be?

23  A.   Yes, sir.

24       MR. MORRIS:  Okay.  I'm going to pass the witness.

25  Thank you.

1          THE COURT:  All right.  Ms. Thompson.

2                    CROSS-EXAMINATION

3    BY MS. THOMPSON:

4    Q.  Mr. Bogard, you said you removed the firearms from your

5    home.  How many firearms did you remove?

6    A.  The starter pistol and the shotgun.

7    Q.  You didn't find any other firearms in the house?

8    A.  No.  And my wife and I did a very, very thorough audit of

9    the house.

10   Q.  What did you do with the firearms?

11   A.  They're with Mr. Morris.

12   Q.  Is it fair to say you did not have any idea your son was

13   making these hateful videos where he threatens to kill people?

14   A.  That's a very fair statement to say.

15   Q.  Is it fair to say you didn't know he had chosen not to go

16   back to school until he ran away?

17   A.  No.  That's not fair to say.  He told us -- we kept asking

18   him what his schedule for the fall semester was.  And he said

19   he was having problems getting on the computer system for Texas

20   State University.

21       And so we asked him the day before classes were supposed to

22   start, Hey, what's your schedule?

23       So he goes in his bedroom, says, Let me print the schedule

24   off.

25       And he's in there for 30 to 45 minutes and then comes back

1  out and makes the statement to us that, I no longer enjoy

2  college; that I'm not going back.

3  Q.  So that was in August?

4  A.  I'd have to look at the Texas State calendar to see exactly

5  when that was, but it was either late August or early

6  September.

7  Q.  You made a -- you reported him missing to Comal County when

8  he left your home on October 8th and didn't return; is that

9  correct?

10  A.  That is correct.

11  Q.  Do you remember speaking with Doug Phillips, the officer

12  that took the report?

13  A.  Yes, I do.

14  Q.  Do you recall telling him that you had contacted Benjamin's

15  supervisor, John Sharrott, at Texas State University, and found

16  out Benjamin hasn't been at Texas State since early September

17  when school started?

18  A.  That was for his job at Texas State.  That wasn't for

19  school.

20  Q.  You were still under the impression that even if he didn't

21  go to school, he could still work there?

22  A.  We had questioned him on that, and he was under the belief

23  that he could continue with the job.  However, it was a student

24  hire-type job.  So when he was no longer enrolled as a student,

25  he was not able to keep the job.

1   Q.  So at least in October you didn't know he was working at

2   Texas State?

3   A.  We believed he was working.  He had only been a driver

4   since we had came back from Europe.  The licensing system is

5   different over there.  And we filed a missing persons report

6   because most of the -- if you can remember the rain we had in

7   September, and it was one of the very rainy nights that he

8   didn't come home.  And we were very concerned about his safety,

9   thinking that he was in a horrific crash.  So we became

10  concerned with his whereabouts.

11  Q.  He had a phone at that time, correct?

12  A.  He did.

13  Q.  He wasn't answering his phone?

14  A.  No.

15  Q.  And he took one of your vehicles that he was allowed to use

16  when he went to Dallas, the station wagon?

17  A.  Yeah.  It's -- the vehicle -- I can't remember if it's in

18  my wife's name or my name.  But when we bought the vehicle, we

19  told him it was his vehicle for going to university.

20  Q.  And are you aware he was going to leave the vehicle in

21  Dallas when he bought the van?

22  A.  He told us he planned on having a friend bring it back.

23  Q.  Did he have a lot of friends at that time in his life?

24  A.  I'm not exactly sure.

25  Q.  Did you know any of his friends in the fall of 2018?

1    A.  The ones that he had been involved with in Boy Scouts in

2    New Braunfels.  We had only been back -- I returned from an

3    assignment in Germany June of 2017, and then he was up at the

4    Texas State University.  But there were things that he did with

5    some of his former Boy Scout friends who lived in

6    New Braunfels.

7    Q.  And that ended in 2014, correct?

8    A.  Yes.  And then we went overseas after that.

9    Q.  And since you moved back in June of 2017, you're not aware

10   of him having any friends?

11   A.  Some of the same Boy Scout friends that he had from June

12   2014, the kids were still around.

13   Q.  You saw him with them?

14   A.  Yes.

15   Q.  You hired a private investigator when he went missing and

16   wouldn't return your phonecalls; is that right?

17   A.  That is correct.

18   Q.  And it took three days for him to locate?

19   A.  I believe it was three days.

20   Q.  The friend had not returned the car at that point?

21   A.  No.

22   Q.  You -- in fact, you and your wife had to drive up and drive

23   the car home?

24   A.  That is correct.

25   Q.  Is it fair to say there's a side of your son that you

1    didn't know existed?

2    A.  We've always known there's been sort of a secretive side to

3    him.  We didn't understand all that that involved.

