```
 1                    UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF TEXAS
 2                       SAN ANTONIO DIVISION

 3    UNITED STATES OF AMERICA,      :
      Plaintiff,                     :
 4                                   :
      vs.                            : No. SA:19-CR-106-DAE
 5                                   : San Antonio, Texas
      BENJAMIN JOOST BOGARD(1),      : August 5, 2019
 6    Defendant.                     :
      *********************************************************
 7
                        TRANSCRIPT OF SENTENCING
 8               BEFORE THE HONORABLE DAVID A. EZRA
                  SENIOR UNITED STATES DISTRICT JUDGE
 9
      APPEARANCES:
10    FOR THE GOVERNMENT:
        Tracy Thompson, Esquire
11      United States Attorney's Office
        Criminal Section
12      601 N.W. Loop 410, Suite 600
        San Antonio, Texas  78216
13      (210)384-7150; tracy.thompson@usdoj.gov

14
      FOR THE DEFENDANT:
15      Michael J. Morris, Esquire
        Morris & Bermudez, PLLC
16      299 W. San Antonio Street
        New Braunfels, Texas  78130
17      (830)626-8779; mmorris@mmbiblaw.com

18

19

20    COURT REPORTER:
      Angela M. Hailey, CSR, CRR, RPR, RMR
21    Official Court Reporter, U.S.D.C.
      655 East Cesar E. Chavez Blvd., Third Floor
22    San Antonio, Texas  78206
      Phone(210)244-5048
23    angela_hailey@txwd.uscourts.gov

24    Proceedings reported by stenotype, transcript produced by
      computer-aided transcription.
25
```

1    *(Monday, August 5, 2019, 1:38 p.m.)*

2                              *   *   *

3            COURT SECURITY OFFICER:  All rise.

4            THE COURT:  Please be seated.

5            COURTROOM DEPUTY CLERK:  SA:19-CR-00106, United States

6    of America versus Benjamin Joost Bogard.

7            MS. THOMPSON:  Good afternoon, Your Honor.  Tracy

8    Thompson appearing on behalf of the United States.

9            THE COURT:  Good afternoon.

10           MR. MORRIS:  Good afternoon, Your Honor.  Mike Morris

11   on behalf of Mr. Bogard.

12           THE COURT:  Good afternoon, Mr. Morris.  You and your

13   client want to approach the podium?

14           MR. MORRIS:  Very good, Your Honor.

15           THE COURT:  All right.  Mr. Bogard, have you had a

16   full and ample opportunity to discuss with your attorney the

17   presentence report and to review it with him and to make any

18   objections you wish to make?

19           THE DEFENDANT:  Yes, Your Honor.

20           THE COURT:  All right.  On February 20th of this year,

21   an indictment was filed in the United States District Court

22   here in the Western District of Texas against the defendant,

23   Benjamin Bogard, charging him with one count of possession of

24   child pornography in violation of 18 United States Code,

25   Section 2252A(a)(5)(b).

1          On April 17th of this year, the defendant entered into
2     a written plea agreement.  Pursuant to that agreement, on
3     April 18th, 2019, the government filed a superseding
4     information charging the defendant with one count of possession
5     of obscene material, representations of the sexual abuse of
6     children, in violation of 18 U.S.C. 1466(a)(b)(1) and (d)(4).
7          On May 1 of this year, the government filed an amended
8     superseding information containing the same charge as the April
9     18, 2019 superseding information, but including a notice of
10    forfeiture.  On the same day, May 1, 2019, the defendant pled
11    guilty to the superseding information.  Pursuant to the written
12    plea agreement, the government recommends and has recommended a
13    three-level reduction for acceptance of responsibility.
14         Now, the Court has reviewed the Rule 11 plea agreement
15    and because I am satisfied that the government has -- the
16    agreement rather, adequately reflects the seriousness of the
17    actual offense behavior and that by accepting the plea
18    agreement, the Court will not be undermining the statutory
19    purposes of sentencing.  Without objection, the plea agreement
20    is hereby accepted.
21         Now, the Court adopts the factual statements contained
22    in the report as to which there are no objections and would
23    address the controverted factual statements and disputes as
24    follows.  Objection number one, the defendant objects to
25    paragraph number one as irrelevant because he pled to the

1   superseding information and these matters were not included in

2   the agreed factual basis to which the defendant and the

3   government mutually agreed and do not comprise defendant's

4   relevant conduct.  The Court is going to overrule the

5   objection.  The presentence report provides a historical

6   account to the Court of all filed charging documents in

7   paragraphs one through three and clearly reflects the charging

8   document the defendant pled guilty to.

9          All right.  Objection number two, the defendant

10  objects to paragraph nine because in his view it describes an

11  additional image depicting child pornography not included in

12  the factual basis of the plea agreement and states that the

13  images were sent numerous times to himself and others.

14  Defendant asserts that the defense has not been provided

15  evidence on numerous sendings reposting or of

16  self-transmission, that the probation officer cannot testify

17  about any motivation for any alleged self-transmission and that

18  these matters were not included in the agreed factual basis and

19  these do not comprise defendant's relevant conduct.

20         He also objects to paragraph ten because it describes

21  additional images not included in the factual basis which

22  reference racist or satanic organizations because they are

23  irrelevant and highly and unduly prejudicial in his view and

24  protected by the First Amendment.

25         Paragraph eleven describes images of the

S E N T E N C I N G                    5

1    plaintiff *(sic)* in the bathroom wearing a skirt, some of which

2    includes his exposed genitals; statements of hate towards

3    multiple races, religions and genders as well as indications of

4    ideology and planning potential mass violence; videos of the

5    defendant burning a copy of the U.S. Constitution and giving a

6    Nazi solute; a video of him holding a gun and giving

7    instructions on how to kill Mexicans, women and mailmen and

8    that the defendant was identified as an administrator of a

9    social group related to raping women.

10           The defendant objects to paragraph eleven because it

11   describes additional images not included in the factual basis

12   which reference the defendant's self-made photos and videos.

13   Additionally, the defendant objects to paragraph eleven

14   asserting that he was an administrator of a social media group

15   about raping females because he was given no evidence of this,

16   the matters were not included in the agreed factual basis of

17   his plea and do not comprise defendant's relevant conduct.

18           He objects to paragraph 12 because it describes

19   additional information about the defendant, provided by another

20   inmate, which was not included in the factual basis and that no

21   evidence, in his view, related to it was given to the defense

22   and it does not comprise, in his view, relative conduct.

23           Ms. Thompson.

24           MS. THOMPSON:  Your Honor, with regard to all of

25   those, the additional images of child pornography were made

1   available to the defense.  They are relevant conduct.  There

2   are a total of four images and one video specifically depicting

3   real children engaged in sexually explicit conduct.  There are

4   also a number of images not described in the PSR that depict

5   anime of adults engaged in sexually explicit conduct with

6   children.  So anything with regard to the obscene visual

7   representations of children is part of the offense conduct.

8   Just because it was not part of the agreed to -- the factual

9   basis did not comprise all of the facts in this case.  So the

10  additional child pornography is clearly relevant conduct.

11          With regard to the other information in there, this

12  case was continually investigated from the beginning.  So, much

13  of the information was provided to Mr. Morris during an

14  evidence review.  Additional information was provided to his

15  defense expert, the computer expert in this case, David Galant.

16  And then I believe -- well, everything was made available to

17  them to come look at, but the FBI probably went through the

18  most detailed look at the evidence with Dr. Fabian because he

19  was the one to review that information last.  I think all of

20  that is appropriately put in the presentence report.