4    Q.  When your son went -- ran away, for lack of a better term,

5    or went missing, he took his passport --

6    A.  Correct.

7    Q.  -- which was still valid at that time?

8    A.  Yes.

9         MS. THOMPSON:  Thank you.  I have nothing further.

10        THE COURT:  All right.  Mr. Morris, anything further?

11        MR. MORRIS:  I'm sorry.

12        THE WITNESS:  Could I finish answering that question?

13        MR. MORRIS:  About the passport?

14        THE WITNESS:  Yeah.

15        MR. MORRIS:  I was going to ask you about the passport

16   anyway.

17        THE WITNESS:  Okay.

18                    REDIRECT EXAMINATION

19   BY MR. MORRIS:

20   Q.  He's got a passport?

21   A.  Yeah.

22   Q.  And --

23   A.  Actually, it was -- he took the information that he needed

24   to join the Air Force with him.  So there was the birth

25   certificate.  There was the passport.  I can't remember all the

1  other information.  But it wasn't just the passport.  It was

2  exactly the information recruiters require for him to join the

3  Air Force, is the information that he took.

4  Q.  To the best of your knowledge has your son ever traveled

5  outside the country without you or your wife?

6  A.  No, he never has.

7  Q.  Never has, to the best of your knowledge?

8  A.  No.

9  Q.  And he's an adult.  Does he have to tell you everywhere he

10  goes?

11  A.  No, he doesn't.

12  Q.  But generally, he does?

13  A.  Yes.

14  Q.  Okay.  Last quick question.  You indicated previously that

15  when Benjamin was at Laurel Ridge, were you able to interact

16  with Laurel Ridge at all and have conversations with them about

17  anything going on there?

18  A.  Not a whole lot.

19  Q.  Because they weren't allowed to disclose anything to you,

20  correct?

21  A.  No.

22  Q.  But what have you put in place -- I forgot to ask you about

23  this.  Are there churches, daycares, schools in your

24  neighborhood?

25  A.  I think the closest one -- it's six-tenths of a mile just

1  to get out of my neighborhood, when I get on the main street in

2  my neighborhood.  So --

3  Q.  Right.  But not in your --

4  A.  -- it's almost eight-tenths of a mile just to get out of my

5  neighborhood.  And then I believe the nearest church, and I

6  think it's on the preservices report, may be 1.5 or 1.9 miles.

7  I can't remember exactly.

8  Q.  But then the answer to my question is there's no churches,

9  anything like that --

10  A.  No.

11  Q.  -- in your neighborhood?

12  A.  No, not at all.

13  Q.  Daycares, any of those kind of things?

14  A.  No, sir.

15  Q.  You and your wife have done quite a bit of homework trying

16  to figure out counseling scenarios.  Are you committed to being

17  -- to get him to and from whatever counseling he's required to

18  attend?

19  A.  Yes.  And that's one of my concerns.  If he stays in

20  detention, he's not going to get the counseling that he needs.

21  And that's something that we're hoping we could get him into as

22  soon as possible.

23          MR. MORRIS:  Very good.  Thank you.

24          THE COURT:  All right.  Anything further,

25  Ms. Thompson?

1          MS. THOMPSON:  One clarification.

2                     RECROSS-EXAMINATION

3    BY MS. THOMPSON:

4    Q.  You stated that he took what he needed to join the

5    Air Force.  Did he tell you that's why he left, was to join the

6    Air Force?

7    A.   That's been his goal all along, since he's quit college.

8    Q.   So when he left October 8th, took his passport, his

9    driver's license, birth certificate, whatever he needed so that

10   he could join the Air Force?

11   A.   We believe so.

12   Q.   Do you know if he ever contacted the Air Force in those

13   three days he was gone?

14   A.   I don't know that.  But I know there's been quite a bit of

15   email traffic between him and the recruiter.  I personally

16   talked to the recruiter myself before this incident and after

17   the incident.  So I believe he was just really concerned that

18   he did not have a job, and our rule was -- has been, since he's

19   been 18 years old, is, hey, you're either going to school or

20   you have a job if you're living at home.

21   Q.   So he ran away because he didn't have a job?

22   A.   I wouldn't really say running away because he is an adult.

23   But I think he was afraid of the repercussions that he'd have

24   to face from mom and dad.

25   Q.   Okay.  So it wasn't to join the Air Force.  He didn't leave

1  in October to join the Air Force?

2  A.  No.  He's still waiting on his paperwork to join.

3  Q.  And you know when he went to Dallas, he did not find a job?

4  Are you aware of that?  He did not get a job?

5  A.  I don't know if he even looked for a job when he went to

6  Dallas.

7  Q.  You do know he looked for a white van, though, correct?

8  And bought a van?

9  A.  Yeah.  He did buy a van.

10  Q.  And you do know that he looked online for a shotgun and

11  bought a shotgun?

12  A.  Yes, he did.

13  Q.  And that he retrofitted the van so that he could live in

14  it?