21          In order for the Court to sentence this defendant, the

22  Court has to look at the whole person.  And if some of the

23  exhibits provided by defense counsel look at the good side of

24  Mr. Bogard, I think the Court needs to look at everything that

25  the FBI found and everything we know about Mr. Bogard.  And so,

1   therefore, I think it's -- all that's appropriately in the

2   presentence report.

3           It's like saying you can put in the ribbon he got for

4   making his bed every day, but you can't look in the closet.

5   All of that is information that was found based on the FBI

6   investigation and it's appropriate for the Court to know in

7   sentencing Mr. Bogard.  And the Court will appropriately

8   consider it for what it's worth.

9           THE COURT:  Counsel.

10          MR. MORRIS:  If I can just briefly respond, Your

11  Honor.  As an example of what we're dealing with, if I can

12  approach and ask this to be handed to the Court.  We received

13  this about 20 minutes ago.

14          *(Pause.)*

15          This is the testimony from the inmate in Mississippi

16  who is interviewed apparently by the FBI months ago.  We

17  received it 20 minutes ago.  We objected to it in our report a

18  week ago, didn't see it since then either.  We're playing

19  against the blind man's bluff.  Why have an agreed factual

20  basis with the government, why have an agreement as to what the

21  evidence is or isn't and what we're presenting to the Court

22  when, in fact, the evidence just continues to mount and mount

23  and mount every day after we've entered our plea agreement with

24  the government as to what the scope is of the plea in front of

25  the Court?  One count of obscenity, that's the plea.  To then

1   make this into a tremendous wealth of videos and other

2   testimony by other people and by other persons and by other

3   accusations that we have no right to confront and no right to

4   challenge makes this a very difficult proposition --

5           THE COURT:  Well, I'm not going to consider any

6   information -- I had already determined that I'm not going to

7   consider any information from this so called informant because

8   I have no idea the relevance and the quality and -- you know,

9   before considering any evidence in sentencing, the Court has to

10  be convinced that the evidence is credible.  And I have no way

11  of determining whether this evidence is credible or whether

12  this individual is simply seeking to better himself by

13  providing something to law enforcement in an effort to try to

14  do himself some good.

15          However, Sentencing Guidelines 1(b)1.3(a)(1)(a)

16  defines relevant conduct as all acts and omissions committed,

17  aided, abetted, counseled, commanded, induced, procured or

18  willfully caused by the defendant and that occurred during the

19  commission of the instant offense.  Doesn't have to be the

20  instant offense, just during the period of time.  The defendant

21  is also -- should note U.S. Sentencing Guideline 6(b)1.4

22  comment (N), which states that the Court is also not obligated

23  to accept the stipulations of the parties.  Even though

24  stipulations are expected to be accurate and complete, the

25  Court cannot rely exclusively upon stipulations that ascertain

1   the factors relevant to the determination of sentence.  Rather

2   in determining the factual basis for the sentence, the Court

3   will consider the stipulation together with the results of the

4   presentence investigation and any other relevant information.

5              Justice Kennedy, retired Justice Kennedy, in one of

6   his opinions during the washout period of the Guidelines,

7   stated that a trial court's obligation -- obligation, not what

8   we would like the trial court to do, what we think the trial

9   court ought to do -- the trial court's obligation is to look at

10  the whole person.  And defense counsel frequently address that

11  to this Court.  They want me to look at the whole person.

12  Don't just look at the bad stuff that he did, look at the good

13  stuff that he did or she did.  And in this case, the Court has

14  to evaluate the defendant's conduct in order to determine with

15  any degree of reasonable certainty whether the defendant poses

16  a danger to the community, which is one of the 3553 factors,

17  and I have every intention of doing that in this case.  And

18  during the period of time when he was engaged in this behavior,

19  he was also engaged in other behavior which was concurrent with

20  it and connected to it.  And so the Court is going to overrule

21  the objection to the extent that you seek to bar the Court to

22  only consider and only evaluate the defendant's conduct for

23  which he specifically pled guilty and ignore all of the other

24  relevant conduct which the Guidelines mandate that the Court

25  look at and the 3553 factors compel me to consider.  I will not

consider unreliable information and that means this thing here
that you just gave me about this so called informant because I
have no way of ascertaining the reliability of that
information.  But the other information presented and contained
within the presentence investigation report is highly reliable
and accurate and so the Court will consider that information.

            MR. MORRIS:  Very good, Your Honor.

            THE COURT:  All right.  Objection number three, the
defendant objects to paragraph three as to the way it's written
as he describes an interview with the defendant's parents.
Defendant objects to the implication that his parents had no
knowledge of his plans related to the white van and camping
trips, that the phrase "live out of the van" is needlessly
derogatory, that the paragraph is inaccurate because he lived
at home for eleven months, not eight as stated in the
paragraph, and that it was not a secret that defendant quit
school because he told his parents he had quit school.

            Now, to the extent I think that it may provide a
shadow on the facts one way or the other, the Court thinks
that -- I mean, in reading it, I did not see this as an intent
by the probation officer to purposely shade it in such a way
that it created a bad impression of the defendant.  The fact of
the matter is that the information contained there is accurate
and I'm not going to order it be reformed because there's no
need to.  I mean, he's reading it, he doesn't like what it

1    says, it's unfortunate, but there isn't any inaccuracy.  The
2    objection isn't that it's inaccurate, it's just that it's done
3    in a way that he doesn't like.  And that's really not an
4    appropriate objection.
5          Objection number four, defendant objects to paragraphs
6    20 and 22 which provides an enhancement for the offense conduct
7    including a minor less than 12 years old and an enhancement for
8    the offense conduct with infants or toddlers.  The factual
9    basis contained in the plea agreement describes a video as
10   depicting a minor female child, one picture is depicting an
11   infant child and another image as depicting a prepubescent
12   toddler.  The factual basis thus supports these enhancements
13   and the objection is overruled.  In addition, the Fifth Circuit
14   has indicated that the determination of whether an image
15   depicts a child can be based on the images themselves.  So the
16   objection is overruled.
17         This objection, however, I think may well have merit,
18   objection number five.  The defendant objects to paragraph 21
19   which provides an enhancement for distribution in exchange for
20   any valuable consideration.  Basically the objection -- there
21   was a five-level enhancement.  The objection is predicated on
22   the defendant's obtaining something of value in exchange for
23   the pictures which he shared.  The problem is that the value
24   the government attributes or attempts to attribute here is so
25   ethereal and not susceptible to any kind of quantification that

1    it becomes virtually impossible to determine with any degree of

2    certainty.  The Fifth Circuit requires four findings to apply

3    this guideline.  The defendant agreed to an exchange with

4    another person.  No question about that.  But did he get any

5    images in return?  No.  Did he get any money in return?  No.

6          Number two, he knowingly distributed child pornography

7    to that person.  Okay, well, we agree that occurred.  Had the

8    purpose of obtaining something of valuable consideration, and

9    that's the problem, and received valuable consideration from

10   that person.  Now, the list of things described is clearly not

11   exhaustive, but social media "likes" does not appear to be the

12   sort of valuable consideration described in the commentary.

13   Black's Law Dictionary describes valuable consideration to be

14   consideration that either confers a pecuniary measurable

15   benefit on one party or imposes a pecuniary measurable

16   detriment on the other.