15  A.  Yeah.  And my wife and I both helped him retrofit the van.

16  Q.  That's before you saw the videos of his plan to be

17  homeless; is that correct?

18  A.  I've never seen these videos.

19          MS. THOMPSON:  Okay.  Nothing further, Your Honor.

20          THE COURT:  Mr. Thompson [sic]?

21          MR. MORRIS:  Nothing further.

22          THE COURT:  Thank you, sir, for your testimony.  You

23  may be excused from the witness stand.

24     Any additional witnesses that you'd like to present or by

25  way of proffer, any information --

1          MR. MORRIS:  Can I do it by proffer just real quick,

2     Your Honor --

3          THE COURT:  Let's find out.  Yeah.

4          MR. MORRIS:  -- because I hate to -- the late hour

5     here.

6          THE COURT:  Let's find out.

7          MR. MORRIS:  I would just say the testimony of

8     Mr. Tobin Hoffmann would be as to the excellent character, the

9     stalwart character of Benjamin Bogard, that he's known him for

10    many years of his life.  He's known him in New Braunfels, known

11    his connections to the community are very strong, friends who

12    he's made through Boy Scouts continue to be friends of his now,

13    today.  And those continued connections are just as strong

14    today as they were back when he graduated in '14.  And then his

15    leadership qualities of bringing up other scouts underneath him

16    as part of that program and being a mentor to the others.

17       I think he would also testify no knowledge of criminal

18    history, no previous disregard for the law, no previous

19    run-ins, none of those things as well.

20         THE COURT:  I'm assuming that proffer would also

21    include, however, that he was completely unaware of this -- all

22    this other information?

23         MR. MORRIS:  Completely unaware of any of this.

24         THE COURT:  All right.  Ms. Thompson, this gentleman

25    is here if you wish to question him -- question him.  But with

1    the limited proffer, you have any objection to me considering?

2        MS. THOMPSON:  I don't have any objection to the

3    proffer.  But there's no information as to how much time he's

4    actually spent with him since 2014 when he was the Eagle Scout

5    leader, or whether he's -- I assume he's not aware that

6    Mr. Bogard is burning the U.S. Constitution and that that would

7    have some effect on the oath he took as an Eagle Scout.

8        THE COURT:  Let me just check and see if they've had

9    any contact since then.

10     Mr. -- do you know?

11        MR. MORRIS:  Very few.  They've visited a couple of

12    times I think --

13        THE COURT:  Less contact obviously than when he was in

14    the Scouts?

15        MR. MORRIS:  That's correct.

16     And it's not the Constitution.

17        THE COURT:  Oh, well, I thought it was the

18    Constitution.

19        MS. THOMPSON:  He said it is in the video.

20        THE COURT:  Oh, oh, oh, oh, I understand.

21        MR. MORRIS:  It's not the Constitution.

22        MS. THOMPSON:  We have the video if you want to see

23    it.

24        THE COURT:  No.  I really -- I got the picture so to

25    speak of what the video indicated.

1    MR. MORRIS:  Very nice.

2    THE COURT:  Any additional evidence you'd like to

3  present, Ms. Thompson?

4    MS. THOMPSON:  No, Your Honor.

5    THE COURT:  Can we turn to -- then to argument, and

6  I'll hear from the government first.

7    Oh, you know what?  I am sorry, Ms. Thompson.  I have to

8  get one more proffer from Mr. Morris.

9    Mr. Morris, I forgot to inquire of the father whether there

10 was a landline in that home.

11   MR. MORRIS:  We can install one.  There's not one

12 currently.

13   THE COURT:  Thank you.

14   Now you can -- I forgot.  And I'm sorry about that,

15 Ms. Thompson.

16   MS. THOMPSON:  No problem, Your Honor.

17   THE COURT:  Okay.

18   MS. THOMPSON:  It is the government's position that

19 there are no conditions or combination of conditions that would

20 assure the safety of the community in this case.  It is an Adam

21 Walsh case.  It does fit under that 2006 legislation, and that

22 means there is a presumption of detention.

23   Now, if the defense meets its burden of production, that

24 doesn't mean it's a bursting bubble and that presumption goes

25 away.  But the Fifth Circuit in *U.S. versus Fortna* followed the

First Circuit by saying that presumption continues to carry
weight even if the defense makes some showing in opposition of
it.  And that's important in this case for a number of reasons.

The factors that the Court has to consider in determining
whether to set conditions of release are:  One, the nature of
the offense charged.  He was charged with receiving and
possessing child pornography.  That is a crime of violence.  It
is also a crime involving minor children as victims.

What makes this case different as far as the nature of the
offense goes is that not only do you have the crime of violence
and minor children as victims, but he also has various firearms
and has used those firearms.  There are numerous threats of
violence against every minority group I could think of, and
mailmen.  I don't know where that fits in, but he includes
mailmen in his list of people he's going to kill and rid the
world of.