17         Now, we know that in the child pornography context, it

18   doesn't actually necessarily have to be a pecuniary benefit.  I

19   have found a benefit where one exchanges an image in return for

20   receiving an image or images, over objection of defendants, and

21   I've been affirmed on appeal.  I don't know whether that was

22   here in the Fifth Circuit or back in the days when I was in the

23   Ninth Circuit, but that's clearly in my view a serious benefit.

24   Now, if he was a media influencer, you know, you see all these

25   young women who try on clothes and they get these "likes" and

1   then based upon the "likes", their value to advertisers

2   increases, therefore, they make more money.  That might be a

3   viable argument in that case.  If somebody was a media

4   influencer or a personality, some fellow who was a sports

5   personality and his value was enhanced to advertisers based

6   upon the number of "likes" he received.  In this case, however,

7   we have no evidence of any type of benefit other than he liked

8   to get "likes", internally.  And that is so broad and so

9   indefinite as to be unquantifiable.

10          Now, it's important for this Court to be measured.

11  And the Fifth Circuit nor any other Circuit I have -- nobody

12  has cited me any cases where anybody has ever had an

13  enhancement predicated on "likes" on social media, particularly

14  in a situation where those "likes" on social media don't result

15  in any possible pecuniary benefit to him.  So Ms. Thompson,

16  what have you got that supports this, other than your feeling

17  that, gee, wiz, he got "likes" and he wanted "likes" and so

18  that's a benefit to him?  I think that's extremely ethereal.

19          MS. THOMPSON:  I understand the Court's concern.  When

20  I first did the guideline calculation for this case, I added a

21  two-level enhancement for distribution, just distribution for

22  any other reason, not for valuable consideration.  But once I

23  read the presentence report, it does make sense.  The

24  Sentencing Guidelines were recently changed.  It used to be if

25  you are using peer to peer software and exchanging child

1    pornography, just putting it out there for other people, then

2    you got that five-level enhancement.  And the Sentencing

3    Guideline Commission decided no, we're not going to do that.

4    It has to be more of a direct connection.

5                THE COURT:  Right.

6                MS. THOMPSON:  Not a one-on-one necessarily, but more

7    of an exchange for people, or to a person.

8                THE COURT:  But he didn't get anything back.  This is

9    one of the very rare cases I've ever had -- and I've been

10   sentencing people for child pornography for virtually all of my

11   31 years on the bench.  This is not a new offense, I'm sorry to

12   say, where people didn't exchange child pornography to others

13   or transfer to others in return for getting them back because

14   what they want and what satisfies their need is fresh material.

15   They want fresh material.

16               MS. THOMPSON:  But it's not limited to that.  And

17   under the Guidelines, the Court mentioned it has no pecuniary

18   value.  If you're doing it for pecuniary value, that's seven

19   levels, that's under a different --

20               THE COURT:  No, I understand that and I said that.  I

21   said we don't need pecuniary.

22               MS. THOMPSON:  Right.  This is any valuable

23   consideration.  Child pornography has no general community

24   value, but it has value if you have a sexual interest in

25   children.  What Mr. Bogard valued at that point was attention.

1  He was lonely, he needed attention.  And in the group that he's

2  posting, other people aren't posting child pornography.

3  They're posting other gross stuff, but he's posting child

4  pornography specifically for attention, to get them talking to

5  him, to get them talking about him, to get them liking it.

6  It's not just when you click "like" on Instagram, these are

7  private groups and he's getting their direct attention and that

8  is valuable to him.

9         THE COURT:  Yeah, but the problem is it's not the kind

10  of value that one can easily quantify.  I mean, I can certainly

11  see where if you exchange child pornography and you receive

12  child pornography in return, that is an easily quantifiable

13  value because this -- sadly, this child pornography has not

14  just a psychological value, it actually has a monetary value.

15  People actually purchase child pornography and sell child

16  pornography, so it has a monetary value.  And it may be highly

17  elicit and inappropriate, but it has a monetary value.  And so

18  when somebody exchanges something for something else, it's a

19  bartering arrangement.  Basically what they're engaging in is

20  bartering.

21         Now, if we had a situation such that you have

22  described and then we looked, as I mentioned, to see, okay,

23  well, he got something of value out of this because he became

24  the president of his organization as a result of that and he

25  couldn't have if he didn't have so many "likes", or to

1    advertisers in his realm of A-Chan *(ph)* or whatever they called

2    it.  I think that thing has been taken down as of today.  He

3    became some sort of an influencer and people sent him things or

4    gave him things as a result of that.  I have no evidence of any

5    of that.  All I have is the suggestion that I should somehow

6    try to quantify the value of a person's internal gratification

7    in receiving "likes", which is going to be different for each

8    person and there is no way for me to measure it.  I'm stepping

9    here on some very shaky ground, I should say the least, and I'm

10   not willing to do that in this case.  If we had more

11   evidence -- as I said, I'm not going to say here today that I

12   will never find in a case that someone who is just getting

13   social "likes" in return for their sharing of child pornography

14   or other elicit wouldn't be susceptible to an enhancement for

15   that because I think in the proper circumstance it might well

16   be that they were getting something of value even though that

17   value might be one step away.

18           Just like I've talked about a social influencer, they

19   can show, Look, I now have 2 million "likes".  And let's say an

20   advertising company that's working with someone says, Okay,

21   well, now you've got 2 million "likes" and we'll pay you X

22   number of dollars, but if you get 4 million "likes", we'll pay

23   you Y number of dollars.  So they're striving to get more and

24   more "likes".  That certainly is something of substantial

25   value, not just value, to the individual in return for what

S E N T E N C I N G                    17

1    they're doing.

2          In this case, the only benefit would be his internal

3    gratification.  And that, sadly, is an inherent part of

4    somebody who has this kind of desire to look at these -- in

5    other words, at every instance, virtually every instance of

6    child pornography we would have the same thing because these

7    people are looking at this for a purpose.  What?  What is the

8    purpose?  Self-gratification.  They look at it because they get

9    some sort of benefit out of it personally that most of us

10   don't.  In fact, the opposite.  And I think that if that was

11   the Sentencing Commission's -- if they wanted to go that far,

12   they would have expressly said so.

13         MS. THOMPSON:  They did give other examples like

14   access to a child, but none of them -- I agree with the Court

15   and I could not find a case where the valuable consideration

16   was something specifically valuable to the defendant and nobody

17   else.

18         THE COURT:  That's right.  We did have -- and you and

19   I have had cases where access to the child -- we had a daycare

20   case.  That is something of value to the person that is outside

21   of themselves.  This is not.  And so I am going to sustain the

22   objection in this case.  Under the very strange and unusual

23   circumstances we have here, it just simply doesn't qualify.

24   Now, look, if the Fifth Circuit told me that this is a case

25   where Ezra got it wrong and he should have quantified that as a

1    benefit, I'm more than happy to apply it in this case and in

2    any other case that comes along, but I think that it is -- it

3    would be highly inappropriate for a District Judge to basically

4    rewrite the Sentencing Guidelines, which is what I would have

5    to do here, and expand them to add this in.  And it's just much

6    too indefinite, ethereal and it doesn't meet the standard, I

7    don't think, so I'm going to sustain that objection and strike

8    those five levels.

9            MS. THOMPSON:  It would go down to two levels.

10           THE COURT:  Two levels, rather, I'm sorry.  Strike the

11   three levels.  The two levels.  It will go to the two-level

12   enhancement instead of the three-level, which is what you said

13   you had initially thought was the appropriate level anyway.

14           MS. THOMPSON:  Correct.

15           THE COURT:  And I don't think that the probation

16   officer was out of bounds.  I'm not suggesting for a moment

17   that an argument couldn't be made, but the Court doesn't

18   sentence predicated on argument.  I have to have some legal

19   basis, particularly when enhancing a sentence, the Court has to

20   have a clear foundation upon which to do that.  And in this

21   case, that is a bridge too far.  So that objection is

22   sustained.