The weight of the evidence the Court has to consider -- and
in this case it's strong.  The video is of a very young
minority child being anally penetrated.  The defendant admitted
having the -- trading -- not trading.  He admitted being a part
of Instagram groups where he knew people were sharing child
pornography, and that video, as well as other images, are
specifically saved on his phone.

The amount of material he's going through on a daily basis
is large.  He chose to save that as one of the things he wanted

to keep on his phone.  He admitted to the agents that he
knowingly obtained the material using Instagram, and the
forensic review of the phone actually shows the material was
obtained in a variety of ways, one of which was Instagram.  So
I would suggest that the weight of the evidence in this case is
strong.

And the third factor is the history and characteristics of
the defendant.  It is significant that he's only 20 years old.
He's young.  His brain isn't fully formed.  We know
biologically that your brain fully forms for men at age 26.

What is significant about his young age and the -- all of
the information that he's posting, it isn't like he's spending
an hour or two a day doing this.  He doesn't go to school.  He
doesn't work.  He is spending most all of his time living
online.  So he can say it's a fantasy or it's not really real,
but it is his reality.  He's not going out and walking the dog
and going to the grocery store and hanging out with other
people.  He's living online.  So while that -- he says that's
not real, it's real to him because that's all he's doing.

And the hateful propaganda that he puts out there is
troublesome for a variety of different reasons.  We know that
if you look at violent behavior on a consistent and ongoing
basis, it normalizes that behavior.  He says he does it to get
attention.  It's shocking and edgy, and he gets attention.
Well, that's why people go shoot up churches, too, is to get

1  attention.

2      And not -- when I first got this case and the FBI asked --

3  or wanted to confirm that I was going to move for detention,

4  they seemed very concerned and gave me more information.  And I

5  looked up -- the shooter at Marjory Stoneman Douglas High

6  School was 19.  Adam Lanza, who killed his -- a family member

7  before he went to Sandy Hook Elementary and killed 20 people,

8  was 20.  The Sutherland Springs shooter was 26.  He's the

9  oldest.

10     The movie theater in Colorado, that dude was 25.  Eric

11  Harris and Dylan Klebold from Columbine were in their teens.

12  They were both high school seniors.  The Charleston church

13  shooter was 21.  And that's Dylann Roof who this defendant

14  seemed to have a fascination with and scarily, if that's a

15  word, admiration for.

16     The videos he makes about starting a race war and killing

17  minorities is -- goes beyond disturbing.  And what stuck out to

18  me originally was, he has this plan.  And the video -- I asked

19  the FBI to bring it because it's one thing to hear about it,

20  but it's really another to see it, where he's got the mask on.

21  And he doesn't sit all quiet and slumped over.  He is a totally

22  different persona.  He's large and loud and angry, and he

23  screams in these videos.

24     And he -- his plan is to go -- what you have to do to rid

25  us of all these bad people is you buy a van, and he did.  And

1  you buy a shotgun, and he did.  And you buy a skull mask, and

2  he did.  And then you pull the trigger.

3      And he talks about driving the van.  That's what he's going

4  to do through neighborhoods.  And he's firing the shotgun as

5  he's going through different groups.  And the fact that he went

6  and did that is frightening.

7      There are many things -- the white supremacy crap stuff,

8  propaganda that he states.  But he dropped out of school.  He

9  doesn't work.  He plays video games and spends his life online.

10 And the Court has to consider that when looking at the history

11 and characteristics of him.

12     He ran away in October, went missing for three days, didn't

13 call his parents, didn't -- ditched their car to go buy his van

14 to enact his plan.  After that, the timeline involves him

15 dropping out of school and then going missing and then being

16 found in -- the beginning of November is when he makes a whole

17 series of videotapes of himself shooting his new toy behind his

18 house, which is a crime, and then culminates on December 29th

19 when he chats as ProphetOfExtinction333, says, I'm thinking

20 about getting a loan, buying a new rifle, ammo, gear and going

21 HAM on a state capitol building.

22     Now, he gets attention from this online because it's

23 shocking.  But that's what he wants, is the attention.  He

24 mentioned that to numerous FBI agents when he was being

25 interviewed.

His search terms are disturbing. How to make a homemade gun, different things about guns, blowing up a building. There's a video about purchasing explosive material that he's posted on there. He's not only normalizing the domestic terrorist behavior, but he's beginning to act out those fantasies. And that's where it takes a turn.

He's in a vacant house that's still being built when he's got his skull mask on and his angry voice and is burning -- supposedly burning what looks to me like a copy of the Constitution. And he is saluting Hitler and talking about the race war at that time.

If there's a theme in going through his material, including the child pornography, it's degradation and the humiliation of others. I don't know if he has a strong -- I don't know if he has a sexual interest in children. I don't know if he knows his sexual identity. Given the pictures that I've seen on his phone of him dressing up as a girl in a cheerleading outfit, with and without the gun and the gas mask, and pictures of him attempting almost, without going into too much detail, to change the look of his gender, given the other pornography that's found on his phone, I don't know if he knows where he is in that, what his sexual interest is or what his sexual identity is, for that matter.