23           Now, let me move on to objection six.  The defendant

24   objects to paragraphs 28 and 30 which overstate the offense

25   level.

1              Other than my ruling on the previous, that is

2    overruled because I believe the offense level -- it will be

3    corrected -- is the correct offense level.

4              The defendant objects to paragraph 47 which indicates

5    that he does not have emotional and mental health issues.

6              That objection is overruled.  There's no question in

7    my view based on the PSR that the defendant does have some

8    mental health issues.

9              MR. MORRIS:  And I misunderstood, Your Honor, his

10   objection to it was that he was unaware of his -- that

11   self-diagnosis, that was our objection.

12             THE COURT:  Okay.  Well, I don't know that that makes

13   any difference.

14             MR. MORRIS:  Certainly does not.

15             THE COURT:  Objection number eight, the defendant

16   objects to paragraph 50 which indicates the defendant is not

17   receptive to alcohol or drug treatment because he alleges he

18   does not consume drugs or alcohol, so such treatment is

19   unnecessary.

20             During the presentence interview, the question on form

21   one, which is the questionnaire he completed, asked the

22   defendant if he is receptive to drug or alcohol treatment.  He

23   answered no.  The presentence report merely reflects his own

24   answer.

25             MR. MORRIS:  And of course, when it just says yes or

S E N T E N C I N G                                    20

1    no, the underlying question that it begs is have you ever used

2    drugs or alcohol.  And he's never.  He's 20 years old, he's

3    never used drugs or alcohol.

4              THE COURT:  I don't think it presumes that.

5              MR. MORRIS:  Okay.

6              MS. THOMPSON:  It actually says that in the

7    presentence report, that he's denied using it.  I think he said

8    he tried it once and didn't like it.  So it's a non-issue.

9              THE COURT:  Right.

10             MR. MORRIS:  And the remainder of these are

11   non-issues, Your Honor.  I'm sorry, I don't want to drag you

12   through the rest of them.

13             THE COURT:  Are you withdrawing the rest of the

14   objections?

15             MR. MORRIS:  Sure, they make no difference on the

16   score, Your Honor.

17             THE COURT:  Are you okay with him withdrawing the rest

18   of the objections?

19             THE DEFENDANT:  Sure.

20             THE COURT:  Sure?  Is that yes?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  All right.

23             MR. MORRIS:  The only one I would bring up, Your

24   Honor, are objection ten talks about the $5,000 for the

25   financial assessment.  The probation officer will determine

S E N T E N C I N G                    21

1    whether that applies or not.  I don't think it does because I

2    don't think the charge to which we've pled is within that

3    subset of charges, but they can figure that out.  I don't think

4    I'm going to tell them anything they can't figure out from the

5    statute.

6              THE COURT:  Ms. Thompson.

7              MS. THOMPSON:  Technically it applies to this charge

8    if the defendant is not indigent.  And while he has private

9    counsel, I believe all of those expenses were paid by his

10   parents.

11             THE COURT:  I think he's indigent.  The Court has no

12   intention of imposing it.

13             MS. THOMPSON:  Thank you.

14             MR. MORRIS:  Thank you, Your Honor.

15             THE COURT:  I didn't have any other objection, so I

16   need to get a recalculation.

17             PROBATION OFFICER:  Yes, Your Honor.  We'll have a

18   total offense level of 27, still a category one.  A range of 70

19   to 87 months.  Supervised release will remain the same.

20   Eligibility for probation is still ineligible.  A fine range of

21   25,000 to $250,000.  Still no restitution.  A special

22   assessment of a hundred dollars remains the same.

23             THE COURT:  Thank you very much.  And you don't object

24   to that calculation, is that right?

25             MR. MORRIS:  I do not.

1              THE COURT:  All right.  So the Court finds the offense

2    level is 27, criminal history category is one, the imprisonment

3    range is 70 to 87 months, supervised release of one to three

4    years, probation is not available and a fine of 25,000 to

5    $250,000 and a 100-dollar special assessment.

6              All right.  You may proceed, counsel.

7              MR. MORRIS:  Thank you very much, Your Honor.  As you

8    know, as you've just recited, probation under the Sentencing

9    Guidelines, this case does not fall within Zone A or B or C

10   where those are usually considered.  However, as this Court has

11   determined previously, there is the opportunity for variance.

12   Why would this Court vary its sentence down to a position to

13   where probation or supervised release would be the actual

14   finding of the Court?  Let me give you three reasons, Your

15   Honor.  The first one is talked about by the U.S. Supreme Court

16   in the case called Tapia.  And it talks about how this Court

17   has inherent jurisdiction over everyone it supervises in

18   probation and supervised release.  However, the moment this

19   Court sentences someone to any term in the Bureau of Prisons,

20   everything that this Court would order becomes a suggestion and

21   the Bureau of Prisons determines all factors from that point on

22   based on their determination of what's going on in the case.

23   It is this Court that is better suited, better equipped and

24   better able to handle the rehabilitation in this case which is

25   one of the 3553 factors that this Court should consider.

1    Rehabilitation of this case cannot proceed without this Court's

2    intervention.  And we have Dr. Fabian and Dr. Simi as very good

3    experts testifying as to the need, the equipment and the scope

4    of what those would be.  And I am fully aware that the Court

5    has reviewed those letters and knows those very well, so I'm

6    not going to go into the details of them, but that would be the

7    first consideration we'd ask the Court to consider is the U.S.

8    Supreme Court's holding in Tapia and why rehabilitation is

9    necessary.

10             Secondly --

11             THE COURT:  Well, I can't sentence based on

12   rehabilitation.

13             MR. MORRIS:  As one of the 3553 factors,

14   rehabilitation is one of the four the Court is allowed to

15   consider.

16             THE COURT:  But I cannot impose a sentence

17   specifically predicated for the basis of rehabilitation.

18   That's what Tapia holds specifically.

19             MR. MORRIS:  Let me restate it and make sure that

20   we're saying the same thing, Your Honor.  You cannot consider

21   rehabilitation for the purpose of extending an incarceration

22   sentence or creating an incarceration sentence that you

23   wouldn't otherwise based on rehabilitation.  That's my

24   understanding of Tapia.

25             THE COURT:  Well, okay.  I think I can't consider it

1    either way.

2          MR. MORRIS:  Okay.  Very good, Your Honor.  Secondly,

3    this is not outside the realm of what has been gone before.

4    The Ninth Circuit Justice Milan Smith wrote an opinion called

5    *Autry(ph)*.  May I approach and hand a copy to Your Honor?  Very

6    similar set of circumstances, very similar set of contributing

7    factors in which the Court departed down from I believe 79

8    months to a term of probation, specifically enunciating the

9    reasons in support of its statement those 3553 factors that

10   indicate that additional incarceration would make no benefit.

11   Additional term of incarceration would have no deterrence

12   effect, but in fact, because of the low recidivism rate with

13   this specific class of case, considering the age and the

14   relative unsophistication of the party, those things argue

15   heavily in favor of more supervision by the Court,

16   rehabilitation is the primary factor.  And that jump down to

17   probation was upheld by the Ninth Circuit.

18          Lastly, Your Honor, the Sentencing Guidelines don't

19   take into consideration a couple of very important factors

20   here.  Notice there's no Sentencing Guideline that talks about

21   someone's youth.  There is a Sentencing Guideline factor for

22   upward departure and a downward departure.  The upward

23   departure saying you shouldn't consider age when it's in the

24   median range, but if you're of infirm age, that's a downward

25   departure.  But there's nothing to give someone who's 20 years

SENTENCING                                      25

1    old the benefit of the doubt for the lack of judgment, lack of

2    foresight.