And I say that because it makes him more dangerous in the fact that he doesn't know who he is, and he doesn't know --

well, he knows what he's doing, and he knows it's wrong, and he

does it anyway.  But he's young and extremely impressionable,

and we still don't know really what his mental condition is.

The diagnosis that I have is anti-social personality

disorder and major depressive disorder.  And those should cause

the Court concern because given the untreated mental health

issues of those, no employment, no education, no real

connection to the community -- he lives with his parents.

They've been back for a year and a half, but he doesn't have a

connection.  He's not engaging with other people, as far as we

can tell, that aren't online.  There's no information that I

recall, from looking at his phone, where he has friends in or

around the neighborhood or real people that come and spend time

with him.

So there's really -- when I look at it, there's no reason

for him not to engage in dangerous behavior.  Everything I know

about him, he has nothing to -- he feels he has nothing to

lose.  Hopefully that changes over time.  But if he was at a

state when the FBI -- when the San Antonio FBI got information

about him, that they believed he was going to engage in an act

of mass violence at that time, the only thing that's changed is

now he's charged with a federal felony where he knows he can go

up to -- go to prison for up to 20 years and then be on

supervised release for the rest of his life.

That doesn't move his ball forward as far as getting better

1  and getting mental health treatment.  That gives him more

2  incentive to go get attention in a very, very bad way.  And

3  that's our concern.  That's what fits into the nature and

4  seriousness of the danger to any person if he's released.

5      We know what he wants to do by looking at what he's posted

6  online and by what's on his phone.  He can tell the FBI or the

7  therapist what -- that that's not true.  I don't really want to

8  do that.  But he's smart enough to know that at that point he's

9  in trouble.  Of course I'm going to say, No, I don't really

10 want to do that.

11     But the amount -- as Special Agent Doran testified, the

12 sheer volume of violent material on his phone makes him a

13 complete danger, someone that we just can't take the risk in

14 letting out at this point.

15         THE COURT:  I have one question for you, Ms. Thompson.

16 You've been focusing on the risk of danger to the community.

17 It seemed to me there might be circumstances upon which you

18 would also be arguing there's a risk of flight in this case.

19         MS. THOMPSON:  Yes.  I think there's a huge risk of

20 flight.  One, in him fleeing.  He's lived in other countries

21 around the world, and of him committing suicide.  The postings

22 show some suicidal ideation.  He did not indicate any of that

23 to the individuals at Laurel Ridge, but he's not going to.  He

24 knows that's going to hurt him at this point, not help him.  He

25 wants to go back home and live with mom and dad until he

1    decides to go do something else.

2        And I think they will do anything the Court asks of them.

3    I think they want this to work out.  But he bought a gun in an

4    hour, maybe an hour and a half online.  Even Mr. Morris

5    commented that he could do that in a shorter period of time.

6    There is just no way to protect the community from what he has

7    spent an enormous amount of time and energy on planning to

8    devastate.  I just don't see any way that we can take the risk

9    in letting him out at this time.

10            THE COURT:  All right.  Thank you.

11        Mr. Morris, let me hear from you.

12            MR. MORRIS:  Thank you, Your Honor.

13        Unfortunately, the way this is being characterized is that

14    Benjamin somehow developed a plan and then started executing a

15    plan, and then now the government is concerned about him going

16    through with the steps in this plan.

17        What you see in the video in which he's talking about, Oh,

18    you got to have a gun, you got to have a van, you got to have

19    your mask.  He's already got them.  He had these props so that

20    he could create this video.  If he'd had a machete, then he

21    would have said, Oh, you got to have a mask, got to have a

22    machete, got to have a station wagon, or whatever it was he

23    had, he was already in possession of it.

24        What we're talking about is not somebody who's planning out

25    some heinous crime.  We're talking about somebody who's making

videos that, quite frankly, are in poor taste and are offensive

to many, many, many populations.  It used to be, young men

would try and one up each other with their car, with their

trading *Playboys*, with getting -- who could steal beer from

dad's house.  That's not today.

Today it's these shock videos, these gore videos, these

trading pornography, by the way, none of which is illegal in

this country.  And that's where this hearing is quickly --

difficult to reign back in to where we started, which is the

charges facing him are one charge of having two photos and one

video of child pornography on his phone.  And they don't know

necessarily how they got there, whether he had to click on them

or whether he had to save them or which Instagram tool put them

there.  That's the government's case.  Out of hundreds of

videos that are nothing to do with that.

And that's the problem.  We've got someone who is clearly

wanting attention, clearly seeking to get the approval of

others by sending them stuff that's surprising to them and is

shocking to them.  And they're doing the same, sending it back.

And that's what these group chats are for.