3            The other thing the Sentencing Guidelines don't take

4    into consideration, his father, as you can tell in the letter

5    he wrote to the Court, has the ability to help Benjamin with

6    his health insurance, with his ability to transfer those

7    benefits to his son, but only up until the time his son turns

8    26.  At that point, those benefits are no longer available and

9    no longer a resource for Tricare to provide the medical

10   benefits here and the psychological benefits Dr. Simi and Dr.

11   Fabian both indicate are important.

12           Another thing the Sentencing Guidelines don't take

13   into consideration, if you'll remember Dr. Fabian's report, he

14   rules out a diagnosis of autism.  But he does so on a

15   technicality.  He says, "Because there's not been a self-report

16   under the age of 18, I don't find that there's autism."

17           However, he goes on for the rest of the report and

18   says every indicator you can have and every testing scheme you

19   can have indicates a high score for autism in this case.  Again

20   something the Sentencing Guidelines don't take into

21   consideration whatsoever.

22           I think based on the reports that are before the

23   Court, based on the fact the Sentencing Guidelines don't take

24   into consideration everything that's before you right now, Your

25   Honor, a variance down to a system of supervision by this Court

1  makes the most sense and allows this Court to mold a punishment

2  that fits the crime, considering the minimal number of images,

3  considering the minimal amount of involvement and the

4  timestamp.  If Your Honor looks at all the evidence in this

5  case, this was about a two to three-month time of involvement

6  in the fall and that was it, nothing before then.  And that

7  stopped.  So that's -- to me, that is another basis for why

8  this Court would look at just the minimum involvement for the

9  Bureau of Prisons at this time.

10          THE COURT:  Anything else?

11          MR. MORRIS:  Nothing else, Your Honor.

12          THE COURT:  All right.  Does your client wish to

13  address the Court?

14          MR. MORRIS:  He does, Your Honor.

15          THE DEFENDANT:  Your Honor, I stand here in front of

16  this Court, my family, this country, to face the consequences

17  of the action I committed.  Throughout this whole case, I've

18  learned a valuable lesson that actions online I commit have

19  legal real consequences and punishments, something I'll never

20  forget now.  I deeply regret my actions and the shame that I

21  brought to myself and everyone I know and I sincerely apologize

22  for everything and all the actions I've committed against this

23  Court and the United States.

24          THE COURT:  Okay.  Ms. Thompson.

25          MS. THOMPSON:  Your Honor, we're asking for a

1    guideline sentence if not a sentence above the advisory

2    guideline range.  When I first read the presentence report, a

3    sentence at the high end of the advisory guideline range seemed

4    appropriate.  In going through all the information in this

5    case, I don't see a justification for a downward variance, let

6    alone of 70 to 87 months, especially when you have to consider

7    the Court's obligation to protect the public from further

8    crimes of the defendant.  The bottom line is when you read

9    through the material that's been submitted to the Court in this

10   case, what comes through is that nobody truly knows who this

11   defendant is.  His father wrote about "The man who stands

12   before you, I don't know.  I know who my son is.  I know who

13   I've raised."  The man that did these things online and sent

14   child pornography to others and mocked it and made fun of it

15   and encouraged it, he doesn't know, despite him living in his

16   house, doesn't know him.

17           Dr. Fabian, in his report, talks about the difference

18   in the defendant from the first interview that they did to the

19   second interview.  First one where he's mitigating everything.

20   The second one where he's exaggerating everything and he's left

21   with -- I'm looking for his exact words.  He says on page 28,

22   "It is difficult, therefore, to know who the real Benjamin

23   Bogard is."

24           We don't know who he is.  I've been asking the FBI as

25   often as I see them, which is often, Who is he?  What is the

1   danger?  What is the risk?  Is he just some stupid kid that

2   doesn't understand the consequences of his actions?  Does he

3   have a deep sexual interest in children?  What is his sexual

4   identity?  What's he going to do?

5         And despite their best efforts, and they are by far

6   the best law enforcement agency in the world, they can't tell

7   me.  Nobody knows who he is.  So what we're left with is what

8   he did.  We know he acquired and saved a few images and one

9   video of child pornography.  We know he sent it to himself so

10  that he would have it because Instagram kept shutting down his

11  accounts.  If Instagram finds out you're using their social

12  media site for things they don't want it to be used for, then

13  they shut down your account.  And he talked about that.  His

14  accounts kept getting shut down, he'd send it to other accounts

15  of his.

16        But we also know that he's posting it within groups,

17  one of which he created.  He created a group of 15 to 20 people

18  that he had known previously, online only, to talk about rape.

19  That's the administrator that is talked about in the

20  presentence report.  He formulated that group.  But he was a

21  member of other groups.  And in there he's distributing child

22  pornography to them.  He knows what it is.  We've gone

23  through -- the amount of volume that Instagram sent is

24  unbelievable.  And yet Special Agent Miller was able to go

25  through it and find where he posts these images and videos and

1   then what he says about them.  So when he talks to Dr. Fabian

2   about his charge of unknowingly possessing child pornography,

3   he knows that's not true.  He knows exactly what he did.

4   Granted he's online all day every day, but he knows what he

5   said about the information he's posted.  He knows that he talks

6   about baby rape.  He knows that he acknowledges having two

7   videos, how he got them, how he's resent them to people, that

8   they involved babies getting raped, a penis in a newborn's

9   mouth.  That, he knows.

10          He talked about with Dr. Fabian that he liked the

11  Internet because of the anonymity, he could pretend, none of

12  this was serious, he could pretend online.  Everybody online

13  knows him as Benjamin or Ben.  They know his identity.  He's

14  not just prophet of extinction or prophet of rape.  Many of

15  these people know his real name, so he's not limited to the

16  anonymity online.

17          In going through the psychological evaluation, I took

18  too many notes on it to go through everything, but the

19  contradictions are astronomical.  I know the Court has read it

20  and studied it, but when you look at the risk factors on, for

21  instance, on page 18, it's inconsistent with what we know about

22  his life.  "No life-style impulsivity."  And yet in earlier in

23  the report, it talks about how he changes his mind all the

24  time, he can't make a decision, changes his mind, is impulsive.

25  We know that in October of 2018, he went missing.  He went all

1   on his own.  Maybe he had talked to his parents about buying a

2   van to live in, but they didn't know where he went.  They had

3   to hire a private investigator to go find him, which he did a

4   few days later after he had bought the van and a gun.

5          The report talks about "no violent-based personality

6   disorders".  And yet the report is full of testing that was

7   done on Mr. Bogard where he is anti-social.  He does exhibit

8   borderline personality and anti-social personality disorders.

9          One other factor is "No formal anti-social peers."

10  Well, most of the people he was communicating with online fit

11  into that.  He presents paranoid thinking and possible

12  borderline personality traits.

13         Even the sex offender risk assessment I didn't

14  completely understand.  "No evidence of sexual deviance."  If

15  you're distributing child pornography to others and talking

16  about how great it is or how you -- I don't even know the right

17  word for it.  Talking about rape in a positive way, especially

18  of children, that's sexually deviant.

19         "No evidence of homicidal ideation."  He has talked

20  about killing other people.  Employment problems, relationship

21  problems.

22         "No use of weapons or threats of death."  That's

23  contradicted by the facts in this case.

24         "No harm to victims."  This Court is well aware of the

25  harm to victims of child pornography and their inability to

1   deal with the fact that there are people in our society who use

2   their rape and torture for sexual gratification.  So I don't

3   know what to say about the psychological report other than I

4   think the conclusions are wrong as far as a low risk to

5   re-offend, possible mental health issues.