Every indicator from Laurel Ridge -- and thank God, they're

mental health professionals.  They get to make these decisions,

and we don't have to because we're not.  They know how to ask

questions.  They know how to determine whether someone has

suicidal ideation or homicidal ideation.  Regardless of what

1   you tell them, they can make that determination based on

2   additional factors that they're looking at and additional

3   information.

4        That research was done, and they're not seeing that.

5   They're seeing somebody who's depressed.  They're seeing

6   somebody who's anti-social.  Well, no doubt, his community ties

7   have changed because he's an Air Force kid.  A dad who

8   honorably serves for 35 years is going to be somebody who moves

9   his family around a lot, nine times during the time that he was

10  growing up.  That is always going to be the challenge for

11  someone as an only child like Benjamin who's got to make

12  community ties.  And he did it through Boy Scouts and keeping

13  his friends from Boy Scouts even after he left that system.

14       We've got somebody who has no online posting -- nothing

15  that Ms. Thompson showed you or any of the agents showed you is

16  Benjamin recommending or holding up or somehow lifting up these

17  shooters that she's talking about or these people who cause

18  violence and cause tragedy.

19       And the one thing that's missing from that analysis, no one

20  that Ms. Thompson mentioned had a previous run-in with the law

21  to catch them in their act and to intervene, which is what the

22  Court has the opportunity to do now.  This is the moment when

23  we get a once-in-a-lifetime chance to take him out of custody

24  and to put him in treatment where he is actively engaged in

25  online college, where he's actively engaged in attending real

1  life college with a flip phone, not a cellphone that's a smart

2  phone, and with the ability to engage with a therapist and a

3  forensic psychologist, who's going to help figure out how to

4  move away from what is apparently a very short period into this

5  world.  I think Detective -- I'm sorry -- Agent Miller said

6  three to four months with that Instagram account.  That's a

7  short time in and a short time out.

8      And that's been -- I think Ms. Thompson and I's both hope

9  through this whole thing is to find a way to quickly intervene

10 and to quickly get him away from this world online, this

11 persona of shocking videos as a edgelord because that's -- the

12 fact that it's now part of our common parlance among that

13 community ought to indicate that this is a much more prevalent

14 problem than we were aware.

15     I think there is all kinds of good indicators that there's

16 plenty of support available at home.  He knows the first time

17 he's not where he's supposed to be, pretrial services is going

18 to get a phonecall, and this is all going to be for naught

19 because he's on a very short leash based on the fact that he's

20 in federal custody.

21     But I think this is the moment to intervene in that and to

22 move forward with the ability to change his future in a way

23 that's for the positive instead of lock him up and wait for

24 months and months and months where he's with people who have

25 similar problems, and not fixing them either.

1    So this point, Your Honor, I think based on the discharge

2  summary, based on their recommendation for outpatient treatment

3  on the third page, based on the observations of his being in a

4  stable mood the entire time, very appropriate, interacted with

5  peers in the unit, these are all indicators of someone whose

6  only downside when they're in Laurel Ridge was their inability

7  to have enough time with him to do more work with him and their

8  desire to at some point say to the FBI, Take him now instead of

9  a couple of days from now.

10    But they did recommend, Let's do a forensic psych

11  evaluation and let's get that help, instead of locking him up.

12        THE COURT:  All right.  Thank you.

13    Ms. Thompson, I saw you were looking through papers.  Was

14  there something else you wanted to argue by way of short

15  rebuttal?

16        MS. THOMPSON:  Well, I'm trying to find the -- because

17  I just got the discharge summary right before we walked in,

18  where it says outpatient treatment needed.

19        THE COURT:  It's on Page 4.

20        MS. THOMPSON:  I think --

21        THE COURT:  I'm sorry.  Page 3.

22        MS. THOMPSON:  We started this with the idea that

23  he -- based on what we have, he clearly has some undiagnosed

24  mental health issues.  And if we could get him treated in a

25  safe -- in a place that keeps the community and him safe, that

1   that would be ideal.  But we don't have that.  In fact,

2   pretrial hasn't even done a home visit of the parents' house.

3       And it just -- as far as one more piece of rebuttal, none

4   of -- buying a van, all that stuff, none of that is illegal.

5   But we're not charging him -- we're not trying to charge him

6   with other crimes.  We're not showing them as acts of criminal

7   behavior.  But they are clearly good indicators of

8   dangerousness.

9           THE COURT:  All right.  Thank you.

10      All right, Mr. Bogard.  We've had a relatively long hearing

11  this afternoon.  There are two things that I have to determine

12  in these cases.  One is, are there conditions I can set which

13  are going to reasonably assure that you appear in court?  And

14  we were talking about that.  Also, are there conditions I can

15  set which will reasonably assure the safety of the community?