6        It says, "There's no evidence of a negative attitude

7   towards intervention."  And yet when asked about sex offender

8   treatment, he said, No, no, I have to know more about it, I'm

9   not signing up for that one yet.

10       We don't know who he is.  But we know what he's done.

11  And I disagree that the age and lack of sophistication -- his

12  young age and lack of sophistication should give him the

13  benefit of the doubt.  His brain is not fully formed and won't

14  be, medically speaking, until he's 26 years old.  Younger

15  people don't think about the consequences of their actions.

16  That makes him more dangerous to our society rather than less

17  dangerous to our society.  The lack of judgment that he has

18  exhibited, again all of those factors that defense counsel

19  spoke of with regards to his age make him a greater danger

20  right now in our society.

21       I believe that his parents will move heaven and earth

22  to help him.  I don't know that they can and I don't know that

23  that should be their responsibility from today forward.

24  They're going to be there for him no matter what happens, but

25  all of this was happening and they were two of the most shocked

S E N T E N C I N G                    32

1    people ever.  They had no idea what he was doing.  They still

2    can't figure out why he was doing it.  That's not the person

3    they raised, but it is the person that's here.  He did

4    knowingly distribute child pornography and possess visual

5    representations of the sexual abuse of children.

6          The fact that it only went on for a short period of

7    time that we know of was based somewhat on when he obtained the

8    phone and what data was available on the phone.  I don't know

9    what happened before that.  I don't know what he was involved

10   in or whether he was involved in anything.  What we know is

11   what we've taken from his phone.  We know it stopped only

12   because of the swift action of the FBI because when they got

13   information about Mr. Bogard, they acted on it immediately.  He

14   didn't decide to stop this.  In fact, one of his accounts is

15   still open.  Even after the end of December when they spoke

16   with him, at least one or two of the accounts are still active,

17   which is part of the reason the government is asking to forfeit

18   not only his phone, but all of his online accounts.  But this

19   was stopped because of the FBI, not because of Mr. Bogard and

20   he shouldn't get credit for that.  And we're asking for a

21   sentence at least within the advisory guideline range if not

22   more.

23          THE COURT:  Any rebuttal, counsel?

24          MR. MORRIS:  Two quick points, Your Honor.

25          THE COURT:  Sure.

1          MR. MORRIS:  When asked, Mr. Bogard, would you be

2    willing to participate in sex offender treatment, his response

3    was not no.  His response was What is that?  What does that

4    consist of?  What are we talking about?  He has never said I

5    would not participate.  If there is something ordered by this

6    Court, ordered by this Court for his intervention and his

7    rehabilitation, his response have always been yes, of course.

8    He's been very transparent.

9          Second thing I heard that I think needs to be

10   clarified a little bit, the FBI came and had a visit with

11   Benjamin's family, had a visit with Benjamin and waited weeks

12   and a month before finally coming to do an arrest.  He could

13   have burned the phone, he could have ditched this, he could

14   have ran away, he could have done all these things.  That's

15   when Ben stopped.  Certainly when he's caught, but by no means

16   by the hand of the FBI when he realized that his online life is

17   exactly what Dr. Fabian says.  The FBI, as you just heard the

18   prosecutor say, gave the most expansive review of evidence to

19   Dr. Fabian.  He's seen it all.  And his answer is "I still

20   adhere to the same opinion that he presents a relatively low

21   risk of sexual or violent offending", after everything.  After

22   all the responses, after all the testing, thank God I don't

23   have to conduct a psychological review.  Thank God the FBI is

24   not equipped or able to render that psychological opinion.

25   This is the person who testifies for the government and for the

1    defense, who has spent the most time with Benjamin and has

2    conducted professional opinions and says, "Concerning

3    rehabilitation, it's critical for Mr. Bogard to participate in

4    intensive individual therapy.  This therapist --" Mr. Fabian

5    "-- should continue to monitor all that and manage it with the

6    local family therapy."  That's the recommendation of the person

7    who knows the most and has seen the worst of what the FBI has

8    to show him.  This is the person who makes the determination of

9    a future threat.  This is the evidence and support of 3553 that

10   says considering the protection of the public there's your

11   opinion to support a statement of reasons that says time

12   served, three years supervised release, I'll make him prove

13   that he's not a danger.

14        MS. THOMPSON:  Your Honor, just so the record is

15   correct, the FBI first interviewed Mr. Bogard on January 25th

16   of 2019.  He was arrested five days later on February 1st of

17   2019.  There was a five-day period in between going to his

18   house and talking to him and his family and his arrest.  And

19   most of that five-day period was having to download the

20   information from his phone which had over 20,000 image and

21   video files and was not one of the run-of-the-mill phones that

22   law enforcement passed to imaging review.  So it was five days,

23   not a number of months.

24        MR. MORRIS:  They spoke to Mr. Bogard seven weeks --

25   seven days --

1          THE COURT:  Counsel, you're having a dialogue with his

2    parents.

3          MR. MORRIS:  I apologize, Your Honor.

4          THE COURT:  That isn't appropriate.

5          MR. MORRIS:  I understand.

6          THE COURT:  In any event, the Court, of course, must

7    correctly -- we started sentencing with the Federal District

8    Court correctly calculating the guidelines and even by

9    defendant's own admission, the Court has done that, then the

10   Court must carefully consider all of the evidence and all of

11   the circumstances surrounding the defendant and I have

12   certainly done that.  The Court must carefully consider the

13   3553 factors and I can assure counsel and the government that

14   this Court has carefully done that as well.

15          Under Fifth Circuit law, this Court is not required to

16   go through each and every one of the 3553 factors and say why

17   I've done this or done that pursuant to that factor.  Of

18   greatest importance here -- and by the way, the Court would

19   state for the record that I am clearly cognizant of what the

20   3553 factors state.  I certainly recognize and apply these

21   factors as advisory guidelines, not as mandatory guidelines.

22   I'm well aware of that.  And I've been on the bench long enough

23   so that I've seen every iteration of the guidelines from

24   mandatory to advisory.  And the guidelines are pretty clear, I

25   think, the 3553 factors.  The nature and circumstances of the

S E N T E N C I N G                    36

1  offense and the history and characteristics of the defendant,

2  I've certainly considered that.  The need for the sentence

3  imposed, A, to reflect the seriousness of the offense, to

4  promote respect for the law and to provide just punishment for

5  the offense; B, to afford adequate deterrence to criminal

6  conduct; C, to protect the public from further crimes of the

7  defendant; and D, to provide the defendant with needed

8  educational, vocational training, medical care or other

9  correctional treatment in the most effective manner.  I think

10 that's what you referred to as the so called rehabilitation

11 factors.

12        MR. MORRIS:  Yes, Your Honor.

13        THE COURT:  And I am well aware that I have the need

14 to consider those matters and I certainly have.  And I'm aware

15 of Tapia because at the time Tapia was being decided, I had a

16 case pending appeal and Tapia affected that case.

17        The kinds of sentences available, the kinds of

18 sentence and the sentencing range established for the

19 applicable category of the offense committed by the applicable

20 category of defendant set forth in the guidelines.  That, we

21 understand.  Any pertinent policy statements, which I have

22 certainly looked at, and the need to avoid unwarranted sentence

23 disparities among defendants with similar records who have been

24 found guilty of similar conduct; and the need to provide

25 restitution to any of the victims of the offense.