16      The attorneys have been arguing about the factors I have to

17  consider.  Ms. Thompson actually listed them as the nature and

18  circumstance of the offense, including whether there's a minor

19  victim, which this is a minor victim offense, the weight of the

20  evidence, history and characteristics of the person, including

21  community ties, physical and mental condition, family ties,

22  also -- and to your favor, whether there's any drug abuse or

23  alcohol abuse and criminal history, which there's not, and

24  also, as Ms. Thompson pointed out, the nature and seriousness

25  of the danger to any person or the community that would be

1  posed by your release.  So I have to consider all those

2  factors.

3      As Ms. Thompson pointed out, and I have to say I agree with

4  her, this is a presumption case.  That means because of the

5  charge in the complaint -- and that's -- it not on the front of

6  the complaint, but it's in the affidavit -- there's probable

7  cause to believe that there's a receipt of child pornography in

8  this case.  For that reason there's a presumption that I can't

9  set conditions.

10     But that presumption can be rebutted, which means if your

11  attorney presents evidence, then I can set conditions if I find

12  that they will reasonably assure that you're going to appear in

13  court and reasonably assure the safety of the community.

14     I will tell you that I have great concerns in this case.  I

15  think Ms. Thompson has eloquently presented the risks that are

16  involved here.  We have two -- first of all, I am considering

17  the discharge summary which shows two mental disorders that

18  are -- at this time have been untreated to this day.  In fact,

19  I think we just now have the medication.  We have what looks to

20  me to be a example of flight; that when you were facing a bad

21  situation, you left for Dallas.  And at the same time you did

22  that, you bought a van and got a shotgun, things that are --

23  show -- or concern me.  Firearms are -- we have child victims

24  in these cases, in child pornography cases.  That's of great

25  concern to the Court.

1    And, as argued by the -- by the agents, each one of them,

2    we have all these videos, including videos that you made

3    showing a desire to engage in extremely violent activity.

4    That's of great concern to the Court.  These are the sorts of

5    things -- as Ms. Thompson has eloquently argued, these are the

6    sorts of things that we see every day in the paper.  They give

7    great concern.  And I have to be -- I have to have a lot of

8    pause and hesitation before I release somebody like that

9    because it's up to me to reasonably assure the safety of the

10   community.  And I've got concerns in this case.

11       That being said, the issue is not whether you're a risk of

12   danger.  The issue is whether there are conditions I can set

13   which would reasonably assure the safety of the community.  I

14   believe there are conditions I can set.  But I'll be very frank

15   with you, Mr. Bogard.  They're the most restrictive conditions

16   I can set.  I cannot set anything but the most restrictive

17   conditions in this -- in this case because I'm very concerned.

18       What the conditions I would be recommending -- or be

19   imposing in this case are, first of all, there'd be home

20   incarceration, which means you are home unless you're visiting

21   your attorney, going to the doctor or going to court.  I am --

22   and then if -- anything else besides that would be very

23   limited, have to be approved by the Court.  And obviously no

24   firearms.  Your parents would both have to sign as sureties in

25   this case and custodians.

1    I am going to be setting a higher bond than I usually set,

2    a bond of $75,000.  So if you don't show up for court, not only

3    would -- or do anything in violation of the conditions, not

4    only would you have that judgment against you, but your parents

5    would have a $75,000 judgment against them.

6    I will require electronic monitoring in this case, which

7    means your parents have to get a landline, which means if you

8    leave the house, I'm going to know about it, and we're going to

9    come pick you up.  I'm going to require mental evaluation and

10   treatment.  I am very thankful for Laurel Ridge to give this

11   evaluation, but I think we need a full forensic evaluation to

12   see if there's any other concerns that have to be raised.  And

13   you have to -- you have to submit to all treatment that's been

14   recommended.

15   Your home has to be approved by pretrial services, which it

16   has not yet.  And a landline has to be put in so that I can

17   have electronic monitoring.  Also, you have to agree and your

18   parents have to agree to subject your home to search at any

19   time if the government wants to search, because they have not

20   searched that house.  And I'm going to let them do that.  I'm

21   going to make absolutely sure we have no other dangers there.

22   I know that your parents have looked for guns.  That doesn't

23   satisfy the Court.  I want the FBI to be able to do that if

24   they wish.

25   I am also going to require the full sweep of Adam Walsh

1  protections, which means you can't have any access to the

2  internet; that all the access to the internet the home will be

3  modified -- will be monitored; and that any internet device

4  will have a password on it that only your parents know.  I'm

5  going to take -- I'm taking -- I'll be frank.  I'm taking every

6  single security that I can here because I'm concerned.

7      I'm also going to have, obviously, no contact with children

8  under 18 years old, no going where they congregate.  I am going

9  to restrict your travel to Comal and Bexar County.  I don't

10  think you need to go anywhere else for the things that you

11  need.  But if you need to go somewhere else for, for example,

12  mental health treatment or other sort of -- or treatment like

13  that, I will consider allowing you to go for that treatment.