1          Now, regarding the child pornography matters, the

2    Instagram posts show Mr. Bogard posting images of child

3    pornography, discussing that he has two videos of child

4    pornography, naming another user with whom he got the child

5    pornography from, that he keeps the child pornography videos to

6    laugh at them, stating that child pornography is the purest

7    form of rape, telling people to become desensitized through

8    exposure to such images, stating that he received some child

9    pornography from a 14-year-old, that he had distributed child

10   pornography to others using a different electronic messenger

11   service, stating that his ideology is just rape and describing

12   how he gets underage girls to send him nude pictures and joking

13   about having sex with young girls.

14          Regarding violence, the Instagram posts show

15   Mr. Bogard discussing how to acquire guns without a background

16   check, stating he wants to kill niggers -- and I apologize for

17   using the N word in its full iteration, but I'm just reading --

18   and hates America; discussing the manufacture and his knowledge

19   of explosive precursor chemicals; discussing bombing buildings;

20   saying he would mail a pipe bomb to the school of another

21   poster; discussing how he once made homemade napalm; discussing

22   a homemade bomb like the Columbine shooters; stating plans to

23   make bombs and saying, "It's only a matter of time until I

24   snap"; discussing lone wolf terroristic tactics to avoid being

25   detected; describing an infamous school massacre in Russia

1   advocating making a last stand during a terrorist attack rather

2   than dying by suicide; discussing admiration for suicide

3   bombing; calling the ATF "people you kill" and the police

4   "targets"; discussing a plan to buy a gun, make homemade bombs

5   and attacking an unidentified target if he can't get a job

6   soon; stating he is going to make the Oklahoma City bombing

7   look like a joke and discussing a hypothetical attack on a

8   Texas State Capitol building; discussing committing jihad on

9   corporations that deny him employment; stating he was going to

10  get a bold cut like Dylan Roof, the Charleston church shooter;

11  wishing he was part of ISIS and discussing his favorite ISIS

12  execution videos; discussing White Islam and White jihad;

13  discussing a race war stating a desire to go to South Africa to

14  kill and dreaming about committing a terrorist attack; stating

15  his desire to join a Ukrainian militia; researching how to make

16  big booms and that he is close to snapping; and discussing a

17  desire to commit White jihad, joking about driving a van into a

18  government building and saying he would make that Timothy

19  McVeigh look like child's work.

20          Finally, the photos and videos of himself posted

21  depict him brandishing weapons, expressing racial hatred and

22  bring a copy of the Constitution and doing a Nazi solute.

23          Now, the Court has also reviewed carefully the

24  sentencing memo of the defendant which describes, of course,

25  various characteristics of his father, his upbringing, the fact

S E N T E N C I N G                                    39

1    that he was a Boy Scout at one point.  He became -- he was in

2    the Junior ROTC at one point.  There's Dr. Fabian's testimony,

3    which I've reviewed very carefully, evidence of some sort of

4    depressive disorder based on his low self-esteem, his feeling

5    of hopelessness.  It describes expert testimony of Dr. Simi,

6    world-renowned expert on the field of hate groups and that Dr.

7    Simi fears that in prison Bogard would be a recruitment target.

8    The memo restates objections to the PSR, which the Court has

9    already ruled upon, and it reminds the Court that I have the

10   ability to vary from the guidelines, both upward and downwards,

11   which I certainly know.

12           In short, this Court has taken a considerable amount

13   of time to carefully review the entire circumstances and

14   situations as my friend, the retired Supreme Court Justice

15   Kennedy, said I must do.

16           I am cognizant of the fact that the defendant was

17   convicted here of possessing without restating the literal

18   specifics of the charge, but possessing child pornography

19   images, that's what he was convicted of.  He wasn't convicted

20   of a terrorist -- preparation for a terrorist attack or

21   anything of that kind.  They just simply didn't bring that

22   charge.  Whether they could have or couldn't have is not of

23   germane to me.  However, the "likes" that your client was

24   getting as a result of this child pornography that he possessed

25   and that he sent off to others is unfortunately intertwined

S E N T E N C I N G                          40

1   with all of the other things that I've read to you from his

2   Instagram posts.  In other words, these were the people he was

3   communicating with.  This is what he wanted them to like him

4   for.  He wanted them to see him as -- and this is my carefully

5   considered conclusion -- a leader, a person to be looked up to,

6   a person to be recommended to others with like White

7   supremacist views.  And the way to do that is to favor himself

8   with them and one of the ways that he did it was with his child

9   pornography, unfortunately.  And so these are not disconnected

10  in a way that they might be in other circumstances.  If he was

11  just getting and trading child pornography -- now, in this

12  case, he didn't trade it, but if he was a person who was

13  getting and trading child pornography, which is the usual case,

14  and then over here in a different place he happened to be a

15  White supremacist and he was doing all kinds of other things,

16  then the Court would see a clear distinction between the two

17  kinds of activities.  But in this case, they were carefully

18  intertwined because by the defendant's own admission,

19  essentially, and by counsel's argument, he was trading these or

20  trading -- he was trading in a way these child pornography

21  images for adulation which he hoped to get from the people that

22  belonged with him in these various hate groups.  And in some

23  instances, people who didn't belong, but others who did.  And

24  he saw himself as an individual who could garner respect and

25  admiration from these individuals based and predicated upon his

1    views.  I don't know whether he really believed these things.
2    I have no way of knowing.
3           I think Ms. Thompson made a point here which I think
4    is absolutely accurate.  And that point is we don't know nor I
5    don't think can we ever know the true individual.  Like many
6    parents of young men and young women who go off the charts one
7    way or the other, whether it be child pornography or go into
8    violence or go into other criminal activities, sometimes go
9    into drug dealing, these parents who are from all description,
10   excellent people, who gave him a good upbringing, who loved
11   their son, who took good care of him, these are not
12   individuals -- his parents were not individuals that you would
13   describe as being off the chart somewhere.  These were good
14   people and who were shocked and completely taken by surprise in
15   determining what they found to be the irrefutable evidence that
16   their son was engaged in these kinds of activities.  And it has
17   to be a tremendous heartbreak of monumental proportions for
18   them.  Fortunately his rhetoric, such that he used it in these
19   groups where he was trading his child pornography for
20   adulation, never came to fruition.  And whether, as I said,
21   whether he intended it to at some point in time, who knows?  I
22   don't know.  But I do know that at some point he -- and I think
23   Ms. Thompson made a good point here and I'm sad to say it, but
24   I think that the fact that he was so willing and so emersed in
25   this activity makes him at this point a danger not only to

1   himself, but a danger to others.  There's no way we can

2   adequately or carefully predict what kind of behavior he will

3   engage in.  He said what he wants to do.  He's told us what he

4   wants to do in his postings.  And it's horrific.

5           So I am afraid that in this circumstance, the Court

6   must in reviewing as I have in trying to balance these 3553

7   factors, it is the Court's view that the most important of

8   these factors under these circumstances, and I don't give

9   greater importance to any of them until I review them, but I

10  certainly in reviewing them find some that stand out and create

11  for the Court a clear path and it is the protection of the

12  community in this case, to put it mildly.  Because I have great

13  concern that given the plethora of his comments which were

14  not -- I mean he was not really even seriously trying to sensor

15  himself.  I mean, as Ms. Thompson pointed out, people on the

16  forum knew who he was.  He was more than happy to put it out

17  there.  I think he did think that he had a certain degree of

18  anonymity, but he wasn't that concerned about it apparently

19  because I think he used his first name.  And somebody who is

20  really trying to be anonymous doesn't use their first name in

21  any way, shape or form.

22          I'm cognizant of his young age and that troubles this

23  Court terribly.  But it would certainly trouble this Court more

24  if he were put in a position without being provided with some

25  substantial distance from what he has done and to carry out any

1    of the many and myriad horrible and reprehensible threats that

2    he has made.