14      So those are -- I will tell you, those are about as

15  restrictive conditions as I can set.  I don't think I've ever

16  set anything more restrictive than that.  I have to set all of

17  these conditions in my -- in this mind, because I am actually

18  quite persuaded by the government that's there a serious risk

19  here.  I'm going to take every action I can to [inaudible]

20  against that risk.

21      However, I believe -- and I know Ms. Thompson may disagree

22  and the agents may disagree.  But I believe that we take all

23  these conditions and I get the approval from pretrial services

24  as to your parents' home, then those conditions will reasonably

25  assure the safety of the community.

I will tell you, Mr. Bogard, you can't violate any of these

conditions.  I've -- if you violate any of the conditions, I

have to put you in jail.  I have no choice.  My job here is

to -- I don't care about guilt or innocence.  That's not my

job.  That's a different court.  My job is to protect the

safety of the community, and that's what I'm going to do.  So

that's the Court's ruling.

Ms. Thompson, it's going to take some time for all this to

happen.  You maybe wish to appeal this decision.  In my view I

think these conditions are sufficient, but I understand your

concerns.

MS. THOMPSON:  I don't know how long it will take for

pretrial to do the home visit, but I would --

THE COURT:  And to also get the landline.  Yes.

MS. THOMPSON:  I would ask for a stay of seven days to

at least confer with my supervisors about the issue of appeal.

THE COURT:  Well, I'll do this.  I don't want to stay

that investigation.  I want them to go over there.

MS. THOMPSON:  Oh, not the pretrial services

investigation but --

THE COURT:  Well, I'm going to -- the conditions I

would set, all those conditions will be subject to their

approval.  I'm not going to sign the approval until they've

come back to me.  And I'm happy to -- I don't know if I can

wait seven days.  I may wait until Monday, give you until

1    Monday to decide, to see if you're going to appeal.

2        But I've thought about this.  This is a troubling case to

3    the Court's view.  I'm not going to stay it beyond Monday.  If

4    all -- if pretrial services approves the home and a landline's

5    in place, I'm going to release him.  But you can seek a stay

6    from the -- from the duty district judge if you believe it's

7    appropriate, or if you want me to reconsider that decision, you

8    can file a motion asking me to reconsider the decision.

9            MS. THOMPSON:  And could that be -- either one be

10   filed by the end of the day on Monday?

11           THE COURT:  Yes.  Well, yeah, let's try -- can we do

12   by noon on Monday?  Because if I'm going to get his parents

13   down here and get this squared away, I don't want to be doing

14   it at 6:00 at night.

15           MS. THOMPSON:  I will try.  And I'm going to try and

16   confer with my supervisors tomorrow.

17           THE COURT:  All right.  Right.  But if you need

18   additional time, you know, just come to me and tell me, file

19   something and I'll consider it.  It's going to take a little

20   bit of time to get all these things squared away, and I want to

21   be -- I'll be frank with Mr. Bogard and his family and

22   Mr. Morris.  I've got to be completely satisfied myself that

23   all those conditions that I've set are imposed.

24       If there are any additional conditions that pretrial

25   services wants me to consider besides the ones I've mentioned,

1    I'm happy to consider those as well.  Oh, I should mention, no
2    drugs and no alcohol.  Though I don't believe that's a big
3    issue in this case, I'm still going to impose it.
4        Yes, Mr. Morris.
5            MR. MORRIS:  Last quick question.  Are we withdrawing
6    the exhibits?
7            THE COURT:  The exhibits are -- the government's
8    exhibits, as far as I know -- the report that you gave me has
9    not been admitted as an exhibit, but the parties have argued
10   from it.
11           MR. MORRIS:  Right.
12           MS. THOMPSON:  I would like mine to be a part of the
13   record.
14           THE COURT:  Which one?  I'm sorry.  They're made part
15   of the record.
16           MR. MORRIS:  Can we ask then that they be sealed?
17           THE COURT:  The -- yeah, sure.
18           MR. MORRIS:  The exhibits themselves.
19           THE COURT:  Yeah.  Sure.  They'll all -- all exhibits
20   will be sealed.
21           MR. MORRIS:  Thank you very much.
22           THE COURT:  But they need to be part of the record in
23   case there is an appeal.
24           MR. MORRIS:  I totally understand.
25           THE COURT:  And it's just the Government's Exhibit 1

1  [inaudible].  Hold on one second.  Let me get someone to

2  clarify all the things I may have did wrong.  Yes.

3      (At the bench off the record)

4          THE COURT:  All right.  That concludes this hearing.

5  We'll be in recess.

6  * * *

7      (End of proceedings at 5:09 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

-oOo-

    I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


Date:  3/4/2019

                    /s/ Chris Poage
                    United States Court Reporter
                    655 East Cesar E. Chavez Blvd., Suite G-65
                    San Antonio, TX  78206
                    Telephone:  (210) 244-5036
                    chris_poage@txwd.uscourts.gov