3            So having carefully considered, and I have, all of the

4    3553 factors, it is the judgment of this Court that the

5    defendant is hereby committed to the custody of the Attorney

6    General of the United States for a term of 80 months.  That

7    will be followed by a term of three years of supervised

8    release.  During the term of supervised release, the defendant

9    shall abide by the mandatory and standard conditions adopted in

10   this Court's November 28, 2016 order.

11           In addition, the following special conditions shall

12   apply.  The defendant shall participate in a sex offense

13   specific treatment program and submit to periodic polygraph

14   testing at the discretion of the probation officer as a means

15   to ensure compliance with the requirements of supervision or

16   the treatment program.  The defendant shall follow the rules

17   and regulations of that program.  The probation officer will

18   supervise the defendant's participation in the program

19   including provider, location, modality, duration, intensity,

20   etc.  The defendant shall pay the cost of the program if

21   financially able.  The defendant shall allow the probation

22   officer to install computer monitoring software on any computer

23   as defined in 18 U.S.C. 1030(e)(1) the defendant uses.  To

24   ensure compliance with the computer monitoring condition, the

25   defendant shall allow the probation officer to conduct initial

1    and periodic unannounced searches of any of the computers as

2    defined in 18 U.S.C. 1030(e)(1) subject to computer monitoring.

3    These searches shall be conducted for the purpose of

4    determining whether the computer contains any prohibited data

5    prior to installation of the monitoring software to determine

6    whether the monitoring software is functioning effectively

7    after its installation and to determine whether there had been

8    attempts to circumvent the monitoring software after its

9    installation.  The defendant shall warn other people who use

10   these computers that the computers may be subject to searches

11   pursuant to this condition.  The defendant shall submit his

12   person, property, house, residence, vehicle, papers, computers

13   as defined in 18 U.S.C. 1030(e)(1), other electronic

14   communications or data storage devices or media or office to a

15   search conducted by a United States probation officer.  Failure

16   to submit to such a search may be grounds for revocation of

17   release.  The defendant shall warn any other occupants of the

18   premises that may be subject to such searches pursuant to this

19   condition -- that may be living in such premises.  The

20   probation officer may conduct a search under this condition

21   only when a reasonable suspicion exists that the defendant has

22   violated a condition of supervision and that the areas to be

23   searched contain evidence of this violation.  Any search shall

24   be conducted at a reasonable time and in a reasonable manner.

25              The defendant shall not associate with any child or

1    children under the age of 18 except in the presence and

2    supervision of an adult specifically designated in writing by

3    the probation officer.  The probation officer shall notify the

4    designated adult of risk occasioned by defendant's criminal

5    record or personal history or characteristics.  The defendant

6    shall permit the probation officer to make such notifications.

7            The defendant shall reside in a residence approved in

8    advance by the probation officer.  Any changes in the residence

9    must be pre-approved by the Court.  The defendant shall not

10   reside within 1,000 feet of the real property comprising of

11   public or private elementary, vocational or secondary school or

12   a public or private college, junior college, university or

13   playground or a housing authority owned by the Public Housing

14   Authority or within 100 feet of a public or private youth

15   center, public swimming pool or video arcade facility without

16   prior approval of the Court.

17           The defendant does not have the financial ability or

18   resources to pay a fine and, therefore, I will not impose one.

19   The defendant must, however, pay a special assessment of $100.

20   The Court finds the defendant is indigent and, therefore, no

21   special assessment under the JVTA will be imposed.  It is

22   further ordered pursuant to the plea agreement and 18 U.S.C.

23   2253(a) that the defendant shall forfeit to the United States

24   the personal property, namely any and all visual depictions

25   described in the plea agreement, any and all online accounts

1    used by the defendant and a Huawei P20 Lite ANE-LX3 cellular

2    telephone with the serial number described in the plea

3    agreement, I believe, or the papers for forfeiture.

4           The Court's final judgment of forfeiture shall be

5    entered at the completion of the ancillary proceeding.  The

6    order shall be incorporated by reference of the Court's

7    judgment in this criminal case.  Mandatory detention provisions

8    apply in this case.

9           The defendant has waived his right to directly appeal

10   his conviction in this case and his plea agreement, therefore,

11   he does not have a direct appeal available to him.

12          All right.  Now, due to the defendant's age and his

13   physical appearance, the Court is going to strongly urge the

14   Federal Bureau of Prisons incarcerate the defendant in a place

15   where he will not be accessible or will not be in a situation

16   where he can be physically harmed or victimized.  I don't think

17   the government has any objection to that.

18          MS. THOMPSON:  No, Your Honor.

19          THE COURT:  Is there a place he would like to serve

20   his sentence?

21          MR. MORRIS:  As close to Central Texas as we can, Your

22   Honor, that has a facility that --

23          THE COURT:  Comports to what I have indicated?

24          MR. MORRIS:  Correct.

25          THE COURT:  Yes, I'll make that recommendation.

S E N T E N C I N G                    47

1          MS. THOMPSON:  Your Honor, I don't know if I stated on

2     the record previously, but the defendant had agreed to pay

3     restitution in this matter, but there have been no requests for

4     restitution made, so there is no --

5          THE COURT:  No restitution.  I understood there had

6     been no requests.

7          MS. THOMPSON:  And then there is also the government's

8     motion to appeal the release order issued by the Magistrate

9     Judge, but I think based on today's sentencing, that is moot.

10         THE COURT:  It's moot.

11         MS. THOMPSON:  Thank you.

12         THE COURT:  All right, the defendant is hereby

13    committed to the custody of the United States Marshal to be

14    transferred at the appropriate time to the custody of the

15    United States Federal Bureau of Prisons.

16         MR. MORRIS:  May we be excused, Your Honor?

17         THE COURT:  Yes, you may be, but I am going to allow

18    the parents to briefly visit with the defendant here in court.

19         MR. MORRIS:  Thank you, Your Honor.

20         THE COURT:  I'm very sorry for the parents in this

21    case.  They are absolutely blameless in this matter and it

22    is -- I know that they love their son.  I appreciate that and

23    understand that.  And having to sentence a young man like this

24    to a sentence that I did is heartbreaking.  It's heartbreaking

25    for me.  It's the toughest thing I have to do, but I have the

1    obligation to follow the law and to protect this community in

2    accordance with the Sentencing Guidelines.  And if this Court

3    were in any way influenced in a manner against the defendant

4    personally, I can assure you I would not have ruled in his

5    favor on the motion that I did.  And I recognize that we have

6    had very recently some horrific attacks in El Paso, Texas as

7    well as Ohio and other places, but we have had unfortunately

8    these attacks going all the way back to Columbine and before,

9    these shootings in shopping malls and other places and this

10   Court was not influenced in any way, shape or form in

11   sentencing the defendant based upon those occurrences.

12          I can tell you that had we had a jury trial, I would

13   have postponed the jury trial, but I am not a jury and I know

14   how to set those things aside.  I did not impose a sentence I

15   imposed upon him predicated on any of those factors.  I mean,

16   if he had been charged with terrorism and engaging in

17   terrorism, his sentence would have been far different than this

18   one.  All right.  So I'm going to close the proceedings.  I'll

19   remain on the bench and I'm going to clear the courtroom

20   please, except for the parents.

21          COURT SECURITY OFFICER:  All rise.

22          *(3:02 p.m.)*

23                          *   *   *

24

25

S E N T E N C I N G                              49

1                        *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.   I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  March 24, 2020

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   655 East Cesar E. Chavez Blvd., Third Floor
     San Antonio, Texas  78206
16   (210)244-5048

17

18

19

20

21

22

23

24

25